**LYNCH LAW FIRM, P.C.**
45 Eisenhower Drive, 3d Floor
Paramus, NJ 07652
Tel: (800) 656-9529
Fax:(888) 271-9726
*Attorneys for the Plaintiff and the Class*
Additional Counsel on Signature Page

SUPERIOR COURT BERGEN COUNTY
FILED

APR 7 - 2009

DEPUTY CLERK

RECEIVED APR 07 2009

SUPERIOR COURT OF NEW JERSEY
COUNTY OF BERGEN
FINANCE DIVISION

---

AL KOWALSKI, on behalf of himself
and all others similarly situated,

      Plaintiff,

-vs-

YELLOWPAGES.COM, LLC, AT&T INC.,
and their Predecessors, Successors, and/or
Assigns, and JOHN DOES 1 – 10
(being those officers, employees,
directors, or other individuals who are
responsible for, or participated in the
conduct forming the basis of the
Plaintiffs' claims) and CORPORATE
ROES 1 – 10 (being entities,
corporations, or other companies not
herein named who are responsible for,
or participated in the conduct forming the
basis of the Plaintiffs' claims),

      Defendants.

| NEW JERSEY SUPERIOR COURT
LAW DIVISION: BERGEN COUNTY |

DOCKET No.: L·3316-09

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

---

**CLASS ACTION COMPLAINT FOR**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**

## TABLE OF CONTENTS

I.      INTRODUCTION...................................................................2

II.     NATURE AND SUMMARY OF THE ACTION......................................3

III.    JURISDICTION AND VENUE.....................................................6

IV.     PARTIES...........................................................................7

V.      BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE.................8

VI.     CLASS ACTION ALLEGATIONS.................................................18

VII.    ASCERTANABLE LOSS ANALYSIS..............................................21

VIII.   COUNT I: JUDICIAL DECLARATION............................................22

IX.     COUNT II: VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT............24

X.      COUNT III: UNJUST ENRICHMENT.............................................28

XI.     COUNT IV: CLASS ACTION DECLARATION...................................29

XII.    PRAYER FOR RELIEF...........................................................30

XIII.   JURY TRIAL DEMAND..........................................................31

XIV.    TRIAL COUNSEL DESIGNATION...............................................31

XV.     CERTIFICATION OF NO OTHER ACTIONS......................................31

XVI.    COUNSEL SIGNATURE PAGE...................................................32

## I.   INTRODUCTION

This action concerns deceptive and fraudulent business practices perpetrated by YELLOWPAGES.COM ("Yellow Pages") upon consumers and business consumers throughout the United States. Yellow Pages is an online advertising service and a "wholly owned subsidiary of AT&T. . . . [Yellow Pages] is uniquely able to offer searchable directory listings. . . . . [Yellow Pages is an] online source for comprehensive national and local business information. The [Yellow Pages] distribution network provides exposure to more than 100 million monthly consumer business searches. Consumers can locate merchants, search White Pages directories, research products and services, obtain maps and directions, and plan entertainment, leisure and travel activities."[1] Yellow Pages is similar to the Yellow Pages book that is still distributed throughout the United States but advertising appears on the internet. Yellow Pages' business is soliciting advertising from consumers and business consumers. Yellow Pages represents to customers that their ads will appear on certain areas of the internet and will receive prominence in certain internet searches. As stated below, the methodology employed by Yellow Pages to siphon advertising revenue from Consumers is deceptive and misleading resulting in consumers being forced to pay for advertising they either didn't want or were misled as to the nature, duration and/or prominence of the advertising.

---

[1] Cite is *available at*: http://www.yellowpages.com/about. Last visited March 1, 2009.

## II.   NATURE AND SUMMARY OF THE ACTION

1.   This class action complaint sets forth facts that show that Yellow Pages has derived a methodology of the solicitation of consumers and business consumers for advertising that is akin to the age old basic principals of extortion. Yellow Pages' method violates basic principals of New Jersey's Consumer Fraud Act as well as the basic tenements of every consumer protection statute throughout the United States. Yellow Pages disregard for the principals and equity of good faith and fair dealing that is inherent within every bargained for exchange is appalling and must be stopped immediately.

2.   Specifically, Yellow Pages has derived a scheme where a sales representative will discuss certain opportunities available to the consumer/business consumer (hereinafter referred to singularly as "Consumer"). If a Consumer expresses an interest in advertising with Yellow Pages, then the representative will give the consumer a tacit and cursory overview of where the Consumer's ad might appear and what the monthly cost could be. Most importantly, the representative will ask the Consumer's permission to record the conversation between the representative and the Consumer.

3.   The recorded conversation asks the Consumer to state that the Consumer agrees to all of the terms and conditions that had been set forth by the representative (the "Oral Representation"). For the conversation to continue, the Consumer must state their assent to the terms and conditions and any other items set forth by the representative. However, the representative has never gone through all of the terms and conditions of the agreement between the Consumer and the representative.

4.   Sometime shortly thereafter, a contract entitled, "Contract for Internet Yellow Pages.com Advertising" will be sent via fax or email to the Consumer. The Consumer's name is

listed on the signature line. The contract is a three page document – two of the pages are entitled "Terms and Conditions for Internet Advertising". These two pages of terms is in all small print and states, most interestingly, that the term of the Contract commenced upon the oral acquiescence of the Consumer while the Consumer was speaking with the representative.

5.   When a consumer refuses to sign the Contract and does not wish to proceed with the advertising with Yellow Pages, the Consumer is informed that they are already under Contract with Yellow Pages and cannot now void the Contract. Yellow Pages grounds this premise on their reliance on the Oral Representation of the Consumer.

6.   The aforegoing scenario is violative of the law for several reasons:

   a.   The Consumer is not privy to many material terms that suddenly appear in the documents that are sent to the Consumer but never stated to the Consumer on the phone:

      i.   The Consumer never agreed to an actual price term, the consumer does not learn the actual consideration required by Yellow Pages until the consumer receives the fax purporting to state that a Contract is already in place;

      ii.   The Consumer NEVER receives any actual written statement of where the ads will appear – simple headings are included, but this does not suffice for specificity of what exactly the consumer is paying for;

4

iii. The Consumer receives a two page terms and conditions document with many material terms that are not discussed by the sales representative (this is discussed in detail below).

b. In consideration of the above, there is no contract formed between Yellow Pages and the Consumer. Yellow Pages assertion of an agreement between the parties is in contravention of the law as there is no meeting of the minds on many of the essential and material terms and conditions asserted by Yellow Pages. Thus Yellow Pages threat of collection and legal action to coerce the Consumer into accepting the agreement is tantamount to fraud, extortion and a deceptive business practice.

7. Therefore, Plaintiff brings this class action on behalf of others similarly situated who are victims of the deception and fraud at the hands of the Defendants.

### III.   JURISIDICTION AND VENUE

8.   Jurisdiction over the Defendants is proper under New Jersey Jurisprudence under the United States Constitution, New Jersey State Constitution, Article VI, and *Gendler & Co. v. Telecom Equipment Corp.*, 508 A.2d 1127 (N.J. 1986) (permitting exercise of long-arm jurisdiction over non-resident defendant to the full extent permitted by due process of law); *Avdel Corp. v. Mecure*, 277 A.2d 207 (N.J. 1971) (observing that New Jersey's long-arm jurisdiction extends to the "outermost limits permitted by the United States Constitution").

9.   Venue is proper as Plaintiff, as the class representative, is a resident of Rochelle Park, in the County of Bergen, in the State of New Jersey.

10.   Venue is also proper in this court because a substantial portion of the transactions complained of occurred in this county and the products at issue were advertised, promoted, sold, and distributed in this county. Defendant has received substantial compensation from the sales of these products in this county and by doing business has had effects in this county.

11.   Defendants transact business and have availed themselves of the forum of the State of New Jersey and Bergen County; thus, Jurisdiction and Venue are proper wherein brought in the State of New Jersey, County of Bergen.

6

**IV.   PARTIES**

12.   Plaintiff provides plumbing services throughout the state of New Jersey. Plaintiff's principal place of business is 71 Central Avenue, Rochelle Park, New Jersey. Plaintiff also resides in Bergen County.

13.   Defendant, Yellow Pages.com LLC, was incorporated in the State of Delaware and is a New Jersey foreign limited liability company that offers internet advertising services. Yellow Pages' headquarters is at 611 N. Brand Boulevard, Glendale, CA 91203 and is a wholly owned subsidiary of AT&T Inc.

14.   Defendant AT&T, Inc., was incorporated in the State of Delaware. Defendant AT&T owns Defendant Yellow Pages. AT&T Inc.'s headquarters is 208 South Akard Street, Dallas, Texas 75202.

## V.   BACKGROUND AND NATURE OF THE DECEPTIVE PRACTICE

**The Initial Contact Between Plaintiff and Yellow Pages**

15.   On October 31, 2008, Al Kowalski contacted Yellow Pages.com for the purpose of learning more about advertising on the internet with the Yellow Pages.

16.   Plaintiff was then directed to speak to a Yellow Pages sales representative. In this case, Plaintiff spoke with Mr. Royce Brown (the "Representative" or "Mr. Brown").

17.   Plaintiff conveyed to Mr. Brown that he would like to learn more about advertising opportunities with Yellow Pages. Plaintiff anticipated that he would get some information, think over the matter and call Yellow Pages in the future should he chose to advertise with them.

18.   What Plaintiff encountered was a high pressure sales pitch. Plaintiff was told that he needed to advertise with Yellow Pages immediately because the rates were going to be going up and that this was the best time for Plaintiff to place his order for service.

19.   Plaintiff inquired of Mr. Brown what the cost would be and which areas on the internet would the Plaintiff's ads appear; in addition, the Plaintiff requested information with respect to how prominent his ads would be in certain search engines.

20.   Plaintiff was assured by Mr. Brown that he would receive prominent advertising in certain areas of the internet having to do with the following categories: 1) Plumbing Contractors; 2) Heating Contractors and Specialties; and, 3) Water Heaters (the "Appearance Categories").

21.   In addition, Mr. Brown told the Plaintiff that Yellow Pages could provide a website hosting services as well.

22. Plaintiff inquired as to exactly where these ads could be found for the Appearance Categories, but received little detailed information from Mr. Brown. Instead, Mr. Brown pushed the Plaintiff to lock in his advertising rate.

23. Plaintiff, feeling uneasy about the transaction, requested that Mr. Brown quote to him the exact monthly cost that Plaintiff would incur for the website services and listing in the Appearance Categories. Mr. Brown responded that he was unable to give him the exact price and that the exact price would appear in an agreement that would be sent to the Plaintiff.

24. Plaintiff stated that he would wait to receive the agreement and then contact Yellow Pages if he wanted to purchase services.

**The Recorded Conversation**

25. Mr. Brown stated that he would need to record the Plaintiff's assent to the terms and conditions of their agreement for Plaintiff to lock in the best rate and for Mr. Brown to send the agreement to the Plaintiff.

26. Plaintiff stated to Mr. Brown that he did not provide Plaintiff terms and conditions and that he wanted to look at the agreement.

27. Mr. Brown assured Plaintiff that this was procedural and that Plaintiff would still have the ability to look at the terms and conditions.

28. Consequently, the Plaintiff agreed to the recorded conversation; however, after the recording was started and Mr. Brown stated that Plaintiff was agreeing to all of the terms and conditions that they had discussed, the Plaintiff became uncomfortable responded again that he was uncomfortable with what Mr. Brown was saying and that he had not just agreed to any terms and conditions.

29.   It appeared to the Plaintiff that Mr. Brown then ceased recording him and said that the only way they could complete the transaction was if Plaintiff agreed to everything that Mr. Brown was setting forth during the recording of the conversation. Mr. Brown assured the Plaintiff that the Plaintiff would receive everything in writing and would be able to look it over after receiving it.

30.   Then it seemed to the Plaintiff that the recording was restarted by Mr. Brown and Mr. Brown resumed his earlier questions. Plaintiff answered Mr. Brown's questions.

31.   Mr. Brown then stated that Plaintiff would be receiving the agreement within twenty-four (24) hours of the Plaintiff and Mr. Brown's conversation.

32.   Mr. Brown never asked Plaintiff for payment – as such, Plaintiff thought that payment options would be contained in the documents that Mr. Brown was sending.

**The Written Contract Arrives**

33.   At approximately 1:35 p.m., on October 31, 2008, Plaintiff received two documents:

   a.   Contract for Internet Yellow Pages.com Advertising (the "Contract");

   b.   Terms and Conditions for Internet Advertising (the "Terms and Conditions").

34.   The Contract contained the following relevant statements and/or provisions:

   a.   The Contract was dated October 31, 2008;

   b.   The Contract listed the sales representative as Royce Brown;

   c.   The Sales Manager was listed as Christina Griffin;

   d.   There was a box called "billing preference" that stated:

   i.   **"Payment in full is required _prior_ to fulfillment of the products in this Order".**

   e.   There was a box marked "Director Approval" that was blank.

10

f.  There was a box marked "Sales Mgr Approval" that was blank.

g.  The aforementioned Appearance Categories of 1) Plumbing Contractors; 2) Heating Contractors and Specialties; and, 3) Water Heaters were listed and were designated to be within the geographic area of Bergen NJ Metro.

    i.  The information of the exact places where Plaintiff's add was to be placed was **not** within the description.

h.  The actual prices were listed:

    i.  Plaintiff was to pay a monthly fee of $49 for the website;

    ii.  Plaintiff was to pay a monthly fee of $309 for the advertising listing;

    iii.  As such, Plaintiff's cost for one year was $4,296.

i.  In the Notes section, the following is written: "Hi Al, Here is the agreement for your records."

j.  Below the Notes section, in very small tiny print (obfuscated by the poor facsimile quality) is the following statement:

> This contract consists of and is governed by this Insertion Order pages [unreadable] hereto and in the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. **By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING,** (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them; however the version applicable to this contract shall be the latest dated version as of the date of your signature. You agree that you authority to bind the individual or company purchasing this advertising in all respect to this contract and the incorporated terms and conditions.

(hereinafter referred to sometimes as the "**Signature Required Clause**")

35. Plaintiff never signed the document referenced above at §34(j).

36. Plaintiff never returned the document reference above at §34(j) to Defendant Yellow Pages. As such, Defendant Yellow Pages could not rely on Plaintiff's signature as proff the Plaintiff had "represent[ed] to Yellowpages.com: (1) that [he had] received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING".

37. The Contract (also referred to by Yellow Pages as "Order") is attached hereto as **EXHIBIT "A"**.

38. In addition, the Plaintiff received a two-page document called "Terms and Conditions for Internet Advertising". All of the terms are in very small print and the quality is obfuscated by the facsimile transmission.

39. The Terms and Conditions contained the following relevant clauses or statements:

   a. #1 Scope – states that <u>**between the Terms and Conditions and the Order (the Contract) that the Order (Contract) controls**</u>. In other words, to the extent that that the Contract and the Terms and Conditions conflict, the Contract controls (hereinafter referred to as the **"Scope Clause").**

   b. #2 Term – states that:

   > the term of the Agreement commences on the date of execution by the Plaintiff "**(either in writing or by electronic signature including recorded oral acceptance of this Agreement** of an Order presented by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances specified in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order for the initial Term specified in the Order. Unless otherwise provided in the Order and except as provided below in [unreadable] T&Cs, upon expiration of the Initial Term, **the term**

of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before expiration of the initial term . . . [u]nless otherwise provided in the Order, either you or we may terminate the Renewal Term, with or without cause. . . [n]either of us may terminate this Agreement during the initial term [first year] . . . [i]f you choose to have our Advertising Products removed from any site and/or our services discontinued prior to the end of the initial Term or Renewal Term . . . you shall notify us in writing and the unpaid balance for the entire Initial Term or Renewal Term, as the case may be, will become immediately due and owing.

c.  #4 Rates and Payments provides, in summary:

   i.  The billing cycle is every thirty (30) days;

   ii.  Yellow Pages can bill a consumer "for advertising products for which no rate is specified in the order" – in other words, Yellow Pages can bill their common "standard rate" if the Order/Contract does not specify a price (although there is no statement of what a standard rate is);

   iii.  Unless the consumer terminates the Agreement at the end of the initial term, then Yellow Pages renew the Consumer's contract at their "standard rates" – although the Terms and Conditions neither defines what a standard rate is nor does it provide any calculus upon which one could derive some sort of reasonable basis for a standard rate;

   iv.  If payment is not received by the due date, then Yellow Pages can suspend all Products being serviced on behalf of the consumer;

v. Yellow Pages allegedly reserves itself the right to charge late fees that will accrue, again, at a "standard rate" or the maximum rate permitted by law

vi. Yellow Pages purportedly make the consumer responsible for any attorneys fees and costs that a Yellow Pages incurs in collecting any unpaid amounts;

d. #6 Custom Domain Registration/Ownership of Work Product

i. Where the consumer has ordered advertising products that include hosting or operation of a website – and where the consumer does not already own the domain name that the website will host – Yellow Pages will purchase the website on behalf of the consumer or the consumer may transfer to the Yellow Pages the domain name onto Yellow Pages' server.

ii. After transfer of the domain name, Yellow Pages states that it may disable any hosted websites if payment is missed and that it will not release the domain name until the consumer has paid all of Yellow Pages' bills;

iii. Yellow Pages states that if it purchases the domain name on behalf of the Consumer, then Yellow Pages owns the domain name and not the Consumer;

iv. If the consumer does not provide transfer instructions to Yellow Pages upon the termination of the Agreement, then

14

> Yellow Pages retains the right to allow the domain name
>
> registration to lapse or allow Yellow Pages to retain ownership.

   e.  #17 Telephone Conversations

      i.  All telephone conversations may be recorded and the consumer

         consents to such.

40. The Terms and Conditions are attached hereto as **EXHIBIT "B"**.

41. As stated above, the Plaintiff never signed the contract and never returned a signed document to Yellow Pages.

42. As stated above, Plaintiff contacted Yellow Pages for the first time on October 31, 2008.

43. Plaintiff received the Contract and Terms and Conditions from Yellow Pages on Friday, October 31, 2008.

44. On the following Monday, November 3, 2009, Plaintiff contacted Yellow Pages to inform Yellow Pages that he did not wish to pursue any relationship with Yellow Pages in the future. Plaintiff made several calls and also sent a fax to Royce Brown stating the same.

45. Plaintiff was told, when he spoke to Yellow Pages, that he could not cancel his order as the contract was already in force and in effect with Plaintiff's verbal recorded consent. Plaintiff was told this by Ted Becker who was a general sales manager in the sales division at Yellow Pages.

46. Shortly thereafter and completely without the Plaintiff's permission, Yellow Pages posted the Plaintiff's advertising information online and subsequently sent Plaintiff his first month's bill on November 22, 2008, and a second bill on December 22, 2008, stating that

Plaintiff's account was past due. All of Plaintiff's other calls to Yellow Pages have been ignored.

47.   Plaintiff has subsequently been threatened by representatives of Yellow Pages with adverse reporting on his credit report and Yellow Pages has stated they are going to commence a collection action against the Plaintiff in order to pressure the Plaintiff to make a payment to Yellow Pages.

48.   Yellow Pages has stated that there is an enforceable contract between the Plaintiff and Yellow Pages. This is an inaccurate assessment of the legal relationships for two reasons:

a.   First, Plaintiff and Yellow Pages never had a meeting of the minds on all of the essential terms of the contract while the Plaintiff and Mr. Brown were on the phone;

  i.   Even when Plaintiff received the Terms and Conditions from Yellow Pages, Plaintiff did not sign the accompanying contract order; in addition, Plaintiff never made any assenting representation to Yellow Pages upon which they could rely.

  ii.   The Terms and Conditions clearly state that, "in the event of any conflict between the terms of the Order [referred to as the Contract herein] and of these Terms and Conditions, the Order [referred to as the Contract herein] controls." The Contract/Order clearly states, "By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING . . . (3) that

16

you acknowledge that Yellowpages.com's reliance upon your acceptance of them."

1. As Plaintiff never signed the Contract/Order Plaintiff neither assented to the Terms and Conditions nor is Yellow Pages able to rely upon the Plaintiff's acquisence.

2. The purported right of Yellow Pages to rely upon the "recorded oral acceptance" of the Plaintiff is clearly contravened by the Contract/Order's requirement of the Plaintiff's signature."

   a. Ted Becker's statement (the general manager of Yellow Pages), is inaccurate that the Contract was binding upon Plaintiff because of his oral consent.

49.   As such, it is obvious that this a deceptive scheme designed to trap consumers into purchasing services from Yellow Pages and then extract money from them under an alleged oral recorded assent that is void as a matter of law (i.e., there is no meeting of the minds and the Contract/Order contravenes the oral acceptance premise).

50.   Where a consumer wishes to cancel the contract or wishes to not be included they are threatened with collection actions and adverse information to be recorded on their credit report.

VI.   **CLASS ACTION ALLEGATIONS**

51.   All of the previous allegations are incorporated herein.

52.   Plaintiff brings this action as a class action, on behalf of itself and all others similarly situated, pursuant to New Jersey Court Rule 4:32. The classes that plaintiff seeks to certify is:

a.   **"The Nonpayment Class"**:

  i.   All individuals from the beginning of the class period until the present that received a Contract/Order and Terms and Conditions from Yellow Pages that contained substantively identical Scope and Signature Required Clauses[2] as the Plaintiff and did not sign the Contract/Order and who:

    1.   Have received adverse credit reporting on their credit report; and/or,

    2.   Are being pursued for payment by Yellow Pages; and/or,

    3.   Have paid money to Yellow Pages for services.

b.   **"The Payment Class"**:

  i.   All individuals from the beginning of the class period until the present that recorded their assent to Yellow Pages Terms and Conditions before they actually received the Yellow Pages' document entitled Terms and Conditions and who:

    1.   Have received adverse credit reporting on their credit report; and/or,

    2.   Are being pursued for payment by Yellow Pages; and/or,

    3.   Have paid money to Yellow Pages for services.

---

[2] See Pages 10-12 infra.

18

    c.  The members of each of the classes above will be referred to generally as **"Class Members"**.

53.  The class is composed of thousands of persons and entities in New Jersey and worldwide. The prosecution of separate actions by individual members of this class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants' Yellow Pages and AT&T Inc.

54.  In addition, Defendants' Yellow Pages and AT&T Inc. have acted and refused to act on grounds applicable generally to the class members, making final relief with respect to the class as a whole appropriate.

55.  As a victim of the Defendants' artifice to defraud, plaintiff is asserting claims that are typical of the claims of the class, and plaintiff will fairly and adequately represent and protect the interests of the class in that it has no interests antagonistic to those of the other members of the class. Plaintiff has retained counsels who are competent and experienced in the prosecution of class action litigation.

56.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impracticable for the class members individually to seek redress for the wrongful conduct alleged here. If class treatment of these claims were not available, defendant would likely continue defrauding the general public, extorting and threatening the general populace with negative credit reporting, collection and legal actions, or would otherwise escape liability for their wrongdoing as challenged in this litigation--liability created as a result of

defendant's own efforts to profit at the expense of the general public. Each of the members of the class will have to obtain an equitable outcome that will insure that they fraudulent transaction is rescinded and all collection/legal efforts are ceased. In addition, those that have been forced to pay money as a result of the Defendant's actions, should have their money returned.

57. Common questions of law and fact exist as to all members of the class. The mechanism employed by the Defendant Yellow Pages to defraud the general population is identical. The facts for every class member will be identical in nature. After a recorded conversation, Yellow Pages would send the Class members a Contract/Order and accompanying Terms and Conditions. As such, the facts are common and similar enough to support a Class Action.

58. In addition, the question of whether or not the Contracts are binding will be identical for every member of the class:

    a. The legal question of whether or not the Contract/Order and Terms and Conditions that contain the Scope and Signature Required clauses are binding upon one who does not sign the Contract/Order is identical;

    b. The legal question of whether or not there was a meeting of the minds on the essential terms of the contract between the Class Members and Yellow Pages will be identical for every class member.

59. Thus, common questions predominate over any questions which may affect individual members of the class.

60. The names and addresses of class members are available from defendant or their agents. Notice can be provided to these owners by a combination of mail and published notice.

## VII.   ASCERTAINABLE LOSS ANALYSIS

61.   All of the previous allegations are incorporated herein.

62.   The Class Members have suffered an "ascertainable loss" as required by law in the following manner:

a.   Class Members that have not paid Yellow Pages, but are the subject of or being threatened with adverse credit reporting, collection or legal action, the ascertainable loss, in conjunction with the *Cox v. Sears Roebuck & Co.*, analysis (138 N.J. 2, 22-24 (1994)) – is the estimate of costs for which the Defendants are attempting to hold the Plaintiff's responsible. As such, Plaintiff Class Members will ask for injunctive relief prohibiting Yellow Pages from enforcing the Contract/Order and Terms and Conditions not only retroactively for the Class Members but also prospectively for all future Consumers who may become victims.

b.   Class Members that have paid Yellow Pages as a result of Yellow Page's fraudulent practices have suffered an ascertainable loss in the amount of their payments for services founded upon non-enforceable contracts – the manner in which they were coerced into their contracts is fraudulent, malicious, and has no place in a sophisticated market place. As such, Plaintiff Class Members will request the rescission of contracts of which they are presently bound and the return of all of their monies paid as a result of the illegal agreement.

c.   As with every action, Plaintiff reserves the right to amend this section as new allegations and claims become known to the Class Members through discovery.

## VIII.   COUNT I - JUDICIAL DECLARATION

63.   All of the previous allegations are incorporated herein.

64.   As it is evident that the Contract/Order and Terms of Conditions set forth above constitute an Agreement that is void as a matter of law.

   a.   The Contract/Order and Terms of Conditions that contained the Scope Clause and the Signature Required Clause and were not signed by a Class Member are void as a matter of law for reasons set forth above but summarized here:

   i.   The Scope clause says that "between the Terms and Conditions and the Order (the Contract) that the Order (Contract) controls." This clause was contained in paragraph 1 of the Terms and Conditions. The Signature Required Clause, contained within the controlling document, the Order (herein referred to as the Contract) states that "By signing below you are representing to Yellowpages.com: (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge that Yellowpages.com's reliance upon your acceptance of them . . . ."

   ii.   For Class Members that did not sign the Order/Contract – there was no binding contract despite Yellow Pages declaration that the Contract is valid upon the recorded oral assent of the Class

Members. The Terms and Conditions wherein the oral consent is allegedly ratified and stated to be a valid form of acceptance is superseded by the terms of the Order/Contract that require the Class Member's signature.[3]

b. For the Payment Class Members who have paid Yellow Pages as a result of their fraudulent conduct, it is evident that the agreements are unenforceable as they are victims of the artifice to defraud as are the Nonpayment Class Members.

    i. When the Payment Class Members orally agreed to the Terms and Conditions through the recording with Yellow Pages representative, they did not have the benefit of the knowledge of all of the essential terms that would be contained in the Terms and Conditions that they would receive;

    ii. As the Payment Class Members have made payments pursuant to a document that is void as a matter of law, all payments made to Yellow Pages should be returned to the Class.

WHEREFORE, the Class Members state that a declaratory judgment is both necessary and proper to set forth and determine the rights, obligations, and liabilities that exist among the Class Members and the Defendants (i.e. a Judicial Declaration is needed to void the alleged agreement between the Class and Yellow Pages as a matter of law).

---

[3] Also contained in the Contract/Order is a statement that says, "[p]ayment in full is required prior to fulfillment of the products in this Order". As such, Yellow Pages is estopped from asserting reliance on a Class Members' actions where they did not received payment. See **EXHIBIT "A"**.

**IX.    COUNT II – VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT**

65.    All of the previous allegations are incorporated herein.

66.    As stated above in detail, the Defendants have employed an artifice to defraud and then extort advertising revenue from the Class Members.

    a.    Defendants trapped Class Members into a recordation wherein they allegedly agreed to certain terms and conditions without the terms and conditions being disclosed to the Class Member;

    b.    Defendants stated to Class Members that they would receive terms and conditions for review at a later date or said nothing at all about what the terms and conditions would be;

    c.    Where Class Members sought to rescind or alter the alleged Contract/Order in any manner, the Defendants would not allow any rescission alleging that the Class Member had already recorded his consent to the terms and conditions – this action was unlawful for two reasons:

        i.    First, class members received Yellow Pages documents (purporting to be the Contract/Order and the Terms and Conditions) and the Scope Clause and the Signature Required Clause (pgs. 10-12, infra.) were included such that the Scope Clause states that the Contract/Order governs the Class Members' acceptance and the Contract/Order contained the Signature Required Clause that required, obviously, the Class Members' Signature.  As such, the statement that the recordation of the Class Member's oral acquiescence sufficed as adequate acceptance is misleading and false.

1. When Yellow Pages stated that the Class Member was bound by the oral acceptance and this was a misrepresentation – in addition they omitted to tell the Class Member that the documents they would received would require their signature to complete the agreement or that they were not telling them all of the essential terms upon which Yellow Pages sought to enforce a contract;

2. Yellow Pages intended that the Class Member rely upon the misrepresentations and omissions.

3. Plaintiff and Class Members relied upon the Defendant's misrepresentation of the legal contractual relations between the Plaintiff and Defendant.

   a. This analysis by Yellow Pages was incorrect for two reasons:

      i. First, the Scope Clause and the Signature Required Clause require the Class Member's written consent to the terms and conditions – where a Class Member did not sign the Contract/Order there is not an enforceable agreement;

      ii. Second, even where a class member agreed orally to certain terms and conditions, those terms and conditions expressed to the Class Members did not contain all of the essential terms of a Contract and, until the Contract/Order was signed by the Class Member – there was no enforceable agreement.

25

      iii. Finally, even where a Class Member signed the Contract/Order – the Contract should be rescinded as Class Members signed the Contract/Order not in order to purchase services from Yellow Pages but to avoid adverse credit reporting and legal and collection actions – Class Members were coerced into signing because they were told that a legal agreement existed based upon the Class Members' alleged oral acquiescence to the terms and conditions of the Contract.

4. Plaintiff and Class Members have been damaged by the Defendant's misrepresentation in the following manners:

    a. Class Members have been coerced into paying for advertising services they either did not want or wanted in another form or fashion;

    b. Plaintiff and Class Members who have not paid for the service are now being threatened or have suffered adverse credit reporting, collection actions and legal actions;

    c. Class Members may have suffered both of aforegoing damage scenarios. As stated in the aforegoing, Class Members, under auspices of the *Cox* analysis have suffered an ascertainable loss.

ii. As such, it is obvious that Defendants are engaging in a deceptive business practice and such a deceptive practice is a violation of New Jersey law under N.J.S.A. 56:8-1 et seq.

## X.   COUNT III – UNJUST ENRICHMENT

67.   All of the previous allegations are incorporated herein.

68.   As enumerated above, Defendants have defrauded the Class Members through the pretense of omission and misrepresentation in order to extract financial gain from the Plaintiff Class Members.

69.   One Class proposed for certification, is made up of Class Members that have paid Defendant Yellow Pages under duress, fraud and/or under false pretenses.

70.   Defendants have received substantial amounts of money from the Payment Class Members, but the requisition of such remuneration is as a result of an illegal and void at law contract.

71.   As such, the Defendants have been unjustly enriched at the expense of the Payment Class Members.

**XI.   COUNT IV – CLASS ACTION DECLARATION**

72.   All of the previous allegations are incorporated herein.

73.   As stated above, Plaintiff has proposed two classes of members to be approved by the Court (i.e. the Nonpayment Class and the Payment Class).

a.   **"The Nonpayment Class":**

   i.   All individuals from the beginning of the class period until the present that received a Contract/Order and Terms and Conditions from Yellow Pages that contained substantively identical Scope and Signature Required Clauses as the Plaintiff and did not sign the Contract/Order and who:

      1.   Have received adverse credit reporting on their credit report; and/or,

      2.   Are being pursued for payment by Yellow Pages; and/or,

      3.   Have paid money to Yellow Pages for services.

b.   **"The Payment Class":**

   i.   All individuals from the beginning of the class period until the present that recorded their assent to Yellow Pages Terms and Conditions before they actually received the Yellow Pages' document entitled Terms and Conditions and who:

      1.   Have received adverse credit reporting on their credit report; and/or,

      2.   Are being pursued for payment by Yellow Pages; and/or,

      3.   Have paid money to Yellow Pages for services.

## XII.   PRAYER FOR RELIEF

Plaintiff, on behalf of itself and on behalf of the members of the class defined in this complaint, requests judgment and relief as follows:

I.      An order certifying that this action may be maintained as a class action;

II.     Compensatory damages in an amount to be proven at trial;

III.    Equitable and injunctive relief as permitted by law or equity, including the rescission of all contracts that fall within the purview of the Class Member's complaint

IV.     Equitable relief in the form of an injunction preventing Yellow Pages deceptive practice to continue into the future;

V.      A judgment imposing a constructive trust upon the Plaintiff's assets;

VI.     An Order requiring Defendants to place assets or post a bond in an equal amount to the value of the assets upon which the Trust is placed;

VII.    Against the Defendants awarding the Class Members treble the amount of their damages pursuant to N.J.S.A. 56:8-19;

VIII.   Against the Defendants awarding the Class Members reasonable counsel fees, filing fees, cost of investigation, and costs of this lawsuit, pursuant to N.J.S.A. 56:8-19;

IX.     An order awarding plaintiff reasonable attorneys' fees, costs and expenses incurred in connection with this suit (on non-New Jersey Consumer Fraud Act Claims).

X.      Pre- and post-judgment interest; and

XI.     Such other and further relief as the court may deem necessary or appropriate.

## XIII.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

## XIV.  DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Paul I. Perkins is designated as trial counsel.

## XV.  CERTIFICATION OF NO OTHER ACTIONS

Pursuant to Rule 4:5-1, it is hereby stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the Court an amended certification if there is a change in the facts stated in this original certification.

XVII.  **COUNSEL SIGNATURE PAGE**

Date:  4-7-09
Paramus, New Jersey

By:  _____
Paul I. Perkins, Esq.
**LYNCH LAW FIRM, P.C.**
45 Eisenhower Drive
Paramus, NJ  07652
(800) 656-9529
(888) 271-9726
paulperkins@lynchlawyers.com

10/31/2008  13:35    7029463865                                    PAGE  35/03

**YELLOWPAGES.COM**
10/14/2008

## Contract for Internet YellowPages.com Advertising

Page _____ of _____

### Billing Information

| | |
|---|---|
| Customer ID | |
| Company Name | Kowalski Plumbing & Heating |
| Billing Name | Kowalski Plumbing & Heating |
| Billing Address | 71 Central Ave |
| City, State, Zip | Rochelle Park          NJ          07662 |
| Contact Name | Al Kowalski |
| Contact Phone # | 201-843-7799 |
| E-mail | kowalskiplumbing@gmail.com |
| Billing Preference | Invoice         Approval Attached |
| Check Box if Applicable ☐ | Payment in full is required prior to fulfillment of the products in this order |
| Card Number | |
| Card Type | Exp:  Month  /  Year |
| Name on Card | |

### Sales Office Information

| | |
|---|---|
| Contract Date | 10/31/2008 |
| Sales Representative | Royce Brown |
| Sales/Seller ID | 1058T20 |
| Sales Manager | Christine Griffin |
| Sales Manager ID | TR5610M |
| Sales Office | R5562000 |
| Sales Office Phone # | (702) 544-0900 |
| Sales Rep E-mail | rbrown@yellowpages.com |
| Contract Type | New |
| Sales Lead Origin | Prospect |
| Director Approval | |
| Sales Mgr Approval | |
| Receive Date/Time | |

### YellowPages.com

| Item: | Term | AF Code | Geography | Heading/Category | Discount Code | Monthly Rate |
|---|---|---|---|---|---|---|
| | | | | 3 page website | | $49 |
| YPW 3 | 12 months | | | Plumbing Contractors | | $309 |
| TILE B | 12 months | BERMZ | Bergen NJ Metro | Heating Contractors & Specialties | | |
| | | | | Water Heaters | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| | | |
|---|---|---|
| Monthly Amount | $ | 358.00 |
| Additional Items (products page) | $ | |
| Total Monthly | $ | 358.00 |
| TOTAL Annual | $4,296.00 | |
| Balance Due | | |

**Notes:**

Hi Al,  Here is the agreement for your records.

This contract consists of and is governed by this Insertion Order, any additional Insertion Order pages attached hereto and the Terms and Conditions for Internet Advertising, all of which are incorporated herein by reference. By signing below you are representing to Yellowpages.com; (1) that you have received and had an opportunity to review a copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING, (2) that they have the same force and effect as if given in full text on this document, and (3) that you acknowledge Yellowpages.com's reliance upon your acceptance of them. (An additional copy of the TERMS AND CONDITIONS FOR INTERNET ADVERTISING may be accessed through www.yellowpages.com; however, the version of Applicable to this contract shall be the latest dated version as of the date of your signature.) You agree that you have authority to bind the individual or company purchasing this advertising in all respects to this contract and the incorporated terms and conditions.

I acknowledge that I have full authority to sign for and bind the party identified as "Customer" to this contract.

| Customer Name | Al Kowalski | Signature _____ | Time _____ |

Updated 10/17/2008

10/31/2008   13:35   7829453869                                PAGE   02/03

## TERMS AND CONDITIONS FOR INTERNET ADVERTISING

1. **Scope.** This is a contract (referred to herein as the "**Agreement**") between YELLOWPAGES.COM LLC (hereinafter referred to as "us", "we" and "our") and the customer ("you" and "your") identified on the first page of the document (the "**Order**") for us to fulfill your order for our Advertising Products identified on the Order, These Terms and Conditions for Internet Advertising (these "**Ts&Cs**"). Except as otherwise provided in these Ts&Cs, in the event of any conflict between the terms of the Order and of these Ts&Cs, the Order shall control.

2. **Term.** The term of this Agreement commences on the date of execution by you (either in writing or by electronic signature, including recorded oral) acceptance of this Agreement of an Order presented by us and shall (subject to our right hereunder to terminate or suspend our performance or remove Advertising Products under circumstances described in this Agreement) continue until we have fulfilled the Advertising Products specified in the Order (or the Initial Term specified in the Order. Unless otherwise provided in the Order, and except as provided below in these Ts&Cs, upon expiration of the Initial Term, the term of this Agreement shall automatically renew for a "Renewal Term" unless you or we notify the other of its intent not to renew at least thirty days before the current Ts&Cs being referred to herein as this Agreement). The Term will be subject to the then current Terms and Conditions, pricing and other terms for Internet Advertising made available in the Order, other your or we may terminate this Agreement on you or without Renewal Term will continue from expiration of the Initial Term and termination pursuant to this Agreement. Unless otherwise provided in the Order, other your or we may terminate this Agreement as any time upon notice to you if your cause, upon thirty-days' prior written notice to the other. Neither of us may terminate this Agreement during the Initial Term, provided that we may terminate this Agreement as the result of your breach in writing and the impact balance for the entire Initial Term or Renewal Term will become immediately due and owing.

3. **Third Parties.** You represent and acknowledge that you are entering into this Agreement to obtain the Advertising Products for your own benefit and not for the benefit or on behalf of any third party, including, but not limited to, any of your shareholders, partners, owners, employees, agents or affiliates. However, each of our distribution or fulfillment vendors or internet search engines on which we place your advertising (each, a "**Distribution Site**") is an intended third-party beneficiary of your obligations hereunder that relate to Advertising Products and may independently enforce such obligation directly against you.

4. **Rates and Payment.** Unless otherwise provided in the Order, we will bill you during our first applicable billing cycle after we fulfill your order for Advertising Products, and will continue to bill you during each applicable billing cycle thereafter during the term of this Agreement. The billing cycle will be thirty (30) days unless otherwise provided in the Order. We will bill our Advertising Products on each billing cycle during the Initial Term only. Unless you or we terminate this Agreement at the end of the Initial Term, you will be invoiced for each billing cycle of the Renewal Term at our standard rates in during each billing cycle for such Advertising Products. Such standard rates may be higher than the rates set forth on the Order. Payments are due on the date specified on the Invoice or, if no payment date is specified, then thirty days after the date of the invoice. Your (amount, or (in the case of Advertising Products posted on Distribution Sites) cause to be removed, the Advertising Products and suspend our services hereunder if payment is not received by the due date. Your prompt payment, suspend our services hereunder if payment is not received by the due date. Your prompt payment of any invoice that may be subject to suspend services or remove or cause removal of Advertising Products, is the successors of replace or cause replacement of Advertising Products, will be a condition to our resumption of services and to the replacement of Advertising Products. You acknowledge that no such suspension or removal will extend the term of this Agreement and, therefore, that it will require the aggregate time that we will fulfill your order. We may charge the payment fees that we incur in collecting any unpaid amount. You will pay any rates, or other local, state, federal, foreign or other taxes or governmental fees arising out of or in connection with this Agreement, other than based on our net income.

5. **Denial of Credit.** If your application for business credit is denied, you have the right to a written statement of the specific reasons for the denial. To obtain this statement, you must contact us within 60 days of the date you are notified of our decision and we will send you a written statement of reasons for the denial within 30 days of receiving your request for the statement. Notice: The Federal Equal Credit Opportunity. Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is Federal Trade Commission, Equal Credit Opportunity, Washington, DC 20580.

6. **Custom Domain Registration/Ownership of Web Product.** If the Advertising Product you have ordered involves the hosting or operation of a Web site, the Universal Resource Locator ("**URL**") therefore must be registered in our name with a domain registrar of our choosing as we may manage the domain while you host or operate the Web site. If you do not have a URL, we will procure a URL and will pay the applicable domain registration fees to the registrar and maintain ownership. If you already own the registration for the desired URL, you must transfer the URL to us with a domain registrar of our choosing. If none of your requested URLs are available, we will contact you and request alternatives. If you already own the registration for the desired URL, you must transfer the URL to us with a domain registrar of our choosing. If none of your requested URLs are available, you will be unable to undertake the action we request to cause the transfer, then, in our discretion, we may (but are not obligated to) procure a URL, and may be subject to termination of the Agreement or in the event you are in breach of this Agreement, any fee that we hosted or operate with your URL (1) will be returned to our URL (2) with the prior written with thirty (30) days after termination of the Agreement. We will then promptly transfer such URL to you if you timely pay such charges. If you fail to notify us in writing within thirty (30) days after termination or expiration of this Agreement that payable in connection with the transfer to your of any URL registered in our name that is related to your Web site if you notify us in writing within thirty (30) days after termination or expiration of this Agreement that you desire to have transferred such URL to you, then we will assume that you do not desire to have transferred such URL to you, then we will deem such URL, or may transfer such URL to a third yet desire such transfer. We will then promptly transfer such URL to you if you timely pay such charges. If you fail to notify us in writing within thirty (30) days after termination or expiration of this Agreement that you desire to have transferred such URL to you, then we will deem such URL, or may transfer such URL to a third party, without restriction.

7. **Performance Based Advertising Products.** We or our vendor will fulfill your performance based Advertising Product including, but not limited to, YPclicks or YPsells). For YPclicks, internet search engines determined by us, which may include affiliated or syndicated search engine network partners, will provide two consumers clicks on your ad or call. We may change search engines from time to time in our sole discretion. You agree that all placements on search engines and exclusively be deemed to have been approved by you. We or our vendor will continue to fulfill your Advertising Product for the contracted number of clicks, call, search or other actions (an "**Action**") or until your budget is exhausted. If the applicable number of Actions has not been delivered at required Actions have been delivered at your budget has been budget has not been exhausted during the Initial Term, we will continue to fulfill your Advertising Product in no guarantee that your Actions will be fulfilled within the timeframe or duration time of the Agreement. We exhausted. Although we will invoice you for twelve maximums for the contract amount, we do not guarantee that your Actions will be fulfilled within the timeframe or duration time of the Agreement. We cannot provide you with (1) the nature of the search engine and/or search engine networks to which your advertisements will be submitted under (2) the URL and IP address from which clicks or other Actions are made. Our only obligation is that the number of Actions identified in the Order will be provided. We do not guarantee that any clicks (1) will come from potential customers for your and/or (2) will be of any benefit or value to you. You acknowledge that clicks may be from adult, minor, non-self-serving URLs, from data potentially offensive to you, the result of prohibited or improper purposes, and the result of robots, robots and other automated or mechanical means. We will send or make available periodic reports from us or Distribution Sites regarding the number of Actions delivered. You agree that such reports and the results of such Actions delivered therein shall be the conclusive, definitive measurements of our performance, and that they shall determine any related obligations or the payment of any charges in Order (or those results exceed any agreement to any performance based Advertising usage statistics from any source whatsoever shall be excepted by us or have any applicability to our obligations or your rights under this Agreement. Notwithstanding anything in the contrary in Section 2 of these Ts&Cs, upon fulfillment of your performance based Advertising Product, we will terminate your performance based program unless you and we agree to renew it. If you cancel your performance based Advertising Product or dispute your Web site or otherwise impair our ability to complete the Actions, we will leave you a credit for additional Actions to be delivered. Product termination charge. We have no liability for any Actions you dispute. However, in our sole discretion, we may issue a credit for additional Actions to be delivered.

8. **Prohibitions, Content and Intellectual Property Rights.** The transmission of any unsolicited commercial e-mail messages through our services is strictly prohibited without the prior consent of the recipient. You acknowledge that neither we nor the Distribution Sites generate the content upon a site where your Advertising Product or by be fulfilled and that neither we nor the Distribution Sites are responsible for such content. You acknowledge that it is not possible to avoid placing your advertisements on web sites that display adult content, have adult-oriented domain names, or that are primarily interested as gambling sites. You acknowledge that it is not possible to avoid placing your advertisements on web sites that display adult content, have adult-oriented domain names, or that are primarily interested as gambling sites. You acknowledge that it is not possible to avoid all such placements, and that we shall in no event have any liability to you of any kind or nature as a result of any Distribution Site being for any reason (a) may subject us be offensive to you. We or any Distribution Site may refuse, remove and/or terminate Advertising Products and our services due to any content that is otherwise unacceptable to us or the Distribution Site's sole discretion; provided a Distribution Site or another party to liability, (a) includes obscene, profane, lewd, violent or other liberate or other inappropriate content, or (c) is otherwise unacceptable to us or the Distribution Site's sole discretion; provided that we have no obligation to review your advertisements and otherwise be facility related to the content thereof. If this occurs, you will provide the following representations which will we and such Distribution Site are current term and will not be entitled to any refund or abatement or any extension of the term of this Agreement. Furthermore, you are making the following representations which we and such Distribution Site are current term and will not be entitled to any refund or abatement or any extension of the term of this Agreement. Furthermore, you are making the following representations which we and such Distribution Site are relying upon (a) that you are authorized to advertise and display the requested features, product or service, (b) you are a business, not a consumer, (c) that the content of any advertisement is truthful, and (d) that you have the right to use and relying upon (a) that you are authorized to advertise and display the requested features, product or service, (b) you are a business, not a consumer, (c) that the content of any advertisement is truthful, and (d) that you have the right to use and not misleading, (b) that you are in compliance with all laws and licensing requirements relating to any interest in the goods or services displayed on or your advertisement, or for other content and that such also complies with all publish any requested name, address, trade name, trademark, service mark, features, reproduction, gross amount, copyrighted or copyrightable item or other content you provide. You represent and warrant that any of these publish any requested name, address, trade name, trademark, service mark, features, reproduction, gross amount, copyrighted or copyrightable item or other content you provide. You represent and warrant that any of these applicable laws, license agreements and other obligations, without limiting any of our other rights or remedies, you agree to indemnify us in writing or any time that you reasonably believe that any of these representations is not true and correct in all respects. You assume sole responsibility for the protection of any copyrights, trademarks, service marks, trade names and other intellectual property owned and/or or other content, we may reject or discontinue the Advertising Products and our services without liability to you in such time you have received that dispute with the other party to our and to any and all respectively and independently Products we create for you, whether in whole or in part, and we shall work that we create from your content, you acknowledge that we and such Distribution Site's sole discretion; provided copyrightable construction you might have prepared or otherwise, (a) may have whether in whole or in part, and we shall work that we create from your content, you acknowledge that we and such Distribution Site's sole discretion; provided copyrightable construction you might have intend for such advertising to constitute a joint work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon intend for such advertising to constitute a joint work. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon publicly display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performances of our obligations under this Agreement. Upon termination of this Agreement, we are not obligated to return any of these works to you. If we receive notice or documentation demonstrating that another person or entity controls any right to use or display a name, trademark, service mark termination of this Agreement, we are not obligated to return any of these works to you. If we receive notice or documentation demonstrating that another person or entity controls any right to use or display a name, trademark, service mark respects. You assume sole responsibility for the protection of any copyrights, trademarks, service marks, trade names and other intellectual property owned and/or or produce by you, whether in whole use or display. If we receive notice or documentation demonstrating that another person or entity controls any right to use or display a name, trademark, service mark or other content, we may reject or discontinue the Advertising Products and our services without liability to you in such time you have received that dispute with the other party to our and Upon notice specifically copyrightable construction you might have the Advertising Products and our services without liability to you in such time you have received that dispute with the other party to our and to any and all respectively and independently or in part, and any derivative work that we create from your content, you acknowledge that we and such Distribution Site's sole discretion; provided copyrightable construction you might have the Advertising Products and our services without liability to you in such time you have received that dispute with the other party. You grant us a nonexclusive license during the term of this Agreement, including the right to sublicense, to copy, distribute, create derivative works based upon publicly display, publicly perform and otherwise use any trademark, service mark, graphics, text or other content you provide to us in connection with our performance of our obligations under this Agreement. Upon termination of this Agreement, we are not obligated to return any of these works to you.

Updated 10/17/2006

9. Design of Our Sites, Advertising Products, Statistics and Interruption of Our Services. We and the Distribution Sites may redesign or modify the organization, structure and/or "look-and-feel" of our respective Web sites, Advertising Products, and published set of headings and directories at any time and without notice, and may discontinue or cull Distribution Sites at any time in our sole discretion. Although we assign each Advertising Product an internally generated paid value and/or security code, such assignment is internal to us and does not confer any rights to you. We or any Distribution Site may position your advertisement on any page within the appropriate Sites, in any position such as on page within the Order, in any sequence and in association with any classified heading or keyword(s) we or any Distribution Site deems appropriate unless otherwise specifically noted in the Order. Unless expressly provided in the Order, neither any Distribution Site nor we make any representations or warranty with respect to traffic or usage statistics regarding actions on our site or on any Distribution Site or the levels of impressions, cost per click, or clickthrough rates or the quality or conversion rate for any advertisements. An "impression" means each occurrence of a display of an advertisement. Neither any Distribution Site nor we will issue any liability to you and you will remain responsible for all moneys owed to us should there be an interruption in our Web site or any third party site or other interruption in our services hereunder for any period of time, although we may, in our sole discretion, issue credits or extend the term of this Agreement in the event of interruptions lasting several days or longer.

10. Disclaimer of Warranties. EXCEPT AS EXPRESSLY PROVIDED IN THE ORDER, NEITHER WE NOR ANY DISTRIBUTION SITE MAKES ANY REPRESENTATIONS, WARRANTIES OR GUARANTEES TO YOU OF ANY KIND, EITHER EXPRESSED OR IMPLIED (INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NONINFRINGEMENT OR OTHER WARRANTIES ARISING BY USAGE OF TRADE, COURSE OF DEALING OR COURSE OF PERFORMANCE), REGARDING THE FUNCTIONALITY, PERFORMANCE OR RESULTS OF THE ADVERTISEMENTS OR ADVERTISING PRODUCTS, LINKED SITES, ANY SITE WE MAY CREATE FOR YOU, OR OTHERWISE UNDER OR RELATED TO THIS AGREEMENT.

11. Assignment. You may not resell, assign, transfer or delegate any of your rights, duties or obligations without our prior written consent, which we may grant or withhold in the exercise of our absolute and sole discretion in the event we give such consent, the assignee must, without any reservation, assume all of your rights, duties and obligations. Any attempt to resell, assign, transfer or delegate such rights, duties or obligations without our prior written consent shall constitute a breach of this Agreement and shall be of no force or effect. We shall have the right to subcontract performance of our obligations hereunder or to assign or otherwise transfer this Agreement or any of our rights, obligations or duties hereunder to any person or entity at any time.

12. Notices. All of our notices, demands and other communications must be in writing and will be deemed to have been given (a) if mailed by certified mail, postage prepaid, (b) if delivered by overnight courier, (c) if sent by facsimile transmission and such transmission is confirmed as received, or (d) if sent by electronic mail, and such message is confirmed as received, in each case to the address, fax number or email address specified on this Order for the recipient of such notice. All of your notices, demands and other communications must be in writing and will be deemed to have been given (a) if mailed by certified mail, postage prepaid if delivered by overnight courier, to our address as shown on our Web site

13. Liability. NEITHER WE NOR ANY DISTRIBUTION SITE NOR ANY OF OUR OTHER VENDORS SHALL HAVE ANY LIABILITY UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE ADVERTISING PRODUCTS FOR ANY SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES RELATING TO LOSS OF PROFIT, LOSS OF INCOME OR REVENUE, LOSS OF GOODWILL, THE REJECTION OR REMOVAL OF ANY ADVERTISING CONTENT, ANY DELAY IN DISPLAYING OR OUR FAILURE TO DISPLAY CONTENT, OR OUR FAILURE TO PERFORM SERVICES, WITHOUT LIMITING THE PROVISIONS OF SECTION 13, IN NO EVENT SHALL OUR LIABILITY ARISE. You acknowledge and agree that the AMOUNT YOU HAVE ACTUALLY PAID TO US FOR THE ADVERTISING PRODUCTS OR OTHER SERVICES WITH RESPECT TO WHICH SUCH LIABILITY AROSE are fundamental to the parties' provisions of this Agreement that limit liability, disclaim warranties, or include nonmonetary damages or other damages or remedies are essential terms of this Agreement and shall be enforced regardless of any breach hereof or other understanding regarding allocation of risk. Accordingly, such provisions shall be severable and independent of any other provisions of this Agreement and shall be enforced regardless of any other provisions of this Agreement and shall be enforced regardless of any other provisions of this Agreement that limit liability, disclaimers of liability, disclaimers of occurrence or condition relating in any way to this Agreement or the Advertising Products. Without limiting the generality of the foregoing, YOU AGREE THAT ALL LIMITATIONS OF LIABILITY, DISCLAIMERS OF WARRANTIES, AND EXCLUSIONS OF CONSEQUENTIAL DAMAGES OR OTHER DAMAGES OR REMEDIES SHALL REMAIN FULLY VALID, EFFECTIVE AND ENFORCEABLE IN ACCORDANCE WITH THEIR RESPECTIVE TERMS, EVEN UNDER CIRCUMSTANCES THAT CAUSE ANY EXCLUSIVE REMEDY UNDER THIS AGREEMENT TO FAIL OF ITS ESSENTIAL PURPOSE. The limitations contained in this Section 13 apply regardless of the form of action, including actions in contract, tort (including negligence), and strict liability.

14. Exclusive Remedies. If we breach our obligation hereunder to fulfill any Advertising Product or breach any other obligation hereunder, we will make commercially reasonable efforts to fulfill such Advertising Product at a later date on the same or substitute site or internet search engine or otherwise reasonably to cure such breach. THE FOREGOING CONSTITUTES OUR SOLE OBLIGATION AND YOUR SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH BY US OF THIS AGREEMENT (EITHER DIRECTLY OR THROUGH A FAILURE OF PERFORMANCE BY ANY DISTRIBUTION SITE).

15. Force Majeure. In no event shall we or any Distribution Site have liability to or be deemed to be in breach hereof for any failure or delay of performance resulting from any governmental action, fire, flood, insurrection, earthquake, power failure, network failure, riot, explosion, embargo, strikes (whether legal or illegal), terrorist act, labor or material shortage, transportation interruption of any kind or work slowdown or any other condition not reasonably within our control. Your payment obligations shall continue during any event of force majeure.

16. Indemnification. You agree to indemnify us and the Distribution Sites and hold us and the Distribution Sites harmless from and with respect to any claims, actions, liabilities, losses, expenses, damages and costs (including, without limitation, actual attorneys' fees) that may at any time be incurred by us or them arising out of or in connection with this Agreement or any Advertising Products or services you receive, including, without limitation, any claims, suits or proceedings for defamation or libel, violation of right of privacy or publicity, criminal investigations, infringement of intellectual property, false or deceptive advertising or unfair practices and any virus, contaminating or destructive features.

17. Telephone Conversations. All telephone conversations between you and us about your advertising may be recorded and you hereby consent to such monitoring and recording.

18. Applicable Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to contracts entered into and performed in New York by residents thereof. Any action or proceeding brought by you under or relating to this Agreement shall be brought in a state or federal court located in the City of New York, State of New York, and you hereby irrevocably submit to the personal jurisdiction of and irrevocably consent to venue in such courts for purposes of any such action or proceeding. Any claim against us arising from this Agreement shall be adjudicated on an individual basis, and shall not be consolidated in any proceeding with any other or controversy by any other party.

19. Entire Agreement. This Agreement constitutes the entire agreement between you and us with respect to the subject matter of this Agreement and supersedes all prior written and all prior or contemporaneous oral communications regarding such subject matter. Accordingly, you should not rely on any representations or warranties that are not expressly set forth in this Agreement. If any provision or provisions of this Agreement shall be held to be invalid, illegal, unenforceable or in conflict with the law of any jurisdiction, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired. Except as provided in Section 1, this Agreement may not be modified except by writing signed by you and us; provided, however, we may change these Terms from time to time, and such revised terms and conditions shall be effective with respect to any Advertising Products ordered after written notice of such revised terms to you or, if earlier, posting of such revised terms and conditions on our Web site.

Updated 10/17/2008

```
BERGEN COUNTY COURTHOUSE
SUPERIOR COURT LAW DIV
BERGEN COUNTY JUSTICE CTR RM 415
HACKENSACK       NJ 07601-7680
                                        TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (201) 527-2600
COURT HOURS

                        DATE:   APRIL 14, 2009
                        RE:     KOWALSKI VS YELLOWPAGES COM LLC
                        DOCKET: BER L -003316 09

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

     DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.

     THE MANAGING JUDGE ASSIGNED IS:  HON JONATHAN N. HARRIS

     IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     006
AT:  (201) 527-2600.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:

                            ATT: PAUL I. PERKINS
                            LYNCH LAW FIRM
                            45 EISENHOWER DRIVE
                            PARAMUS          NJ 07652


JUBEE5
```