UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

AL KOWALSKI d/b/a KOWALSKI :    Civil Action No. 1:10-cv-07318-PGG
PLUMBING, MICHELLE WINICK d/b/a :
MICHELLE WINICK DESIGN and :
MICHAEL GIDRO Individually and on Behalf :    <u>CLASS ACTION</u>
of All Others Similarly Situated, :
            :    PLAINTIFFS' MEMORANDUM IN
            Plaintiffs, :    SUPPORT OF MOTION FOR CLASS
            :    CERTIFICATION
       vs. :
            :
YELLOWPAGES.COM, LLC, :
            :
            Defendant. :

—————————————————— x

618970_1

# TABLE OF CONTENTS

**Page**

I.  Introduction ................................................................................................... 1

II.  Statement of Relevant Facts ........................................................................ 3

    A.  The Salespeople Are Extensively Trained to Deliver a Memorized Sales Pitch ..................................................................................... 3

    B.  The Memorized Sales Pitch ............................................................. 3

    C.  The Misleading Nature of the Scripted Sales Pitch ........................ 7

    D.  Delivery of the Terms and Conditions *After* the Class Members Had Purportedly Entered the Contract ............................................ 10

III.  Legal Standard in Certifying a Class Action .............................................. 12

IV.  Because This Action Involves Memorized Scripts Which Are Used with Each Class Member Certification of the Proposed Class Is Appropriate ................... 13

    A.  The Elements Under Rule 23(a), Numerosity, Typicality, Commonality, and Adequacy, Are All Satisfied ................................................... 14

        1.  The Members of the Class Are so Numerous that Joinder Is Impracticable ........................................................................ 14

        2.  There Are Questions of Law or Fact Common to the Members of the Class .......................................................................... 15

        3.  Plaintiffs' Claims Are Typical of the Claims of the Other Class Members ............................................................................... 16

        4.  Plaintiffs Will Fairly and Adequately Protect the Interests of the Class .................................................................................... 18

    B.  This Action Satisfies the Predominance Requirement of Rule 23(b)(3) ......... 19

        1.  Common Questions Predominate over Any Individual Issues ......... 19

        2.  Class Action Treatment Is Superior to Other Methods of Adjudication ......................................................................... 22

V.  Conclusion ................................................................................................... 25

618970_1

# TABLE OF AUTHORITIES

Page

## CASES

*Amchem Prods. v. Windsor,*
  521 U.S. 591 (1997)..........................................................................................18

*American Pipe & Constr. Co. v. Utah,*
  414 U.S. 538 (1974)..........................................................................................23

*Ansari v. New York Univ.,*
  179 F.R.D. 112 (S.D.N.Y. 1998) ......................................................................12

*Barrus v. Dick's Sporting Goods, Inc.,*
  No. 05-CV-6253 CJS, 2010 U.S. Dist. LEXIS 79014
  (W.D.N.Y. Aug. 4, 2010).................................................................................13

*Barry v. Arrow Pontiac, Inc.,*
  494 A.2d 804 (N.J. 1985)..................................................................................21

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
  Managed Care L.L.C.,*
  433 F.3d 181 (2d Cir. 2005)..............................................................................24

*Chana Friedman-Katz v. Lindt & Sprunguli (USA), Inc.,*
  270 F.R.D. 150 (S.D.N.Y. 2010) ......................................................................12

*Charrons v. Pinnacle Group NY LLC,*
  269 F.R.D. 221 (S.D.N.Y. 2010) ......................................................................15

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.,*
  502 F.3d 91 (2d Cir. 2007)................................................................................13

*Cox v. Sears Roebuck & Co.,*
  647 A.2d 454 (N.J. 1994)..................................................................................21

*Deposit Guar. Nat. Bank v. Roper,*
  445 U.S. 326 (1980)..........................................................................................23

*Duling v. Gristede's Operating Corp.,*
  267 F.R.D. 86 (S.D.N.Y. 2010) ........................................................................16

*Dupler v. Costco Wholesale Corp.,*
  249 F.R.D. 29 (E.D.N.Y. 2008) ...................................................................13, 14

**Page**

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ............................................................................................12

*Ersler v. Toshiba Am., Inc.*,
    No. CV-07-2304 (SMG), 2009 U.S. Dist. LEXIS 14374
    (E.D.N.Y. Feb. 24, 2009) ..................................................................................19

*Fensterstock v. Educ. Fin. Partners*,
    611 F.3d 124 (2d Cir. 2010) .............................................................................12

*Fleischman v. Albany Med. Ctr.*,
    No. 1806-CV-765, 2008 U.S. Dist. LEXIS 57188
    (N.D.N.Y. July 28, 2008) ..................................................................................16

*Fogarazzo v. Lehman Bros.*,
    263 F.R.D. 90 (S.D.N.Y. 2009) ........................................................................17

*Freeland v. AT&T Corp.*,
    238 F.R.D. 130 (S.D.N.Y. 2006) ......................................................................17

*Furst v. Einstein Moomjy, Inc.*,
    860 A.2d 435 (N.J. 2004) ..................................................................................25

*Genden v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,
    114 F.R.D. 48 (2d Cir. 1987) ............................................................................23

*General Tel. Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982) ...........................................................................12, 16, 23

*Gennari v. Weichert Co. Realtors*,
    691 A.2d 350 (N.J. 1997) ..................................................................................21

*Gross v. Wash. Mut. Bank, F.A.*,
    No. 02 CV 4135 (RML), 2006 U.S. Dist. LEXIS 16975
    (E.D.N.Y. Feb. 8, 2006) ....................................................................................14

*In re Blech Sec. Litig.*,
    187 F.R.D. 97, 107 (S.D.N.Y. 1999) ...............................................................19

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d. Cir. 2006) ("*IPO*")............................................................12, 13

*In re J.P. Morgan Chase Cash Balance Litig.*,
    242 F.R.D. 265 (S.D.N.Y. 2007) ......................................................................16

- iii -

**Page**

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997) *aff'd*, 148 F.3d 283 (3d Cir. 1998)......................................19

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)........................................................................................................12

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................................................19

*Jeffries v. Pension Trust Fund of Pension, Hosp. and Benefit Plan of the Elec. Ind.*,
   No. 99 Civ. 4174 (LMM), 2007 WL 2454111
   (S.D.N.Y. Aug. 20, 2007) ..........................................................................................................13

*Katz v. Image Innovations Holdings, Inc.*,
   No. 06 Civ. 3707 (JGK), 2010 U.S. Dist. LEXIS 73929
   (S.D.N.Y. July 22, 2010) ...........................................................................................................19

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ..............................................................................................22

*Lee v. Carter-Reed, LLC*,
   4 A.3d 561...................................................................................................................20, 21, 23, 24

*Lewis Tree Serv. v. Lucent Techs., Inc.*,
   211 F.R.D. 228 (S.D.N.Y. 2002) ..............................................................................................20

*McCracken v. Best Buy Stores, L.P.*,
   248 F.R.D. 162 (S.D.N.Y. 2008) ..............................................................................................20

*Miller v. Am. Family Publishers*,
   663 A.2d 643 (N.J. Ch. Div. 1995)...........................................................................................21

*Moore v. PaineWebber, Inc.*,
   306 F.3d 1247 (2d Cir. 2002)....................................................................................2, 19, 20, 22

*Moore v. PaineWebber, Inc.*,
   No. 96 Civ. 6820(JFK), 2001 U.S. Dist. LEXIS 2325
   (S.D.N.Y. Mar. 1, 2001) *aff'd*, 306 F.3d 1247 (2d Cir. 2002)................................................20

*Ogilvy Group Swed., AB v. Tiger Telematics, Inc.*,
   No. 05 CIV. 8488 (DLC), 2006 U.S. Dist. LEXIS 60456
   (S.D.N.Y. Aug. 29, 2006) ..........................................................................................................21

Page

*Open Hous. Ctr. v. Samson Mgmt. Corp.*,
 152 F.R.D. 472 (S.D.N.Y. 1993) ........................................................................14

*Pelman v. McDonald's Corp.*,
 No. 02 Civ. 07821 (DCP), 2010 U.S. Dist. LEXIS 114247
 (S.D.N.Y. Oct. 27, 2010) ....................................................................................19

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985)............................................................................................23

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
 226 F.R.D. 456 (S.D.N.Y. 2005) ........................................................................14

*Spagnola v. Chubb Corp.*,
 264 F.R.D. 76 (S.D.N.Y. 2010) ..............................................................13, 16, 18

*Spicer v. Pier Sixty LLC.*,
 269 F.R.D. 321 (S.D.N.Y. 2010) ........................................................................17

*Steinberg v. Nationwide Mut. Ins. Co.*,
 224 F.R.D. 67 (E.D.N.Y. 2004) ..........................................................................14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
 546 F.3d 196 (2d. Cir. 2008)...............................................................................13

*Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*,
 655 A.2d 417 (N.J. 1995).....................................................................................21

*Union Ink Co., Inc. v. AT&T Corp.*,
 801 A.2d 361 (N.J. App. Div. 2002).....................................................................24

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
 Rule 23 .........................................................................................................12, 13
 Rule 23(a).........................................................................................13, 14, 16, 19
 Rule 23(a)(1)........................................................................................................14
 Rule 23(a)(2)........................................................................................................14
 Rule 23(a)(3)........................................................................................................16
 Rule 23(b)......................................................................................................13, 19
 Rule 23(b)(2)........................................................................................................14
 Rule 23(b)(3)............................................................................................14, 19, 22
 Rule 23(b)(3)(A)..................................................................................................22
 Rule 23(b)(3)(B)..................................................................................................22

**Page**

New Jersey Consumer Fraud Act, N.J. Stat.
§56:8-1, *et seq.* ...................................................................................1

New Jersey Statutes
§56:8-2 ......................................................................................................21
§56:8-2.11 ................................................................................................24
§56:8-19 ...................................................................................................24

## SECONDARY AUTHORITIES

Arthur R. Miller, An Overview of Federal Class Actions: Past, Present and Future 24
(2d ed. 1977) ...........................................................................................15

Herbert B. Newberg & Alba Conte, Newberg on Class Actions
§7.17 (3d ed. 1992) .................................................................................13

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
Federal Practice and Procedure:
Civil 3d §1768 (3d ed. 2005) .................................................................18

## I.      Introduction

This class action is on behalf of all persons who allegedly entered into contracts with Defendant Yellowpages.com, LLC in New Jersey, for advertising services between May 1, 2005 and the present.  First Amended Complaint (Dkt. No. 16) ("FAC"), ¶114.  All plaintiffs and putative class members purchased listings on Yellowpages.com after being informed that the listing was supposed to substantially increase web-traffic from people looking for goods or services to the class members' websites.  Many of the class members also purchased Defendant's guaranteed clicks product – YPClicks.  With YPClicks!, Defendant guarantees to deliver a stated number of clicks (360 to 6,000) to the class members' website by "local," "targeted" and "qualified" customers.  Both products are abysmal failures.

With both products, plaintiffs and the class members received far fewer clicks than represented.  And those clicks they did receive were often far from local, targeted and/or qualified.  For example,  many potential class members report receiving phone calls from out-of-state individuals who could not possibly utilize the class members' products or services.  When the class members realize they are not receiving the promised benefits, Defendant refuses to cancel the contract, and even turns them over for collection if they refuse to continue to pay.

This class action seeks damages and equitable relief for violation of the New Jersey Consumer Fraud Act, N.J. Stat. §56:8-1, *et seq*. ("NJCFA") and for breach of contract.  Plaintiffs charge that two discrete frauds were perpetrated in the sale of Defendant's products.  The first is in inducing the business relationship itself through fraudulent misrepresentations and omissions as to the nature and quality of the services Defendant was supposed to provide. *See generally* FAC, ¶¶12-50. The second is in misrepresenting – indeed secreting – material terms of the agreement itself. *See generally* FAC, ¶¶51-63.

With respect to the attributes of the advertising products, Defendant's scripted sales pitch misrepresents the sales class members will receive each month by advertising on Yellowpages.com. Defendant's promise to deliver local, targeted and qualified customers also falls flat, as the majority of the clicks received are either for entirely different services, or come from locations not geographically relevant to class members' businesses.  Further, ignoring that material "Terms and Conditions" were only made known to the Class *after* the contract had purportedly been executed (if at all), Defendant insists they are binding, and subjects the class members to aggressive collections process to enforce payment if they do not pay for the benefits Defendant fails to deliver.

Class treatment is appropriate because plaintiffs and the class members were each subjected to the same uniform sales pitch, delivered by highly-trained salespeople, using a memorized script. Defendant's corporate designee admits that the language of the script – what he calls the "lyrics" – remained the same throughout the class period: "***the uniformality [sic] of the lyrics that were used to train our individuals is pretty basic – basically, the same.***"  Ex. 18, at 61:14-19 (Deposition of Patrick Quinlan) ("Quinlan Tr.").[1]  Similarly, the salespeople were trained to not provide or show the terms and conditions until after a signature had been obtained.  The Second Circuit explains that class certification is proper where (like here) proof is offered:

> that the misrepresentations were made pursuant to a written, standardized sales script and that the sales agents participated in a common training program that emphasized uniformity in sales techniques.

*Moore v. PaineWebber, Inc*., 306 F.3d 1247, 1253 (2d Cir. 2002).

---

[1]     Unless stated to the contrary, internal quotation marks and citations are omitted and emphasis is added and all "Ex." and "Exs." references are to the Declaration of Frank J. Janecek, Jr. in Support of Plaintiffs' Motion for Class Certification ("Janecek Decl.").

## II.   Statement of Relevant Facts

### A.   The Salespeople Are Extensively Trained to Deliver a Memorized Sales Pitch

Defendant's salespeople undergo an intensive training during the first two weeks of their of their employment. Quinlan Tr., 32:20-33:6. In the first 48 hours, they are required to memorize the "sales script." *Id*. at 81:14-82:20; Ex. 19. Remaining true to the script was so important that they were fired if they did not. Quinlan Tr. 81:14-82:20; Ex. 22. Salespeople practice their delivery of the sales pitch and scripted responses to common objections customers may raise with role playing exercises. Quinlan Tr. 54:8-55:3, 159:21-160:7; Exs. 25-26. Throughout their employment, every salesperson also attended weekly training sessions to reinforce the scripted presentation learned in their initial training, as well as the necessity of following the script for every pitch. Quinlan Tr. 31:20-32:1, 95:3-20, 100:10-104:6, 190:23-191:2. Weekly training ensures that salespeople will not deviate from the scripted presentation in the field: "[I]t was always core for a selling organization to rehash the steps of the sales." Quinlan Tr. 107:9-12.

Defendant's corporate designee admits that a common script was utilized to train its salespeople. Quinlan Tr. 73:20-74:1-4; *accord* Ex. 20 at 45:1-9, 46:13-47:21 (Deposition of Jacob Lee) ("Lee Tr."). Moreover, three former sales representatives have independently confirmed the extensive training they received to memorize and use the scripted sales pitch, and that they in fact used the scripted sales pitch in the field. Exs. 21-23. Defendant trained its salespeople to deliver the same "core" message and follow the same "steps of the sale" regardless whether the customer had 2 or 200 employees. Quinlan Tr. 93:17-97: 14, 190:16-22; *accord* Lee Tr. 46:8-11.

### B.   The Memorized Sales Pitch

Regardless whether the sales pitch was given over the phone or at the class members' premises, the sales script consists of six steps: (1) the approach; (2) fact-finding; (3) a needs

assessment; (4) the presentation; (5) the close; and (6) a return on investment ("ROI") analysis (if needed).  Quinlan Tr. 136:6-140:19; *see also* Exs. 8-10 (Sales Scripts).  Defendant's corporate designee admits that "***the core steps of the sale, they've always been constant throughout***."  Quinlan Tr. 215:2-3; *accord* Lee Tr. 46:13 – 47:21.

      **The Approach**:  The salesperson begins by thanking the class member for their time, after which they set the stage by telling them that Yellowpages.com can help them grow their business by providing "***guaranteed traffic to your website***."  Ex. 8; *see also* Exs. 9-10.

      **The Fact Finding**:  Here, the salesperson asks a series of questions to obtain information to be used later in the sales pitch, *e.g.* how much money they make on their average job or product sold; how many additional jobs or sales they can handle and how far they will travel for a job or sale.  Exs. 8-10 (Scripts); *see also* Quinlan Tr. 60:19-61:19.  The salesperson also asks: "***If 10 people were to search for a local [class member's business] on-line, and they found your web site, how many would end up doing business with you***?"  Ex. 8; *see also* Exs. 9-10.  This leading question is designed to elicit a whole number response between 1 and 10, resulting in conversion rates in multiples of 10%.  The salesperson enters the class member's answers into a spreadsheet on their laptop which calculates a "return on investment" amount the class member can expect to receive.  Ex. 29 (Return on Investment).

      **The Needs Assessment**:  The needs assessment focuses on how much growth the customer can handle.  Exs. 8-10 (Scripts).  Here, the salesperson repeats the information he/she just learned about the current average amount of work, the growth class member seeks and the average dollar amount per sale or job.  *Id*.

      **The Pitch**:  The salesperson tells the class member that advertising on Yellowpages.com will "***drive traffic to your business***" through search engines and internet Yellow Pages directories.

Ex. 8; *see also* Exs. 9-10.  Class members are told:  **"We connect buyers with sellers by searching a specific category in a geographic area . . . just like using the print yellow pages but online**."  *Id.*  The script directs the salespeople to provide the customer with the "Advertising Products" sales piece and a "print out of a local search" on Yellowpages.com.  *Id.*  The sales piece tells class members that "*[o]ver 74% of online users who visit YELLOWPAGES.COM contact a merchant*" and that "*55% of online users who visit YELLOWPAGES.COM make a purchase from a merchant*."  Exs. 2-6 and 30.  The local search printout purports to show that hundreds of searches are made in the class member's local area each month, by people looking for the services and goods he/she provides.  Ex. 31-33.  The salesperson asks the class member to imagine the several hundred potential customers who were searching for their business last month.  Exs. 8-10.  Using the sales pieces (Exs. 2-6), the salesperson describes the various listing products (Bronze, Silver, Gold, Platinum and Priority), explaining that each progressive category will drive more and more business to their website.[2]  Exs. 8-10 (Scripts).

The scripted pitch next moves to the guaranteed clicks product.  Class members are told that with YPClicks!  Defendant "**promotes your website on an expansive network of search engines where we offer a guaranteed number of clicks annually to your website.  We build traffic to your website when someone is searching in their local area for the services you offer**."  Exs. 8-10; *see also* Ex. 7.  The salesperson again confirms that: "When people are searching for your products or

---

[2]      Each of the plaintiffs purchased a Platinum listing. Ex. 12, at 91:9-15 (Deposition of Alfred Kowalski) ("Kowalski Tr."); Ex. 13, at 44:4-6 (Deposition of Michelle Winick) ("Winick Tr."), and *see* Ex. 17.

services **on search engines** we are going to market your website to offer **local targeted qualified traffic to your website**."  Ex. 8-10.[3]

    **The Close**:  The salesperson tells the class member he/she needs his/her signature to reserve their purchase (or in the case of a telephone sale, obtains oral commitment), and hands him/her a stylus to provide an electronic signature.  Exs. 8-10.

    **Return on Investment Analysis**:  If the class member hesitates, questions the cost or declines, the salesperson pulls up the "Return on Investment" ("ROI") spreadsheet and estimates the financial return the class member can expect by purchasing Defendant's products.  Ex. 34 at 132:4-22 (Deposition of Brooks McMahon) ("McMahon Tr.").  The return on investment is considered a key element of the sales pitch. Quinlan Tr. 56:16-23.  Indeed, it was needed in almost every sales pitch.  Exs. 21-23.

    The scripted ROI analysis begins by reminding the class member that hundreds of searches for similar goods and/or services were made in the last month.  Ex. 29.  The salesperson repeats that 74% of these searches will result in a customer contacting a merchant.  *Id*.  The ROI spreadsheet purports to show the number of potential customers by multiplying the number of searches by 74%.  *Id*.  As a "Trust Checker," the salesperson asks the class member to agree he/she can "conservative[ly]" expect to be contacted by 1% of these potential customers, and calculates the average number of calls the class member will receive each month.  *Id*.  The salesperson next reminds the class member of the number of customers out of 10 who he/she earlier stated would do business with him/her, and the average dollar amount he/she would receive from each of those

---

[3]    Plaintiff Gidro purchased Defendant's guaranteed clicks product, at a cost of $467, which for which he was supposed to receive 360 local, targeted and qualified clicks per year, 30 per month. FAC, ¶¶102, 103; Ex. 17.

customers.  *Id*.  Applying those numbers, the ROI scripting materially overinflates the sales the class

member can expect to receive each month by advertising on Yellowpages.com.  *Id*.

      **C.**      **The Misleading Nature of the Scripted Sales Pitch**

      The scripted sales pitch is riffled with misleading representations and omissions.  It does this

in at least three ways: (1) it overstates the "conversion" statistics; (2) it overstates the class members'

expected return on investment; and (3) it misrepresents that the clicks received will be local, targeted

and qualified.

      **Overinflated Conversion Statistics**:  The scripted pitch vastly overstates the conversion rate

class members could expect by advertising with Yellowpages.com.  In asking the leading question

about how many people out of 10 would do business with you (Exs. 8-10), Defendant designed the

scripted pitch to lead the class members to believe that the conversion rates they can expect are 10%,

20%, 30% or greater.  However, based on his experience with hundreds of ecommerce companies

(and on empirical studies), Mr. Kent opines that "***online conversion rates are tiny, more often than***

***not under 1%***."  Ex. 16 at 11 (Expert Report of Peter Kent) ("Kent Report").  Concealing this

material information from consideration, the scripted pitch omits to tell the class members that it will

likely take more than a hundred clicks to even achieve a single sale.

      **Return on Investment Calculation**:  The return on investment analysis is further inflated

when it represents that over 74% of the ***searches*** made on Yellowpages.com will result in a contact

with one of the listed businesses.  Ex. 29.  The "research" referred to is a "Morpace study." Exs. 2-6.

But, that "is simply not correct; it is a misinterpretation of the study."  Kent Report at 32.  What the

study actually concluded is that 74% of the ***people surveyed*** contacted or visited a merchant they

found on Yellowpages.com.  It does not state that 74% of ***searches*** result in a contact.  Ex. 35 at

Question 331.

The number of *visitors* who contact a merchant does not tell you how many *searches* turn into a contact.  Kent Report at 32.  In fact, the Morepace Study concluded that people who searched Yellowpages.com *visited the website an average of 4.9 times per month*.  Ex. 35 at Question 328.  Even assuming that each visitor conducts just a single search per visit, the Morpace Study would conclude that only *15%* of the searches made would turn into a contact, far less than the 74% represented to the class members.  Kent Report at 33.  Beyond making multiple visits per month, the average visitor makes several searches during each of those visits.  *Id*.  If a visitor searches only twice on average, the percentage of searches turning into contacts would in reality be 7.5%, and if it is three times the percentage would really be 5%.[4]  *Id*.  As Mr. Kent concludes:

> By using the wrong number—the percentage of *searches* rather than *searchers*, the <u>YP.com</u> salesperson creates a completely incorrect impression of the amount of business likely to result from the searches.

*Id*. (emphasis in original).  Indeed, Morpace itself specifically told Defendant the study did not support the sales statistics as Defendant was representing them:  "*[H]ow these data are plugged into your tools and used in your sales, ROI, and conversion calculations is beyond the scope of the study*."  Ex. 37; *see also* Ex. 36, at 116-121 (Deposition of Gregory Deinzer) ("Deinzer Tr.").

Having inflated the number of potential new customers, the ROI analysis also exaggerates the expected number of sales the class member can expect to make.  As a "trust checker," the ROI script "conservatively assumes" the class member will receive 1% of the total monthly contacts identified on the print out of the local Yellowpages.com search.  Ex. 29.  Defendant then misleadingly applies the previously elicited 10%, 20% 30% estimate to the inflated number of

---

[4]     Once Defendant provides discovery identifying the average number of searches per visit (which data is contained in their databases), the actual expected conversion rate can be easily calculated.  Kent Report at 33.

contacts and calculates the number of new customers the class member can expect to receive.  *Id*. But with internet advertising the true conversion rate is 1% – not the 10%-30% (or more).  Kent Report at 11, 30.

      **"Local," "Targeted" and "Qualified" Clicks**:   Defendant's representation that by advertising on Yellowpages.com, the class members will receive "local," "targeted" and "qualified" clicks is similarly false.   Defendant targeted the marketing of its advertising products on yellowpages.com to small local businesses.  Ex. 28.  These types of businesses need to advertise to people who are in a "small relevant geographical radius."  Kent Report at 15.  With respect to Google's pay-per-click advertising network, Google recommends targeting local ads within a 20-mile radius.  *Id.* at 18.  Even then, ensuring that the clicks received are within such a geographic area is only moderately accurate, with 17% of the searches coming from outside the targeted area.  *Id.* at 17-18.  The geographic area Defendant uses is orders of magnitude larger than 20 miles.

      Plaintiffs and the class members received far fewer clicks than represented.  And those clicks they did receive were often far from local, targeted and/or qualified.  Instead of using a given mileage from the class members' business, or even the city in which the business is located, Defendant uses "Designated Market Areas" ("DMA") as the purportedly relevant market.  Ex. 40 ("At this time we are targeting only 1 DMA or MegaZone per campaign based on actual business location or service area."); *see also* Ex. 42.  Here, the New Jersey class members purportedly "local, targeted and qualified" clicks come from the New York DMA.  *See* McMahon Tr. 57-63.  Far from local, targeted and qualified, the New York DMA "***represents about 6.5% of the U.S. population and is somewhere around 5 times the size of a circle with a 20-mile circumference***."  Kent Report at 18.  Because of the extremely large size of the New York DMA, the New Jersey class members

- 9 -

"end up getting a lot of clicks that are highly unlikely to turn into business." *Id.* at 18.  As Mr. Kent concludes:  "YP cannot fairly claim that all the clicks will be local clicks." *Id.* at 18.

**Search Engine Program**:  Defendant's scripted pitch represents that with the guaranteed clicks program, the clicks will come from people who are actively looking for goods or services using search engines.  Ex. 18.  Indeed, Defendant's salespeople were trained to stress that clicks will come from internet search engines. Quinlan Tr. 145:23-146:10.  Clicks originating from a search engine by someone actively looking for a business to supply a good or service are valuable.  Kent Report at 41.  However, many (if not most) of the clicks Defendant delivers come from "ad content networks." *Id.* at 41-42.  Clicks from ad content pages – where people are ***not actively looking for a good or service*** but instead are reading an internet article upon which the pay-per-click ad is placed – are much less likely to convert to sales. *Id.* at 41.

Finally, beyond use of the too large New York DMA and extensive reliance on the ad content networks, Mr. Kent identified no less than 12 additional flaws that preclude Defendant from complying with their promise to deliver local, targeted and qualified clicks. *Id.* at 35-44.

**D.    Delivery of the Terms and Conditions *After* the Class Members Had Purportedly Entered the Contract**

Defendant's sales force does not to provide (or even discuss) the "Terms and Conditions" until after the customer has signed the "insertion order," or recorded their oral assent to purchase over the phone.  Quinlan Tr. 249:21-250:1, 260:1-10; Ex. 45.  In fact, the salespeople are expressly trained to not give them the terms and conditions until after the customer signs, or verbally assents with telephone sales. *See generally* Exs. 21-23.  Defendant contends that "a deal is completed upon a customer signing a contract, under an insertion order, be it a paper or electronic copy determined on when the electronic copy was – the E-signature was deployed as well as for telephone; it was based off of a voice verification process." Quinlan Tr. 241:7-21.

- 10 -

With premises sales, once the salesperson convinces the class member to purchase one or more of Defendant's products, he/she gives them a laptop with a truncated form for the class member to electronically sign. Quinlan Tr. 253:4-8. Omitted entirely from the class member's view is any reference to a document referred to as the "Terms and Conditions for Internet Advertising" ("Terms and Conditions"). *See generally* Ex. 52. The entire contract including the Terms and Conditions was thereafter e-mailed or mailed to the class members. Quinlan Tr. 274:9-14. With telephone sales, it was not until the conclusion of the voice verification script – after the customer orally agreed to purchase one or more products – that the class member is told additional terms and conditions are located on-line. Quinlan Tr. 241:7-21, 260:1-10; Ex. 42.

Accordingly, it is only after the class member is fraudulently induced into providing his/her assent to purchase that they receive: (i) a complete version of the contract including the section previously withheld from plaintiffs that purported to incorporate the Terms and Conditions by reference; and (ii) a copy of the Terms and Conditions themselves. The Terms and Conditions contain numerous additional terms of which the class members were never aware, and to which they have not agreed. Exs. 14, 17 and 43. In other words, the written "contract" containing, and making reference for the first time to, the Terms and Conditions arrives only after the class member has purportedly orally bound him or herself to the contract.

Class members who disagree with the Terms and Conditions and/or realize they are not receiving the services they were promised are unable to cancel the contract. Ex. 21. When the Defendant is unable to deflect a class member's complaint and he/she stops paying, he/she is subjected to an aggressive collections process to enforce payment. *See, e.g.*, Winick Tr. 13-17; Ex. 44 (e-mail from Yellowpages.com collections); Ex. 45 (collections letter).

### III.     Legal Standard in Certifying a Class Action

The requirements of Rule 23 are liberally construed in recognition of the rule's policy in

favor of class actions – particularly consumer class actions:

> Frequently numerous consumers are exposed to the same dubious practice by the same seller so that proof of the prevalence of the practice as to one consumer would provide proof for all. ***Individual actions by each of the defrauded consumers is often impracticable because the amount of individual recovery would be insufficient to justify bringing a separate action; thus an unscrupulous seller retains the benefits of its wrongful conduct***. A class action by consumers produces several salutary by-products, including a therapeutic effect upon those sellers who indulge in fraudulent practices . . . .

*Fensterstock v. Educ. Fin. Partners*, 611 F.3d 124, 133 (2d Cir. 2010) (emphasis in original). Thus,

"doubts as to the propriety of certification are to be resolved in favor of allowing the class action."

*Ansari v. New York Univ.*, 179 F.R.D. 112, 117 (S.D.N.Y. 1998). Indeed, "[a] company which

wrongfully exacts a dollar from each of millions of customers will reap a handsome profit; the class

action is often the only effective way to halt and redress such exploitation." *Fensterstock*, 611 F.3d

at 133.

In deciding class certification, the court does not decide the merits of the underlying

controversy. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 133 (2d Cir. 2001); *see

also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). However, "sometimes it may be

necessary for the court to probe behind the pleadings before coming to rest on the certification

question." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982). *Chana Friedman-

Katz v. Lindt & Sprunguli (USA), Inc.*, 270 F.R.D. 150, 153-54 (S.D.N.Y. 2010) ("The requirements

of Rule 23 are to be applied liberally, although the Court must still conduct a rigorous analysis of the

criteria set forth in Rule 23."). The court must determine that "each of the Rule 23 requirements has

been met" based on a review of sufficient evidence. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d

24, 41 (2d. Cir. 2006) ("*IPO*"). However, nothing in *IPO* disturbs the basic Second Circuit principle

- 12 -

that Rule 23 is to be liberally construed. *Jeffries v. Pension Trust Fund of Pension, Hosp. and Benefit Plan of the Elec. Ind.*, No. 99 Civ. 4174 (LMM), 2007 WL 2454111, at *10 (S.D.N.Y. Aug. 20, 2007).

While all evidence submitted must be considered, Courts should avoid mini-trials of substantial portions of the underlying litigation. *IPO*, 471 F.3d at 41; *see also Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29 (E.D.N.Y. 2008). Indeed, full evidentiary hearings on Rule 23 issues are unnecessary, where the court "receive[s] enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 93 (S.D.N.Y. 2010).

Finally, the applicable requirements of Rule 23 must be met by a preponderance of the evidence. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d. Cir. 2008). The leading treatise on class actions "indicates that the plaintiff's burden under Rule 23 is merely a burden to plead facts indicating that Rule 23 is satisfied, which then creates a rebuttable presumption in favor of class certification." *Barrus v. Dick's Sporting Goods, Inc.*, No. 05-CV-6253 CJS, 2010 U.S. Dist. LEXIS 79014, at *9 n.1 (W.D.N.Y. Aug. 4, 2010) (citing 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions §7.17 (3d ed. 1992)).

## IV.   Because This Action Involves Memorized Scripts Which Are Used with Each Class Member Certification of the Proposed Class Is Appropriate

Rule 23 establishes the prerequisites for class certification. Rule 23(a) contains four prerequisites: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of fact or law common to the class; (3) the claims or defenses of the representatives are

typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  In addition, one of the three requirements under Rule 23(b) must be satisfied. Here, both Rule 23(b)(2) and (3) are satisfied.  Defendant has acted "on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," and the common issues of law or fact (in this case, both) predominate over individual issues, and a class action is the superior method for fairly adjudicating this dispute. Indeed, it is the only method for fairly doing so.  Fed. R. Civ. P. 23(b)(2).

> **A.    The Elements Under Rule 23(a), Numerosity, Typicality, Commonality, and Adequacy, Are All Satisfied**
>
> > **1.    The Members of the Class Are so Numerous that Joinder Is Impracticable**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members be impracticable.  "[T]he Second Circuit has observed that numerosity is presumed at a level of 40 members."  *Dupler*, 249 F.R.D. at 36; *see also Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 226 F.R.D. 456, 466 (S.D.N.Y. 2005).  Reasonable estimates of class size are sufficient to establish numerosity.  *Gross v. Wash. Mut. Bank, F.A.*, No. 02 CV 4135 (RML), 2006 U.S. Dist. LEXIS 16975, at *5-*6 (E.D.N.Y. Feb. 8, 2006); *Open Hous. Ctr. v. Samson Mgmt. Corp.*, 152 F.R.D. 472, 475 (S.D.N.Y. 1993). Here, Defendant's corporate designee testified there were approximately 11,700 different orders for internet advertising, based in New Jersey pulled from the Yellowpages sales ordering database, between May 1, 2005 and January 2010. Ex. 1 at 74:3-81:20 (Deposition of Jason Boehret) ("Boehret Tr.").  As the class members number in the thousands, numerosity is satisfied.

### 2. There Are Questions of Law or Fact Common to the Members of the Class

The commonality requirement of Rule 23(a)(2) is satisfied when one or more common questions of law or fact are present.  *See Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 72 (E.D.N.Y. 2004).  "Typically, the subdivision (a)(2) requirement is met without difficulty for the parties and very little time need be expended on it by the . . . judge." Arthur R. Miller, An Overview of Federal Class Actions: Past, Present and Future 24 (2d ed. 1977); *accord Charrons v. Pinnacle Group NY LLC*, 269 F.R.D. 221, 230 (S.D.N.Y. 2010) (explaining that commonality is usually a minimal burden for a party to shoulder and is to be liberally construed).  Indeed, if one issue of law or fact is common to the whole class, the commonality prerequisite is satisfied.  *Charrons*, 269 F.R.D. at 230.

This case involves a classic example of deception of an entire class which involves common questions of both fact and law.  Plaintiffs and the class members all received the same sales pitch based upon a memorized scripted presentation.  As a result, the following questions, among others, are common to each of the class members:

Does Defendant use a uniform scripted presentation to sell its products?

Does the scripted sales pitch contain material misrepresentations or omissions?

Do the written sales materials contain material misrepresentations or omissions?

Does use of the New York DMA provide "local, targeted and qualified" clicks?

Does the uniform presentation used by Defendant have the capacity to mislead?

Is there a valid contract between Defendant and the Class Members where the Terms and Conditions are not provided to the Class Members until after they purportedly have given their assent to the Order?

Do defendants perform the technical functions as represented and whether the functions performed are in accordance with industry standards?

Does Defendant's conduct constitute a breach of that contract?

- 15 -

Does Defendant's conduct violate the NJCFA?

What are the proper remedies for Defendant's improper conduct?

At bottom, because plaintiffs and the class members were bilked by the same scripted sales pitch, they share these common issues.

### 3. Plaintiffs' Claims Are Typical of the Claims of the Other Class Members

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." "Like that for commonality, the threshold for 'typicality'. . . is not high." *Fleischman v. Albany Med. Ctr.*, No. 1806-CV-765, 2008 U.S. Dist. LEXIS 57188, at *9 (N.D.N.Y. July 28, 2008).

> As the Supreme Court has found, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."

*Spagnola*, 264 F.R.D. at 93 n.19 (citing *Gen. Tel. Co. of the Southwest*, 457 U.S. 147).  "[T]he commonality and typicality requirements together, require Plaintiffs to show that they raise questions of fact or law, arising out of a single course or conduct or set of events, that are common to all putative class members and that their individual claims and circumstances are sufficiently similar to those of the absent class members so as to ensure that the named plaintiffs will press the claims of all class members." *Duling v. Gristede's Operating Corp.*, 267 F.R.D. 86, 97 (S.D.N.Y. 2010).  "[T]he typicality requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id.* at 96.

"This prong of the test does not require that the factual background of each named plaintiff's claim be identical to that of all class members; rather it requires that the disputed issue of law or fact

- 16 -

occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *In re J.P. Morgan Chase Cash Balance Litig.*, 242 F.R.D. 265, 272-73 (S.D.N.Y. 2007). "Rather than focusing on the precise nature of plaintiffs' injuries, the typicality requirement may be satisfied where injuries derive from a unitary course of conduct by a single system." *Fogarazzo v. Lehman Bros.*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009); *see also Spicer v. Pier Sixty LLC.*, 269 F.R.D. 321, 337 (S.D.N.Y. 2010). Stated differently, the focus of the typicality inquiry is not the class member's behavior, but the defendant's "course of conduct." *Spicer*, 269 F.R.D. at 337.

Here, typicality is demonstrated by the deposition of Defendant's corporate designee when he describes the manner in which the sales pitch is made by Defendant's sales representatives. Further, plaintiffs have located no less than [four] former sales representatives have independently confirmed the extensive training they received to memorize and use the scripted sales pitch, and that they in fact used the scripted sales pitch in the field. Exs. 21-23. As Defendant's corporate designee admits, "***the core steps of the sale, they've always been constant throughout***." Quinlan Tr. 215:2-3. The evidence demonstrates that the scheme was identically carried out with respect to plaintiffs and each class member, through a memorized sales presentation.

In short, the claims of plaintiffs and the class members allege the same set of operative facts and derive from the same legal theories. Defendant's methodical step-by-step approach establishes that the proximate cause of their injuries flow from a uniform set of operative facts. Each was cheated out of their money through the same scheme utilizing the same scripted sales pitch. Accordingly, the typicality element is satisfied.

**4.      Plaintiffs Will Fairly and Adequately Protect the Interests of the Class**

The purpose of Rule 23's adequacy requirement is "designed to ferret out potential conflicts *between representatives and other class members*." *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 141 (S.D.N.Y. 2006) (emphasis in original).  The adequacy prong entails a two part inquiry.  "To show that absent class members are adequately represented, plaintiffs must prove that (1) class counsel is qualified, experienced, and generally able to conduct the litigation; and (2) proposed class representatives have no interests that are antagonistic to the proposed class members." *Spagnola*, 264 F.R.D. at 95.  The adequacy element is satisfied where the plaintiff's claims "are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).  Only a conflict that goes to the very nature of the subject matter will defeat a party's claim of representative status.  7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 3d §1768 (3d ed. 2005).

Both prongs of the "adequacy" test are easily met here.  First, there can be no legitimate dispute that plaintiffs have retained counsel who have the abilities and resources to prosecute the action.  Plaintiff's counsel include attorneys who are among the most experienced in the nation in successfully prosecuting class actions.  As the firm resumes of Robbins Geller Rudman & Dowd LLP, Cohn Lifland Pearlman Herrmann & Knopf LLP, Lynch, Held, Rosenberg & Perkins P.C., Milberg LLP and Sommers Schwartz PC demonstrate, these firms possess extensive experience in the area of class actions and consumer litigation and have successfully prosecuted numerous class actions on behalf of injured persons and consumers in this district and across the country.  *See* Exs. 47-51.  Second, the named plaintiffs' interests are co-extensive with the class members' interests and their claims are typical of those of the other class members.  Just like the absent class members,

- 18 -

plaintiffs have a strong interest in proving the elements of those claims.  Kowalski Tr. 157:6-158:20; Gidro Tr. 174:25–175:9; Winick Tr. 85:7–86:25.  As plaintiffs seek no relief that is any different than that sought for the class (FAC at Prayer), there is no conflict or antagonism between their interests and those of the members of the class.

### B.     This Action Satisfies the Predominance Requirement of Rule 23(b)(3)

Having satisfied the elements of Rule 23(a), the analysis turns to Rule 23(b).  "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Pelman v. McDonald's Corp.*, No. 02 Civ. 07821 (DCP), 2010 U.S. Dist. LEXIS 114247, at *28-*29 (S.D.N.Y. Oct. 27, 2010).  Here, because common questions predominate over any individual issues, and prosecution of a class action is superior to the filing of multiple individual actions, Rule 23(b)(3) is met.

### 1.     Common Questions Predominate over Any Individual Issues

"Predominance is a test readily met in certain cases alleging consumer or securities fraud . . . ." *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2010 U.S. Dist. LEXIS 73929, at *15 (S.D.N.Y. July 22, 2010); *see also Ersler v. Toshiba Am., Inc.*, No. CV-07-2304 (SMG), 2009 U.S. Dist. LEXIS 14374, at *12 (E.D.N.Y. Feb. 24, 2009).  Predominance is satisfied where plaintiffs establish "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject to individualized proof." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 90 (S.D.N.Y. 2007) (quoting *Moore*, 306 F.3d at 1252).  "[W]hen determining whether common questions predominate courts' focus on the liability issue . . . and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999).

- 19 -

Common issues of law and fact generally predominate in actions (like this one) alleging that common representations are made. *Katz*, 2010 U.S. Dist. LEXIS 73929, at \*15; *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 513-14 (D.N.J. 1997) ("One indicator of a scheme of common deception is that the oral representations were substantially similar.") *aff'd*, 148 F.3d 283 (3d Cir. 1998).   Indeed, certification is appropriate where proof is offered – such as plaintiffs submit here – "that the misrepresentations were made pursuant to a written, standardized sales script and that the sales agents participated in a common training program that emphasized uniformity in sales techniques."   *Moore*, 306 F.3d at 1253; *see also Lewis Tree Serv. v. Lucent Techs., Inc.*, 211 F.R.D. 228, 234 (S.D.N.Y. 2002).   As *Moore* explains:

> Courts have permitted class resolution of claims based upon oral misrepresentations where those misrepresentations were made pursuant to a uniform "written script."   In such cases, a uniform written script serves to "further guarantee[] the consistency of accompanying oral misrepresentations."

*Moore v. PaineWebber, Inc.*, No. 96 Civ. 6820(JFK), 2001 U.S. Dist. LEXIS 2325, at \*9-\*10 (S.D.N.Y. Mar. 1, 2001) *aff'd*, 306 F.3d 1247 (2d Cir. 2002).   Indeed, with evidence of uniform misrepresentations, questions of liability on a class scale are a simpler matter to determine. *McCracken v. Best Buy Stores, L.P.*, 248 F.R.D. 162, 168 (S.D.N.Y. 2008).

Here, the overarching question in every class member's claim centers on the representations and omissions contained in Defendant's scripted sales pitch.   Any attempt by Defendant to argue there are a number of misrepresentations alleged in the script and not all were made to every class member, would be contrary to the evidence and should be rejected.   The evidence establishes that: a common script was utilized to train Defendant's sales people; the salespeople had to memorize the script verbatim or they were fired; the salespeople attended weekly training to reinforce the scripted presentation and stress the necessity of following the script for every pitch and that the salespeople were instructed that every sales pitch should contain the same "core concepts."   Moreover,

- 20 -

Defendant's corporate designee confirms that such extensive training is undertaken in order to ensure "the core components wouldn't change."  Quinlan Tr. 201:12-22.  At most, any contrary evidence would merely create a triable issue of fact.  Indeed, a further observation of New Jersey's Supreme Court in *Lee* is particularly appropriate here:

> A corporate defendant engaged in a marketing scheme founded on a multiplicity of deceptions should not be in a better position in fending off a motion for class certification than a defendant engaged in a sole marketing deception.

*Lee v. Carter-Reed, LLC*, 4 A.3d 561, 580 (N.J. 2010).

Similarly, any attempt by Defendant to argue that individual issues of reliance exist would be misplaced.  Claims under NJCFA do not require proof of reliance.[5]  New Jersey Statute §56:8-2; *Lee*, 4 A.3d at 580 (N.J. 2010); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 365 (N.J. 1997). The question to be resolved in an NJCFA claim is not whether anyone has in fact been misled, but whether the defendant's conduct ***has the capacity*** to mislead.  *Miller v. Am. Family Publishers*, 663 A.2d 643, 647 (N.J. Ch. Div. 1995); *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) ("A practice can be unlawful even if no person was in fact misled or deceived thereby.");  *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 655 A.2d 417, 429 (N.J. 1995); *Barry v. Arrow Pontiac, Inc.*, 494 A.2d 804, 810 (N.J. 1985) (The question is "whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer.").  Moreover, in last year's seminal NJCFA decision the New Jersey Supreme Court reiterated that "[b]ecause it is remedial legislation, the [NJ]CFA is construe[d] liberally to accomplish its broad purpose of safeguarding the public."  *Lee*, 4 A.3d at 577.

---

[5]     The same is true with respect to the breach of contract count.  "Reliance is not a required element of a breach of contract claim . . . ."  *Ogilvy Group Swed., AB v. Tiger Telematics, Inc.*, No. 05 CIV. 8488 (DLC), 2006 U.S. Dist. LEXIS 60456, at *5 (S.D.N.Y. Aug. 29, 2006).

- 21 -

At bottom, the appropriateness of class treatment is obvious.  The mechanism of the fraud is the use of a scripted sales presentation made to each and every class member.  Because the alleged misrepresentations and omissions "were made pursuant to a written, standardized sales script and . . . the sales agents participated in a common training program that emphasized uniformity in sales techniques" predominance is satisfied.  *Moore*, 306 F.3d at 1253.

### 2. Class Action Treatment Is Superior to Other Methods of Adjudication

Plaintiffs must also show that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  In considering superiority, Courts are to consider:

> (A)  the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members;  (C)  the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  "[S]uperiority, will be met if, in terms of fairness and efficiency, the Court finds that the advantages of a class action are greater than those of alternative available methods of adjudication."  *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 186 (S.D.N.Y. 2008).  Here, the proposed class members have a significant interest in proceeding as a Class.  Undoubtedly, it would be economically burdensome for individual plaintiffs to proceed individually, given the millions of dollars necessary to prosecute this case and the relatively small losses they suffered.

### a. The Lack of Interest by Class Members to Individually Prosecute Separate Actions Supports Certification

As for Rule 23(b)(3)(A) and (B) – the interest of individual class members to control and to file separate actions and the extent of any such actions filed by class members – these factors favor certification of the class.  Plaintiffs' counsel is not aware of any individual actions that have been

filed by a consumer who purchased a Yellowpages.com listing and/or guaranteed clicks product. Janecek Decl., ¶60-61.  Moreover, as explained in the next section, due to the small individual amounts at issue, any notion that such claims could be litigated individually would be wholly unrealistic.

> **b.      The Desirability of Concentrating the Litigation in One Forum Supports Certification**

Where claims are numerous and relatively small, such that individuals are unlikely to incur the cost and take on the burden of litigation, the superiority of the class action is beyond dispute. *Genden v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 114 F.R.D. 48, 53 (2d Cir. 1987).  As the Supreme Court has repeatedly recognized: "Class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *see also Deposit Guar. Nat. Bank v. Roper*, 445 U.S. 326, 339 (1980).  Here, not only would it be "uneconomical" for class members to litigate individually, the class action device is the only viable vehicle by which persons injured by the scripted sales pitch may obtain a remedy. Because of the relatively small dollar amount of their individual claims, the high cost of discovery, and the high cost of experts, that issue will be resolved for injured consumers only if this case is certified as a class action.  "[M]ost of the plaintiffs would have no realistic day in court if a class action were not available."  *Shutts*, 472 U.S. at 809; *Lee*, A.3d at 580.

Moreover, certification of the class will promote "'the efficiency and economy of litigation which is a principal purpose of the [class action] procedure.'" *General Tel. Co. of Southwest*, 457 U.S. at 159 (quoting *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974)).  Class certification is both useful and necessary and the class action device offers judicial efficiencies because it permits common claims and issues to be tried only once, with binding effect on all parties. Without class certification, individual class members would be forced to file individual suits, where

court after court would be forced to answer the exact same questions – is scripted sales pitch misleading or deceptive.  Accordingly, the superiority requirement is satisfied

### c.   The Proposed Class Is Easily Manageable

This case presents no management difficulties precluding it from being maintained as a class action.  Janecek Decl., ¶¶5-6.  Indeed, this action is simple and straight forward.  If the jury finds that the scripted pitch is misleading or deceptive or that material portions of the agreement were withheld from the class members, it will find for the class on those issues.  Conversely, if the jury finds that is not the case, the ruling will be in favor of Defendant.  Once these common questions are resolved, all that remains is computing the amount of damages each class member suffered – information which is accessible from Defendant's electronic databases.[6]  And, plaintiffs' expert has identified three available damage models that can be utilized to calculate damages on a class-wide basis:

> First, returning all payments back to YellowPages.com customers.[7]  Second, the disgorgement approach.[8]  This involves the restitution of the amount paid by YellowPages.com customers less YellowPages.com's actual costs.  Third, actual damages suffered by YellowPages.com customers.  This would involve multiplying the ratio of actual benefits received by YellowPages.com customers to the promised benefits to YellowPages.com customers times the purchase amount.

---

[6]   Defendant's databases contain the name, address, date of enrollment, and the amount purchase price each paid.  Boehert Tr. 76:11-15.

[7]   N.J. Stat. §56:8-2.11 provides: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful."

[8]   "A consumer who proves (1) an unlawful practice, (2) an ascertainable loss, and (3) a casual relationship between the unlawful conduct and the ascertainable loss, is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees."  *Lee*, 4 A.3d at 576 (citing N.J. Stat. §56:8-19).

- 24 -

Ex. 46, Macpherson Report at 11.[9]  "Even where there are some individualized damage issues,

common issues may predominate when liability can be determined on a class-wide basis." *Central*

*States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care L.L.C.*, 433 F.3d

181, 190 (2d Cir. 2005).  At bottom, the proposed class action is undoubtedly manageable.

## V.    Conclusion

For all of the foregoing reasons, plaintiffs respectfully request that their motion for class

certification be granted.

DATED:  February 14, 2011                ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         FRANK J. JANECEK, JR.
                                         CHRISTOPHER COLLINS


                                                s/ FRANK J. JANECEK, JR.
                                         ─────────────────────────────
                                              FRANK J. JANECEK, JR.

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

---

[9]      "An ascertainable loss occurs when a consumer receives less than what was promised."
*Union Ink Co., Inc. v. AT&T Corp.*, 801 A.2d 361, 379 (N.J. App. Div. 2002).  The measure is
essentially the same as in the Class's breach of contract action.  *See Furst v. Einstein Moomjy, Inc.*,
860 A.2d 435, 441-42 (N.J. 2004).  "Similarly, in a breach of contract case, the innocent party must
be given the 'benefit of his bargain' and placed in as good a position as he would have been in had
the contract been performed."

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LYNCH LYNCH HELD ROSENBERG
  & PERKINS, P.C.
PAUL I. PERKINS
45 Eisenhower Drive, Suite 300
Paramus, NJ  07652
Telephone:  800/656-9529
888/271-9726 (fax)

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Attorneys for Plaintiffs

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 19, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 19, 2011.

s/ FRANK J. JANECEK, JR.
FRANK J. JANECEK, JR.

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  FrankJ@rgrdlaw.com

# Mailing Information for a Case 1:10-cv-07318-PGG

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James F. Bogan , III**
  jbogan@kilpatrickstockton.com,dleavell@kilpatrickstockton.com

- **Christopher Collins**
  chrisc@rgrdlaw.com

- **Curtis Allen Garrett , Jr**
  agarrett@kilpatricktownsend.com

- **John R. Gibson**
  jogibson@kilpatricktownsend.com

- **Ian Michael Goldrich**
  IGoldrich@kilpatrickstockton.com,AGarcia@kilpatrickstockton.com,EPulsipher@kilpatrickstockton.com

- **Frank J. Janecek , Jr**
  frankj@rgrdlaw.com,MBacci@rgrdlaw.com,JWolsborn@rgrdlaw.com

- **Peter S. Pearlman**
  psp@njlawfirm.com

- **Christopher S. Polaszek**
  cpolaszek@milberg.com,dleifer@milberg.com,asokolowski@milberg.com

- **Ronald Lee Raider**
  rraider@kilpatrickstockton.com

- **Roland Winfield Riggs , IV**
  rriggs@milberg.com

- **Peter George Safirstein**
  psafirstein@milberg.com,MAOffice@milberg.com

- **Daniel G. Schulof**
  dschulof@kilpatricktownsend.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Paul I. Perkins
LYNCH LAW FIRM, P.C.
45 EISENHOWER DRIVE
Third Floor
PARAMUS, NJ 07652
```

**Andrew Sokolowski**
Milberg LLP
300 South Grand Avenue, Suite 3900
Los Angeles, CA 90071

**Jason Thompson**
Sommers Schwartz PC
2000 Town Center Suite 900
Southfield, MI 48075