UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AL KOWALSKI d/b/a KOWALSKI PLUMBING, MICHELLE WINICK d/b/a MICHELLE WINICK DESIGN, and MICHAEL GIDRO, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>v.<br><br>YELLOWPAGES.COM, LLC,<br><br>            Defendant. | Civil Action No. 10-7318 (PGG)<br><br>CLASS ACTION<br><br>DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

KILPATRICK TOWNSEND & STOCKTON LLP

JAMES F. BOGAN III (admitted *pro hac vice*)
C. ALLEN GARRETT JR. (admitted *pro hac vice*)
RONALD L. RAIDER (admitted *pro hac vice*)
JOHN R. GIBSON (admitted *pro hac vice*)
DANIEL G. SCHULOF (admitted *pro hac vice*)
1100 Peachtree Street, Suite 2800
Atlanta, Georgia 30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

IAN M. GOLDRICH (NY State Bar No. 501475)
31 West 52nd Street, 14th Floor
New York, New York 10019
Telephone: (212) 775-8700
Facsimile: (212) 775-8800

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND.........................................2

    A.    Procedural Overview ........................................................................2

    B.    The Far-Reaching Allegations of Plaintiffs' Amended Complaint as Compared to the Limited Representations at Issue in Plaintiffs' Motion ..............3

    C.    The Named Plaintiffs' Highly-Individualized Sales Experiences...........................5

        1.    Plaintiff Al Kowalski Indisputably Was Not Exposed to the Alleged Misrepresentations and Did Not Pay for His Advertising...........................................................................5

        2.    Plaintiff Michelle Winick Also Did Not Purchase YPClicks! and Expressly Disavowed Seeking Any Damages Remedy ......................7

        3.    Mr. Gidro Purchased YPClicks! and Repeatedly Complained About its Efficacy, Yet Made Each of His Monthly Advertising Payments ........................................................................8

        4.    Summary of the Named Representatives' Unique Sales Experiences ...............................................................10

    D.    Plaintiffs Have Failed to Show Systematic Dissemination of the Alleged "Misleading Representations and Omissions" .........................................10

        1.    There is No Evidence that Uniform "Overinflated Conversion Statistics" Were Used With All Members of the Putative Class ..............10

        2.    There is No Evidence that Members of the Putative Class Purchased the YPClicks! Product Based On the Alleged Misrepresentation that Clicks Would be "Local," "Targeted," and "Qualified" ......................................................................12

        3.    To the Extent a Representation was Made Regarding Expected Returns, the Underlying Data Fully Supported the "74%" Representation, and there is no Evidence that the Erroneous "74%" Spreadsheet Was Disseminated to the Class .................................14

    E.    Plaintiffs Have Not Shown that YellowPages.com Used a Uniform Script ..........................................................................17

    F.    Plaintiffs Cannot Show that YellowPages.com's Contracting Process with Respect to its Terms and Conditions Applies to the Class as a Whole ...........................................................................19

US2008 2338549.12

III.   ARGUMENT AND CITATIONS OF AUTHORITY.......................................................21

    A.    None of the Named Plaintiffs Are Appropriate Class Representatives ................21

        1.    Because Mr. Kowalski Did Not Pay for His Advertising, He Lacks Standing and Has Not Suffered "Ascertainable Loss" Under the CFA.........................................................................................21

        2.    Ms. Winick Has Disavowed Any Damages Claim Against YellowPages.com...............................................................................23

        3.    Mr. Gidro Knew of His Complaints When He Made His Payments and Thus is Subject to the Unique Defense of Voluntary Payment ......................................................................25

        4.    Two of The Named Plaintiffs Face a Unique "Breach of Forum Selection Clause" Counterclaim ...............................................26

    B.    Plaintiffs' Class Does Not Even Satisfy the Commonality Requirement ............27

    C.    Plaintiffs Cannot Demonstrate that Common Issues Predominate Over Individual Issues .....................................................................................29

    D.    The Class Action Device is Not Superior to Individual Adjudication...................33

        1.    Prior Individual Actions Confirm That Members of the Putative Class Have an Interest in Controlling Their Own Litigation...................................................................................33

        2.    The Class Action Waiver in the Terms and Conditions Should Be Enforced ........................................................................34

        3.    Manageability Concerns Justify Denying Certification............................35

IV.   CONCLUSION.............................................................................................36

US2008 2338549.12

# TABLE OF AUTHORITIES

## Cases

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009) .................................... 22

*Aimis Art Corp. v. Northern Trust Secs., Inc.*,
   641 F. Supp. 2d 314 (S.D.N.Y. 2009) .................................... 22

*Albert's Transp. v. YellowPages.com*,
   DC-013400-09 (N.J. Super. Ct. Law. Div.) ........................... 33

*Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.*,
   992 F. Supp. 278 (S.D.N.Y. 1998) ....................................... 26

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ............................................................. 34

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   222 F.3d 52 (2d Cir. 2000) ................................................... 25

*B-Dry Systems of South Jersey & Philadelphia, Inc. v. YellowPages.com, LLC*,
   No. BUR-C-065-08 (N.J. Super. Ct. Ch. Div.) ...................... 33

*Benner v. Becton Dickinson & Co.*,
   214 F.R.D. 157 (S.D.N.Y. 2003) ......................................... 35

*Calabrese v. CSC Holdings, Inc.*,
   No. 02-CV-5171 (DLI)(JO), 2009 WL 425879 (E.D.N.Y. Feb. 19, 2009) ...................... 24, 35

*Camafel Building Inspections, Inc. v. BellSouth Advertising & Publishing Corp.*,
   Civ. A. No. 1:06-CV-1501-JEC, 2008 WL 649778 (N.D. Ga. Mar. 7, 2008).......................... 26

*Carfagno ex rel. Centerline Holding Co. v. Schnitzer*,
   591 F. Supp. 2d 630 (S.D.N.Y. 2008) .................................. 21

*Central States Southeast and Southwest Areas Health and Welfare Funds v.
   Merck-Medco Managed Care, L.L.C.*,
   433 F.3d 181 (2d Cir. 2005) ............................................ 22, 23

*Clerk v. First Bank of Del.*,
   735 F. Supp. 2d 170 (E.D. Pa. 2010) ................................... 34

*Crowley v. VisionMaker, LLC*,
   512 F. Supp. 2d 144 (S.D.N.Y. 2007) .................................. 23

*Davis v. Dell, Inc.*,
   Civ. No. 07-630 (RBK), 2008 WL 3843837 (D.N.J. Aug. 15, 2008) ...................... 34

*Delaney v. American Express Co.*,
   No. 06-5134 (JAP), 2007 WL 1420766 (D.N.J. May 11, 2007) ............................ 23

*Delta Funding Corp. v. Harris*,
   189 N.J. 28, 912 A.2d 104 (2006) ....................................... 34

US2008 2338549.12

*Demmick v. Cellco P'ship*,
No. 06-2163 (JLL), 2010 WL 3636216 (D.N.J. Sept. 8, 2010) ............................................. 31

*Doe v. Blum*,
729 F.2d 186 (2d Cir. 1984) ..................................................................................... 22, 23

*Douglas v. YellowPages.com*,
ATL-L-0158-06 (N.J. Super. Ct. Law. Div.) .............................................................. 33

*Edwards v. Publishers Circulation Fulfillment, Inc.*,
268 F.R.D. 181 (S.D.N.Y. 2010) ................................................................................ 24

*Ersler v. Toshiba Am., Inc.*,
No. CV-07-2304 (SMG), 2009 WL 454354 (E.D.N.Y. Feb. 24, 2009) ...................................... 32

*Gary Plastic Pkg. Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) ................................................................................... 25, 27

*General Tel. Co. v. Falcon*,
457 U.S. 147 (1982) ............................................................................................. 21, 25

*Herman v. YellowPages.com, LLC*,
Compl., No. 3:10-cv-00195-JAH-AJB (S.D. Cal. filed Jan. 26, 2010) .................................... 2

*Hoffman v. AsSeenOnTV.com*,
404 N.J. Super. 415, 962 A.2d 532 (2009) .................................................................... 22, 23

*Hoffman v. UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008) ............................................................................. 21

*In re Blech Sec. Litig.*,
87 F.R.D. 97 (S.D.N.Y. 1999) ..................................................................................... 32

*In re Currency Conversion Fee Antitrust Litig.*,
230 F.R.D. 303 (S.D.N.Y. 2004) .................................................................................. 25

*In re Initial Public Offerings Sec. Litig.* ("*IPO*"),
471 F.3d 24 (2d Cir. 2006) ............................................................................. 20, 21, 28

*In re LifeUSA Holding Inc.*,
242 F.3d 136 (3d Cir. 2001) ....................................................................................... 31

*In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*,
No. 08-0663, 2008 WL 5451024 (D.N.J. Dec. 31, 2008) ..................................................... 20

*In re Schering Plough Corp. ERISA Litig.*,
589 F.3d 585 (3d Cir. 2009) ...................................................................................... 27

*In re The Prudential Ins. Co. of Am. Sales Practices Litig.*,
962 F. Supp. 450 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998) .................................... 32

*In re Vivendi Universal, S.A. Sec. Litig.*,
242 F.R.D 76 (S.D.N.Y. 2007) ..................................................................................... 32

*Indosuez Intern. Finance, B.V. v. Nat'l Reserve Bank*,
304 A.D.2d 429, 758 N.Y.S.2d 308 (1st Dep't 2003) ......................................................... 26

US2008 2338549.12

*Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*,
  192 N.J. 372, 929 A.2d 1076 (2007) ....................................................................... 32

*Johnston v. HBO Film Mgmt., Inc.*,
  265 F.3d 178 (3d Cir. 2001) ................................................................................. 31

*Jones v. The Chubb Institute*,
  No. 06-4937 (KSH), 2007 WL 2892683 (D.N.J. Sept. 28, 2007) ............................... 34

*Katz v. Image Innovations Holdings, Inc.*,
  No. 06 Civ. 3707 (JGK), 2010 WL 2926196 (S.D.N.Y. July 22, 2010) ........................ 32

*Kowalski v. YellowPages.com, LLC*,
  Civ. A. No. 09-2382 (PGS), 2010 WL 3323749 (D.N.J. Aug. 18, 2010),
  *adopted*, 2010 WL 3810156 (D.N.J. Sept. 22, 2010) ........................................... *passim*

*Lee v. Carter-Reed, LLC*,
  4 A.3d 561 (N.J. 2010) ........................................................................................ 32

*Lewis Tree Service, Inc. v. Lucent Technologies, Inc.*,
  211 F.R.D. 228 (S.D.N.Y. 2002) ......................................................................... *passim*

*Lewis v. Casey*,
  518 U.S. 343 (1996) ............................................................................................ 21

*Mann v. TD Bank, N.A.*,
  No. 09-1062 (RBK/AMD), 2010 WL 4226526 (D.N.J. Oct. 20, 2010) ......................... 27

*McCracken v. Best Buy Stores, L.P.*,
  248 F.R.D. 162 (S.D.N.Y. 2008) ..................................................................... 30, 31

*McNair v. Synapse Group, Inc.*, Civ. A. No. 06-5072 (JLL), 2009 WL 1873582
  (D.N.J. June 29, 2009) ........................................................................................ 32

*Monmouth Shadowbrook, Inc., et al. v. YellowPages.com, LLC, et al.*,
  No. DC-16100-09 (N.J. Super. Ct. Law Div.) ........................................................ 33

*Moore v. PaineWebber, Inc.*,
  306 F.3d 1247 (2d Cir. 2002) ......................................................................... 29, 30

*Morgan v. Markerdowne Corp.*,
  201 F.R.D. 341 (D.N.J. 2001) ........................................................................ 29, 31

*Newman v. RCN Telecom Servs., Inc.*,
  238 F.R.D. 57 (S.D.N.Y. 2006) ............................................................................ 25

*Parker v. Howmedica Osteonics Corp.*,
  Civ. A. No. 07-02400 (JLL), 2008 WL 141628 (D.N.J. Jan. 14, 2008) ....................... 32

*Parker v. Time Warner Entm't Co.*,
  331 F.3d 13 (2d Cir. 2003) .................................................................................. 24

*Pelman v. McDonald's Corp.*,
  No. 02 Civ. 07821 (DCP), 2010 WL 4261390 (S.D.N.Y. Oct. 27, 2010) ..................... 32

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  No. 01 Civ. 9882 (DLC), 2005 WL 2278076 (S.D.N.Y. Sept. 20, 2005) ..................... 35

US2008 2338549.12

*Prime Equity Holdings, Inc. v. YellowPages.com, LLC and AT&T Inc.*,
   Compl., No. 3:10-cv-007980JAH-AJB (S.D. Cal. filed Apr. 15, 2010) .................................... 2

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) ............................................................................. 25, 26, 33, 35

*Thiedemann v. Mercedes-Benz USA, LLC*,
   183 N.J. 234, 872 A.2d 783 (2005) .................................................................................. 22, 23

*U 1/2 2 Inc. v. YellowPages.com LLC*,
   No. SC 2237-08 ...................................................................................................................... 33

*Vilches v. Travelers Cos., Inc.*,
   No. 10-2888, 2011 WL 453304 (3d Cir. Feb. 9, 2011) .......................................................... 34

*Warth v. Seldin*,
   422 U.S. 490 (1975)........................................................................................................... 21, 22

*Weiner v. Snapple Beverage Corp.*,
   No. 07 Civ. 8742 (DLC), 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ................................. 32

**Rules**

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

Fed. R. Civ. P. 9(b) ................................................................................................................... 5

US2008 2338549.12

## I.    INTRODUCTION

Plaintiffs Al Kowalski, Michelle Winick, and Michael Gidro seek to represent a class of New Jersey advertisers seeking damages for allegedly uniform oral misrepresentations made by representatives of Defendant YellowPages.com, LLC ("YellowPages.com") during telephonic sales calls and in-person sales consultations.  The named Plaintiffs, however, are not representative of the putative class.  Mr. Kowalski did not pay anything for his advertising, and Ms. Winick has disavowed any claim for compensatory damages.  Although Mr. Gidro paid for his advertising, his claims are subject to a unique voluntary payment defense.  Because each of the named representatives faces unique challenges to their standing, adequacy, and typicality, Plaintiffs' Motion for Class Certification ("Motion") should be denied.

Tellingly, the Motion virtually ignores the experiences of the named Plaintiffs, emphasizing instead generalized allegations relative to the use of a script containing standardized misrepresentations and omissions.  The testimony of Plaintiffs, however, as well as a mountain of additional evidence, confirms that no script was used.  To the contrary, the overwhelming evidence shows that sales representatives engaged in highly-individualized sales presentations, in which the alleged misrepresentations were not made; did not influence the advertiser's purchasing decision; and had no bearing on the efficacy of the advertising created for each customer.  Indeed, Mr. Kowalski and Ms. Winick did not even purchase the YPClicks! product (the only product to which two of the three alleged misrepresentations relate).  As Plaintiffs' own authorities recognize, class certification is not appropriate in these circumstances.

The Motion also ignores the significant value of the claims of Plaintiffs and the class members.  Mr. Kowalski agreed to pay $4,296 for a year's advertising; Ms. Winick agreed to pay $1,212; and Mr. Gidro agreed to pay (and did pay) $5,604 for his advertising.  Considering these claims in light of the generous remedies available under New Jersey's Consumer Fraud Act (the

"CFA"), including treble damages and attorneys' fees, the class action device is not necessary to ensure the prosecution of valid claims.  Indeed, the "Terms and Conditions" that govern Plaintiffs' advertising – which already have been enforced by the District of New Jersey – explicitly preclude Plaintiffs from prosecuting this case as a class action.

For these and many other reasons, Plaintiffs' Motion should be denied.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Procedural Overview

This action was filed in New Jersey state court on April 7, 2009, with Mr. Kowalski seeking to serve as the representative of a nationwide class.  (Dkt. No. 1.)  On November 6, 2009, an Amended Complaint was filed naming Ms. Winick and Mr. Gidro as additional class representatives, and narrowing the class to New Jersey advertisers.  (Dkt. No. 16.)[1] YellowPages.com promptly moved to transfer this action from the District of New Jersey to this Court, based on the New York forum selection clause in the "Terms and Conditions for Advertising" incorporated into every customer's contract.  (Dkt. No. 23.)[2]

---

[1] Shortly after limiting this class action to New Jersey advertisers, Plaintiffs' counsel re-filed a nationwide class action against YellowPages.com in the Southern District of California.  *See Herman v. YellowPages.com, LLC*, Compl., No. 3:10-cv-00195-JAH-AJB (S.D. Cal. filed Jan. 26, 2010).  The *Herman* complaint essentially duplicates the substantive allegations of the Amended Complaint.  *See* Decl. of James F. Bogan III ("Bogan Decl." or "Bogan Declaration") ¶ 10 & Ex. 2 thereto (unless otherwise specified, all exhibits referenced herein are attached to the Bogan Declaration that accompanies this motion and are indexed at paragraph 115 of the Bogan Declaration).

[2] YellowPages.com similarly moved to dismiss or transfer *Herman*, based on the New York forum selection clause, as well as the pendency of this "overlapping" class action.  (*Herman*, Dkt. No. 24.)  Also, on April 15, 2010, another nationwide class action was filed in California, *Prime Equity Holdings, Inc. v. YellowPages.com, LLC and AT&T Inc.*, Compl., No. 3:10-cv-007980JAH-AJB (S.D. Cal. filed Apr. 15, 2010).  The *Prime Equity* case was consolidated with *Herman*, and YellowPages.com moved to dismiss or transfer *Prime Equity* for the same reasons as *Herman*.  (*See* Dkt. Nos. 36, 37.)  The parties are awaiting rulings in both cases.

- 2 -

US2008 2338549.12

On August 18, 2010, Magistrate Judge Salas of the District of New Jersey recommended that YellowPages.com's motion to transfer be granted, and District Judge Sheridan adopted this ruling and granted the motion to transfer on September 22, 2010.[3]  Class certification discovery was conducted in this case both before and after the transfer of this action to this Court.

### B.    The Far-Reaching Allegations of Plaintiffs' Amended Complaint as Compared to the Limited Representations at Issue in Plaintiffs' Motion

Plaintiffs' Amended Complaint challenges virtually every aspect of YellowPages.com's business, from its sales to its performance of its advertising obligations and even its collection practices.  *See* Am. Compl. (Dkt. No. 16.)  Paragraph 127, for example, identifies no less than eight alleged misrepresentations and omissions purportedly made to Plaintiffs and to the putative class members,[4] while Paragraph 128 identifies three other allegedly unconscionable practices.[5]

Plaintiff's Motion, however, focuses on only three alleged misrepresentations:  (1) "overstated conversion statistics"; (2) YellowPages.com's ability to provide "local, targeted, and qualified clicks"; and (3) an allegedly flawed "return on investment calculation."  Motion, at 7-10.  Although Plaintiffs challenge other aspects of YellowPages.com's practices (such as the value of "ad content network" clicks with respect to the YPClicks! product and the practice of

---

[3] *See Kowalski v. YellowPages.com, LLC*, Civ. A. No. 09-2382 (PGS), 2010 WL 3323749 (D.N.J. Aug. 18, 2010), *adopted*, 2010 WL 3810156 (D.N.J. Sept. 22, 2010).

[4] These allegations include that YellowPages.com (1) misrepresented that it had "partnerships with major on-line search engines"; (2) misrepresented that YellowPages.com itself was a "major search engine"; (3) misrepresented the benefits of a "Tile" ad on www.YellowPages.com; (4) misrepresented that visitors to a business's website will come from a certain geographic area; (5) misrepresented the number of searches conducted on www.YellowPages.com by relying on data reflecting searches on the extended distribution network; (6) phrased questions to elicit misleading answers; (7) omitted disclosing that it lacked the "technology or customer support" to ensure Plaintiffs' websites would appear in relevant searches; and (8) improperly incorporated by reference material contractual terms.  Am. Compl. ¶ 127.

[5] These include (1) providing the "Terms and Conditions" after the sale; (2) refusing to allow advertisers to cancel the contracts; and (3) asking customers to "make projections" based upon "unsubstantiated assumptions."  *Id.* ¶ 128.

US2008 2338549.12

providing "Terms and Conditions" after the initial sale, *see id.* at 10-11), they advance no genuine argument that such practices support a damages award.

Two of the three misrepresentations – regarding allegedly "overstated conversion statistics" and YellowPages.com's ability to provide "local, targeted, and qualified clicks" – pertain only to the YPClicks! product, whereby an advertiser pays a monthly fee for a guaranteed number of "clicks" (or visits) to the advertiser's website.  Bogan Decl. ¶¶ 20, 29(a)-(b).  Because numerous putative class members did not purchase YPClicks!, including Mr. Kowalski and Ms. Winick, these alleged misrepresentations could not possibly have caused injury to the entire class.  Moreover, even among YPClicks! purchasers such as Mr. Gidro, the evidence shows that sales presentations were customized and, therefore, highly-individualized.

The third alleged misrepresentation – concerning an allegedly improper use of a 74% statistic in a "return on investment calculation" spreadsheet – applies only to advertising in the online directory, and not to the YPClicks! product.  *Id.* ¶¶ 21, 29(c).[6]  As confirmed by Plaintiffs' own evidence, however, virtually all of the materials referencing the 74% statistic **correctly** describe the underlying study, which concluded that 74% of internet users who visit www.YellowPages.com contact a merchant on that site.  *See* Bogan Decl. ¶¶ 78-83.  The only

---

[6] That the specified misrepresentations only relate to specific products (*i.e.*, that the "overstated conversion statistics" and "local, targeted, and qualified clicks" representation only pertain to YPClicks!, and that the "74%" misrepresentation only applies to ads listed on www.YellowPages.com), is made absolutely clear in the report of Plaintiffs' damages expert, David Macpherson.  *See* Analysis of Economic Damages at YellowPages.com, LLC (attached to Bogan Decl. as Ex. 48).  Mr. Macpherson's report purports to construct damages models that make it clear that the specified misrepresentations are confined to specific products and do not apply in a general way to YellowPages.com's stable of advertising products.  *Id.* at 4-7 (outlining damages models for the alleged misrepresentation of "74% of searches" solely in relation to advertising on www.YellowPages.com), 7-10 (outlining damages models for alleged misrepresentations regarding "overstated conversion statistics" and "local, targeted, and qualified" clicks solely in relation to the YPClicks! "Guaranteed Clicks" product).

US2008 2338549.12

document Plaintiffs identify that incorrectly used this statistic was ***not*** approved for distribution to YellowPages.com sales personnel and was never used in the field.[7]  *See id.* ¶¶ 84-86.

### C.   The Named Plaintiffs' Highly-Individualized Sales Experiences

Although Plaintiffs' Motion discusses at length the alleged "script" purportedly used by YellowPages.com sales representatives, they make no effort to relate this "script" to the actual sales experiences of the named Plaintiffs.  Indeed, Plaintiffs hardly mention the class representatives at all, citing their transcripts only a few times in the Motion.[8]  This omission speaks volumes, because the testimony of the named Plaintiffs (a) shows scripts were not used in their individual sales presentations; (b) illuminates dramatically different exposure and reactions to the alleged misrepresentations at the heart of Plaintiffs' Motion; and (c) reveals fundamental defects in the named Plaintiffs' ability to serve as representatives of the putative class.

#### 1.   Plaintiff Al Kowalski Indisputably Was Not Exposed to the Alleged Misrepresentations and Did Not Pay for His Advertising

Plaintiffs claim that the allegedly uniform sales "script" was used with all members of the putative class, "[r]egardless whether the sales pitch was given over the phone or at the class members' premises."  Motion, at 3.  Yet, even Plaintiffs' own experiences show that uniform sales scripts were not used either over the phone or during in-person visits.

---

[7] Moreover, the alleged "74% of searches" misrepresentation is not identified in the Amended Complaint (notwithstanding Plaintiffs' obligation to plead each alleged misrepresentation with particularity, Fed. R. Civ. P. 9(b)), nor in Plaintiffs' responses to YellowPages.com's interrogatory asking Plaintiffs to identify every alleged misrepresentation.  *See* Bogan Decl. ¶ 29(c).

[8] One of the few places the Motion cites testimony of all three Plaintiffs is note 2, which states "Each of the plaintiffs purchased a Platinum listing."  Motion, at 5 n. 2 (citing Kowalski Dep. at 91, Winick Dep. at 44, and Plfs.' Ex. 17).  The statement is incorrect:  Mr. Kowalski only purchased "Tile" ads and a three-page website (Kowalski Dep. at 76 & Ex. 3), and Mr. Gidro purchased a "Priority Local Listing" ad and a three-page website, as confirmed by the exhibit Plaintiffs cite in support of their statement he purchased a Platinum listing (*see* Plfs.' Ex. 17).

- 5 -

Mr. Kowalski is the only named Plaintiff who agreed to purchase YellowPages.com advertising during a telephonic sales call.  Mr. Kowalski's telephone conversation was recorded and preserved, and the entire conversation was played during Mr. Kowalski's deposition and transcribed in his deposition transcript.  *See* Kowalski Dep. at 54-96.  This irrefutable evidence of the actual substance of the sales call with Mr. Kowalski destroys Plaintiffs' theory of the case.

As noted above, two of the three alleged misstatements at the heart of Plaintiffs' Motion (regarding "overinflated conversion statistics" and "local, targeted, and qualified clicks") pertain only to the YPClicks! product.  During the sales call, however, the sales representative (Royce Brown) did not mention YPClicks!, meaning that Mr. Kowalski was asked no questions about "conversion statistics" and Mr. Brown said nothing about "local, targeted, and qualified" clicks.[9]

The recorded transcript also confirms that Mr. Brown never conducted a "return on investment" analysis and thus did not use the allegedly flawed "return on investment calculation."[10]  Accordingly, with respect to the only alleged misrepresentation pertaining to the product Mr. Kowalski agreed to purchase, the evidence conclusively establishes that no such misrepresentation was made.

Ultimately, Mr. Kowalski agreed to purchase (a) "Tile" ads on www.YellowPages.com under three separate headings (Plumbing Contractors, Heating Contractors & Specialists, and Water Heaters) at a cost of $309 per month for twelve months; and (b) a three-page website developed by YellowPages.com personnel at a cost of $49 per month for twelve months, for a total yearly cost of $4,296.[11]  After agreeing to buy the advertising, however, Mr. Kowalski

---

[9] *See* Kowalski Dep. at 54-96 (transcript of telephone call); *id.* at 127 (confirming that no representations regarding "local" or "targeted" clicks were made).

[10] *Id.*; *see also id.* at 127-128 (confirming a return on investment analysis was not conducted).

[11] Kowalski Dep. at 76:14-20 & Ex. 3 thereto.

US2008 2338549.12

sought to cancel it.[12]  To this day, Mr. Kowalski has never paid ***anything*** to YellowPages.com for the advertising he agreed to purchase.  Kowalski Dep. at 128:23-129:6.

2.     **Plaintiff Michelle Winick Also Did Not Purchase YPClicks! and Expressly Disavowed Seeking Any Damages Remedy**

Ms. Winick made her decision to purchase advertising following two personal visits by YellowPages.com sales representative Craig De Vito (the second meeting, according to Ms. Winick, lasted between 2½ and 3 hours).  Winick Dep. at 28:13-20, 29:4-6.  Yet, like Mr. Kowalski, Ms. Winick did not purchase the YPClicks! product.  *See id.* at 38:17-25.

Mr. De Vito informed Ms. Winick about YPClicks! and (according to Ms. Winick) said something akin to the "overstated conversion statistics" misrepresentation.[13]  Ms. Winick also claimed Mr. De Vito referred to "local" and "targeted" advertising.  *Id.* at 96:11-24.  But Ms. Winick claims they only discussed YPClicks! "for a few minutes," because she was "quickly convinced" she did not want the product and that it was too expensive for her.[14]  Of course, because Ms. Winick did not purchase YPClicks!, she could not have been injured by any alleged misrepresentations about that product.

With respect to the third alleged misrepresentation identified by Plaintiffs, Ms. Winick testified that Mr. De Vito conducted a "return on investment" analysis.  *Id.* at 83:9-14.  She did not claim, however, that he made any representation relative to "74%" of any group of potential contacts.  *See generally* Winick Dep.  For his part, Mr. De Vito acknowledged participating in a

---

[12] *See* Kowalski Dep., Ex. 4.  Mr. Kowalski confirmed during his deposition that he had no complaint with the performance of advertising he purchased, but rather disputed having agreed to purchase the advertising in the first place.  Kowalski Dep. at 150:24-151:12.

[13] *See* Winick Dep. at 100:20-23 (stating Mr. De Vito asked her how many people "out of ten" would contact her after visiting her website, in response to which Ms. Winick allegedly said "two would be a great number"); *but see id.* at 27:1-12 (admitting that, when she visited a website, Ms. Winick "rarely" purchased a product, estimating she does so "half a percent, not often").

[14] *See id.* at 40 (testifying she "didn't trust" YPClicks! and "didn't even want to speak about it").

US2008 2338549.12

"return on investment" discussion, but denied having made any "74% of searches" representation. De Vito Decl. ¶ 5. In fact, Mr. De Vito claimed he "never used" a return on investment spreadsheet with any customer and that he had "never seen" the particular spreadsheet containing the "74% of searches" misrepresentation. *Id.*

Ultimately, Ms. Winick agreed to purchase a Platinum Listing for three categories of advertising on www.YellowPages.com (Interior Designers & Decorators, Color Consultant, and Home Décor) at a rate of $101 per month for twelve months, for a total cost of $1,212. Winick Dep., Ex. 1. She testified at her deposition, however, she was not pursuing any damages claim. Winick Dep. at 65:1-11. Ms. Winick, therefore, cannot properly represent a damages class.

### 3.    Mr. Gidro Purchased YPClicks! and Repeatedly Complained About its Efficacy, Yet Made Each of His Monthly Advertising Payments

Mr. Gidro, a Georgetown Law graduate who has practiced law continuously since 1985, purchased advertising after an in-person meeting with Senior Media Consultant Cheryl D'Elia. Gidro Dep. at 11:10-15, 57-59 & Ex. 6 thereto. Mr. Gidro purchased (a) a Priority Local Listing for Bergen County under the heading "Bankruptcy law attorneys" on www.YellowPages.com, at a rate of $328 per month; (b) a 3-page website at a rate of $49 per month, and (c) the 360-click YPClicks! package, at a rate of $90 per month, for a total yearly cost of $5,604. *Id.*

Mr. Gidro is the only representative who purchased the YPClicks! product. According to Mr. Gidro, however, Ms. D'Elia did not engage in the "overstated conversion statistics" dialogue. Gidro Dep. at 115. Instead, she merely inquired as to the number of clients he hoped to generate, in response to which Mr. Gidro stated, "I'd like to be busy. I don't want to be swamped." *Id.* at 115:11-12. Mr. Gidro later stated that he and Ms. D'Elia "collectively" agreed on an increase of three to four clients per month, but he disclaimed having come to a conclusion as to the exact

US2008 2338549.12

number of clients he would get if he received 30 clicks per month.[15]  Ms. D'Elia likewise

testified she did not "guarantee" any specific increase in business.  D'Elia Decl. ¶ 13.

 Mr. Gidro also testified that Ms. D'Elia made representations regarding the "local" and

"targeted" nature of the clicks he would receive from buying the YPClicks! product.  Gidro Dep.

at 189:11-23.  But, contrary to Plaintiffs' arguments, Mr. Gidro did not complain that his clicks

resulted in him receiving "phone calls from out-of-state individuals who could not possibly

utilize the class members' products or services."  Motion, at 1, *see also* Janacek Decl. ¶ 42 (citing

Gidro Dep. at 131, 138).  Rather, Mr. Gidro's complaint was that he received too few calls, from

any location.  *See* Gidro Dep. at 131:10-25, 137:23-138:23.

 With respect to his purchase of a Priority Local Listing, Mr. Gidro offered no testimony

that he saw the "return on investment" spreadsheet containing the "74% of searches" statistic.

*See generally* Gidro Dep.  And, Ms. D'Elia confirmed that she has "never used this spreadsheet

[containing the incorrect 74% of searches statement] in any sales meeting."  D'Elia Decl. ¶ 7.

 Shortly after purchasing his advertising, Mr. Gidro began to complain about its efficacy.

On October 29, 2008 – just over a month after purchasing the advertising – Mr. Gidro wrote an

e-mail to Ms. D'Elia complaining that he was not getting new clients.  Gidro Dep. at 109:20-

110:13.  Mr. Gidro continued complaining and later asserted that the YPClicks! product "must be

fraudulent."  *Id.* at 114:15-25, 121:12-122:13, 126:23-127:3, 129:5-130:21, 137:23-138:23.

However, notwithstanding his multiple complaints, Mr. Gidro made every payment required

under his year-long contract for advertising.  *Id.* at 135:10-12.  Moreover, YellowPages.com

delivered to Mr. Gidro all of the clicks (360) he agreed to buy.  *See* Bogan Decl. Ex. 54.

---

[15] *See id.* at 118:12-16 ("I don't know that I said for 30 I'm going to get – for 30 clicks I would
get four.  I don't know that I came up with that.  I think we decided that was a decent budget to
start with.").

US2008 2338549.12

4.     **Summary of the Named Representatives' Unique Sales Experiences**

Of the three named Plaintiffs, only one (Mr. Gidro) purchased the YPClicks! product to which the "overstated conversion statistics" and the "local, targeted, and qualified clicks" alleged misrepresentations relate.  Mr. Gidro's testimony, however, reveals an interactive exchange about conversion statistics that does not jive with Plaintiffs' claim about that practice.  Furthermore, he makes no claim he received calls from potential clients outside of his "local" and "targeted" area.

Although all of the representatives purchased online directory products to which the "return on investment calculation" representation potentially would apply, none testified to hearing the allegedly incorrect "74%" statistic.  Mr. Kowalski was not exposed to any "return on investment" presentation, and the in-person presentations made to Ms. Winick and Mr. Gidro did not include the "74%" statistic.  Moreover, none of the sales presentations made to Plaintiffs, whether telephonically or in-person, involved standardized scripts or otherwise were uniform.

Thus, none of the alleged misconduct identified by Plaintiffs actually was directed to any of the named Plaintiffs.  Accordingly, none of them is a proper class representative.

D.     **Plaintiffs Have Failed to Show Systematic Dissemination of the Alleged "Misleading Representations and Omissions"**

YellowPages.com has developed substantial evidence showing that none of the allegedly misleading representations was "systematically" made to or relied upon by the putative class. Rather, the evidence shows that no script was used, in New Jersey or elsewhere.

1.     **There is No Evidence that Uniform "Overinflated Conversion Statistics" Were Used With All Members of the Putative Class**

At the heart of Plaintiffs' "overstated conversion statistics" claim is the allegedly misleading question of "how many people out of 10 would do business with you" after reviewing an advertiser's website, which question allegedly is part of the YPClicks! sales presentation.  *See* Bogan Decl. ¶ 29(a).  According to Plaintiffs, the question is inherently misleading because

- 10 -

advertisers are predisposed to provide a whole number in response, and far less than 10% of consumers who "click" on an advertisement actually will make a purchase.  Motion, at 7 (arguing that the actual conversion rate is often less than 1%).

As a threshold matter, numerous current YellowPages.com employees have confirmed that they never asked an advertiser how many customers "out of 10" would contact the advertiser after viewing the advertiser's website.  *See* Bogan Decl. ¶ 50.  For example, General Sales Manager Robert McCue, who began his career at YellowPages.com in 2006 selling advertising to New Jersey advertisers, testified that when he used "conversion statistics" (and he often did not), he framed the question in terms in terms of "100 people" visiting the advertiser's website, adding "I would normally use the figure of 1% as a baseline" and that he "never guaranteed a customer would receive additional business … as a result of purchasing advertising from YellowPages.com."  McCue Decl. ¶ 7.  Mr. McCue added that, as a manager, he had not seen a salesperson he supervised frame the opening question "using 10 people as a baseline."  *Id.* ¶ 9.[16]

---

[16] Jason Boudreau, the current General Sales Manager for Northern New Jersey, similarly testified that, if an advertiser predicted that 10% of website visits would result in a contact, "I would lower the figure to one out of 100," emphasizing that YellowPages.com "could not guarantee any results."  Boudreau Decl. ¶ 5.  Director of Sales – Premise, Robert Quirk likewise testified that, when he used conversion statistics, he also asked advertisers how many contacts they would expect if "100 people viewed your website."  Quirk Decl. ¶ 8.  Mr. Quirk similarly emphasized that he would dissuade advertisers from using an "unrealistic number" and that he would "never guarantee results for customers."  *Id*.

Media consultant Jarrett Howard (who met with the plaintiff in *Herman*) also testified that, when he used conversion statistics to sell YPClicks!, he always used "100 people" as the baseline:  "I never form the question using only 10 people as the baseline."  Howard Decl. ¶ 5.  If the advertiser responded with an "obviously inflated figure, such as 25%, I will use much smaller numbers, typically 3-5%."  *Id.*  Mr. Howard emphasized that he never makes a "guarantee the advertiser will receive additional business."  *Id. See also* Padelford Decl. ¶ 4 (emphasizing that consultants are trained to "ask the customer whether they can afford the advertising even if a single new customer is not generated").

US2008 2338549.12

Plaintiffs identify no evidence contradicting these sworn statements of YellowPages.com personnel.  Although their expert, Mr. Peter Kent, opines as to "correct" conversion statistics, he had no opinion about (and could identify no evidence showing) the percentage of putative class members purportedly exposed to this allegedly deceptive information.  Kent Dep. at 52:22-53:2.

<div style="margin-left: 2em;">

**2.    There is No Evidence that Members of the Putative Class Purchased the YPClicks! Product Based On the Alleged Misrepresentation that Clicks Would be "Local," "Targeted," and "Qualified"**

</div>

Plaintiffs also claim that YellowPages.com fraudulently induced sales of YPClicks! by misrepresenting the advertiser will receive "'local,' 'targeted' and 'qualified' clicks."  Motion, at 9.  According to Plaintiffs, YellowPages.com cannot deliver "local, targeted, and qualified" clicks to its YPClicks! advertisers because it utilizes "Designated Market Areas" ("DMAs") to geo-target end users, and DMAs are too large to serve "local" advertising needs.  *Id.* at 9-10.

As an initial mater, Plaintiffs' own evidence shows the appropriate definition of "local" advertising necessarily varies considerably among class members.  Plaintiffs' expert, Mr. Kent, testified that the use of DMAs is appropriate for at least some advertisers.  Kent Dep. at 76:1-3.

In any event, YellowPages.com presented evidence showing that it uses far more than DMAs to "geo-target" potential customers of its advertisers.  In its "Editorial Creation & Best Practices" policy, YellowPages.com identifies "four components to just about every keyword set we create:  Geographic Terms, Business Terms, Other Terms, and Negative Keywords."  Bogan Decl. ¶ 57-61 & Ex. 37, at 10.  Even with respect to "Geographic Terms," YellowPages.com uses an advertiser-specific analysis to determine appropriate terms to funnel advertisers' ads to the relevant customers, rather than simply relying upon a DMA.  *See* Ex. 37 at 11-12.[17]

---

[17] These "Geographic Terms" are supplemented with additional, advertiser-specific search terms such as "Business Terms" (which provide greater specificity as to the products and services offered); "Other Terms" (such as the business's name and existing URL, to "help an account get

US2008 2338549.12

Given this customer-specific process, any determination as to the efficacy of a particular combination of geo-targeting and keyword choice would require an account-by-account review.[18]  Plaintiffs offer no evidence to dispute this; indeed, Plaintiffs' expert did not review the "Best Practices" manual setting out the multi-step process utilized in assigning keywords for each YellowPages.com advertiser, and thus could not opine on the efficacy of those practices. *See* Kent Report at 4-5 (omitting "Best Practices" manual from list of documents reviewed).

Plaintiffs' only other specific challenge to the "quality" of clicks received by YPClicks! customers focuses on the placement of ads on "ad content networks" (*i.e.*, ads displayed on websites based on the site's content) rather than on the result pages of search engines.  *See* Motion, at 10.  Plaintiffs, however, identify no proof of a common representation that clicks will come only from "search engines":  their first citation is to their own expert's report, not an alleged "script" or the experience of any of the named Plaintiffs (*see* Motion, at 10 (citing Plfs.' Ex. 18)); and their second citation is to testimony about training in connection with the sale of advertising on www.YellowPages.com, not the YPClicks! product (*see id.* (citing Quinlan Tr., at 145:23-146:10)).[19]  Plaintiffs likewise have not presented any evidence that Mr. Gidro (the only named Plaintiff who purchased YPClicks!) (a) was told his clicks would solely come from ads displayed on "search engine" results page, or (b) received "many (if not most)" of his clicks from websites on the "ad content network."[20]

---

clicks from customers who already know the business or Web site they're looking for"); and "Negative Keywords" (which function to filter out irrelevant searches).  Bogan Decl. ¶¶ 59-61.

[18] *See* Bogan Decl. ¶ 63 (citing Def.'s Rule 26(a)(2)(C) Disclosure for Jacob Lee ¶ 10).

[19] The use of "extended distribution networks," to which the cited portion of Mr. Quinlan's testimony refers, ***increases*** the value of advertising on www.YellowPages.com because it allows for a wider distribution of the ads across multiple sites.  *See, e.g.,* Plfs.' Ex. 7.

[20] Mr. Kent himself testified that he had no opinion as to the percentage of the putative class that might have been subject to this alleged misrepresentation, or the percentage of customers that

US2008 2338549.12

Finally, Plaintiffs assert, without further explanation, that their expert "identified no less than 12 additional flaws that preclude Defendant from complying with their promise to deliver local, targeted and qualified clicks."  Motion, at 10 (citing Kent Report, at 35-44).  At his deposition, however, Mr. Kent admitted he had "no opinion" on the majority of the alleged "flaws" in his Report.[21]  Further, he admitted one of his asserted "flaws" – YellowPages.com's alleged failure to use "negative keywords" – conflicted with the evidence showing that YellowPages.com regularly utilizes "negative keywords" in ad campaigns.  Kent Dep. at 84-86.

> **3.   To the Extent a Representation was Made Regarding Expected Returns, the Underlying Data Fully Supported the "74%" Representation, and there is no Evidence that the Erroneous "74%" Spreadsheet Was Disseminated to the Class**

Moving away from the YPClicks! product, the only alleged misrepresentation relative to online advertising on www.YellowPages.com is an alleged statement that "74% of searches" on the site results in a contact to an advertiser.  Motion, at 7.  The document Plaintiff cite, however, was *never* distributed to YellowPages.com's sales representatives.  *See* Bogan Decl. ¶ 84.

By way of background, there is "correct" use of the 74% statistic and an "incorrect" 74% use.  As Plaintiffs acknowledge, an independent study by Morpace concluded that "74% of the *people surveyed* contacted or visited a merchant they found on YellowPages.com."  Motion, at 7 (emphasis in original).  The "disconnect" giving rise to Plaintiffs' claim is based upon a mischaracterization of the Morpace study as having concluded that "74% of the *searches* made on YellowPages.com will result in a contact with one of the listed businesses."  *Id.* (emphasis in original).  Stated differently, Plaintiffs allege that YellowPages.com misrepresented that 74% of "search**es**" resulted in a contact, when in fact only 74% of "search**ers**" contacted a merchant.

---

purchased YPClicks! as a result.  Kent Dep. at 43:9-25, 122:17-123:2.

[21] Kent Dep. at 72-73, 82-96; *see also* Bogan Decl. ¶¶ 70-71.

- 14 -

Although Plaintiffs assert that a number of documents contain the misrepresentation, all but one of documents cited by Plaintiffs accurately characterize the study's findings. Bogan Decl. ¶¶ 78-83. Plaintiffs cite to "Exs. 2-6 and 30" on page 5 of the Motion. In each of these exhibits, however, the statistic is correctly stated: "Over 74% of *online users* who visit YELLOWPAGES.COM contact a merchant." *Id.* Similarly, Plaintiffs' Exhibits 24 and 27, which are excerpts from initial training presentations, appropriately state that 74% of users of www.YellowPages.com contact a merchant. These are *correct* statements of the study's findings, as Plaintiffs themselves acknowledge.[22]

The *only* document Plaintiffs identify as incorrectly characterizing the Morpace study is their Exhibit 29, an "ROI spreadsheet" stating "74% of searches" on www.YellowPages.com result in contact with a merchant. As YellowPages.com corporate representation Mary Jane Thornburg testified, however, this "ROI spreadsheet" was *never* approved for use by Morpace, and was *never* made available for use by YellowPages.com's sales representatives.[23] Plaintiffs offer no evidence challenging this testimony, which is corroborated by testimony from numerous YellowPages.com representatives,[24] including those who dealt with the named Plaintiffs.[25]

---

[22] *See* Motion, at 7 ("[W]hat the study actually concluded is that 74% of the people surveyed contacted or visited a merchant they found on YellowPages.com.").

[23] Thornburg Dep. at 113:25-115:5, 118:7-17, 118:23-119:21, 122:21-124:3.

[24] *See* Bogan Decl. ¶ 86 (citing Padelford Decl. ¶ 5 ("I have never seen or used a return-on-investment spreadsheet that represents that 74% of searches on YellowPages.com result in a customer contacting a merchant."); Spray Decl. ¶ 6 (same); Quirk Decl. ¶ 6 ("In my roles as a media consultant and a manager, I have not seen or used a return-on-investment spreadsheet that states that 74% of searches on YellowPages.com result in a customer contacting a merchant."); McCue Decl. ¶ 6 ("I never told a customer that 74.2% of searches on YellowPages.com result in a contact …. As both a General Sales Manager and in my current role as Continuation Sales Trainer, I never encountered a sales presentation where the 74.2% figure was used.")).

[25] *See* Bogan Decl. ¶ 85. Mr. De Vito and Ms. D'Elia both testified they never used Plaintiffs' Exhibit 29 in any sales meeting, much less in their meetings with Ms. Winick and Mr. Gidro. De Vito Decl. ¶ 5 & Ex. A thereto; D'Elia Decl. ¶ 7 & Ex. A thereto. Mr. De Vito went ever further,

- 15 -

Although Plaintiffs offer contrary declarations from two former sales representatives who did *not* sell to the putative class (Gary Gillaspy and Janet Simmons), these declarations are not credible.[26]   In any event, the "74%" statistic allegedly was part of the "return-on-investment" ("ROI") analysis, but Plaintiffs have not shown a ROI analysis was conducted with every advertiser, much less that the 74% representation was made.[27]   No evidence was presented that the 74% representation was made to the named Plaintiffs.[28]   Accordingly, even if the declarations of Mr. Gillaspy and Ms. Simmons are credited, the question of whether an ROI presentation was used would necessarily require a class member-by-class member inquiry.

---

stating he had "never seen this return-on-investment spreadsheet before."  De Vito Decl. ¶ 5.

[26] *See* Bogan Decl. ¶¶ 87-91.  Both Mr. Gillaspy and Ms. Simmons provide the same *verbatim* assertion that, in conducting a return-on-investment analysis, "YellowPages.com premises sales used ***the statistic from the Morpace study*** which indicated that 74% of searches made on the YellowPages.com entire distribution network resulted in a contact to a merchant."  Plfs.' Ex. 22 ¶ 13 (emphasis added); Plfs.' Ex. 23 ¶ 12.  But the Morpace study did ***not*** include any statistic relative to "74% of ***searches***"; it concluded that "over 74% of online ***users*** who visit YELLOWPAGES.COM contact a merchant."  *See* Plfs.' Exs. 2-6, 30 (emphasis added).  Thus, the declarations are not reliable, because the "statistic from the Morpace study" was correct, even if the statistic was misstated in an unused piece of sales collateral.

Moreover, Mr. Gillaspy was employed with YellowPages.com for less than five months (in New Mexico, not New Jersey), from March 12, 2007 through July 31, 2007.  The Morpace study, however, was not finalized until May 2007.  *See* Bogan Decl. ¶ 92.  Thus, it is unlikely that Mr. Gillaspy would have been exposed to the Morpace study, let alone the misstatement in Plaintiffs' Exhibit 29.  Ms. Simmons was a "telephone sales representative for YellowPages.com from June 17, 2007 through April 15, 2010," selling advertising "predominantly in Michigan and Ohio" (not New Jersey).  Plfs.' Ex. 23.  Yet her declaration speaks to "premises sales," without any explanation as to how she would have knowledge of non-telephonic sales.

[27] Plaintiffs claim the ROI analysis is only conducted when a potential customer "hesitates" or otherwise objects to the cost of the advertising (Motion, at 6), but they provide no mechanism through which "hesitating" class members can be ascertained.  Moreover, YellowPages.com has developed significant evidence showing that an ROI analysis was not conducted on a class-wide basis.  *See* Bogan Decl. ¶¶ 77 (citing Eastburn Decl. ¶ 8; McCaulley Decl. ¶ 10; Kenyon Decl. ¶ 4; Boudreau Decl. ¶¶ 5-6; Juhasz Decl. ¶ 6; Green Decl. ¶ 8; Howard Decl. ¶ 5; Spray Decl. ¶ 8; Johnson Decl. ¶ 7; Gamper Decl. ¶ 5; De Vito Decl. ¶ 4; D'Elia Decl. ¶ 6).

[28] As noted above, a ROI analysis was not done with Mr. Kowalski, and neither Ms. Winick nor Mr. Gidro testified that the 74% of searches representation was part of their sales presentations.

US2008 2338549.12

### E.      Plaintiffs Have Not Shown that YellowPages.com Used a Uniform Script

The focus of Plaintiffs' class certification argument is YellowPages.com's purported use of a standardized script in **all** sales presentations. *See* Motion, at 3-7. YellowPages.com has used scripts for training purposes, for the purpose of educating trainees about the core steps of the sale.[29] These scripts, however, have never been used in actual sales presentations. This is made clear in the deposition testimony of Patrick Quinlan, which Plaintiffs misleadingly excerpt.

Mr. Quinlan testified that memorizing a script at the beginning of initial sales training was a mechanism to gauge the trainees' dedication to the program and to educate the trainees about the steps of the sale, but it was never intended to be utilized in meetings with actual customers.[30] Mr. Quinlan also testified that the training script was never made available to sales representatives after the initial training, even if they wanted it in the field.[31] Plaintiffs offer no

---

[29] Plaintiffs conflate the "steps of the sale" with a "script." The "steps of the sale" (such as the approach, fact finding, needs assessment, pitch, and close) are the "core fundamental step[s] of what the sales process should look like." Quinlan Dep. at 81:24-82:3. The scripts were used in training to educate trainees about this fundamental process. *Id.* at 81:6-13. A script is not needed for a salesperson to execute an "approach," for example; a salesperson can customize an "approach" without using any sort of script. *Id.* at 99:1-13. Mr. Quinlan emphasized this point in his deposition testimony, which is that a script – although helpful in terms of teaching trainees about the "steps of the sale" – is not needed for a salesperson to follow the "steps of the sale" in any live sales presentation. *Id.* at 279:10-280:1.

[30] *See* Quinlan Dep. at 81-82 (explaining "night and day" difference between sales script used in training and actual sales presentations); 87 ("We're a consultative sales force. The last thing we want to be is scripted."); 87-88 (explaining that there are no scripts utilized by YellowPages.com employees for actual sales pitches to prospective or current customers and that no such scripts are provided by the training department); 88 ("[T]here's not a per se, script out there that people should be using."); 89-90 (there were guidelines for sales representatives to utilize in determining what topics to discuss with a potential customer, but "in a consultative approach … there's no two sales pitches that would really look the same"); 125-126 (explaining that sales representatives conduct customer specific research prior to engaging customers in a sales meeting); 194-195 (trainees were told that they were "never" to use the "script" out in the field).

[31] Quinlan Dep. at 135:8-10 (stating that the script was not posted on Samurai, YellowPages.com's sales document database); *see also* Thornburg Dep. at 175:17-18.

US2008 2338549.12

evidence of when the use of scripts in the initial sales training began, and also fail to note that the use of scripts in training ended in the Summer of 2009.  *See* Bogan Decl. ¶¶ 94-97.

With respect to Plaintiffs' individual experiences, the transcript of Mr. Kowalski's sales presentation confirms that a script was not recited to him, and the testimony of Mr. De Vito and Ms. D'Elia likewise shows a script was not recited to Ms. Winick or Mr. Gidro, either.[32] Furthermore, Ms. D'Elia made it clear in her declaration that she ***never*** memorized a script in her sales training.  D'Elia Decl. ¶ 3.  Therefore, Plaintiffs' seminal contention that ***every*** sales representative who dealt with the putative class memorized a script in sales training (Motion, at 3-6), is not correct even as to the sales representative who spoke to Mr. Gidro.

Plaintiffs' contrary testimony from three former employees (Robert Long, Gary Gillaspy, and Janet Simmons) either is not relevant or is not credible.[33]  Indeed, two of the former YellowPages.com salespeople identified by Plaintiffs themselves in their sworn Interrogatory responses as having "knowledge of sales training techniques and processes" (Gabriel Gamper and Michael Johnson) have confirmed that they did not use a sales script.[34]  And numerous other

---

[32] *See* De Vito Decl. ¶ 3 (explaining that, while he memorized a script during training, he has never used the script in "actual sales presentations"); D'Elia Decl. ¶¶ 3-5 (stating that she never even memorized the script during training and "never used a scripted sales presentation" during "actual sales presentations";  "Rather, it was and is my practice to conduct independent research, as well as to contact the customer by telephone in advance of an in-person meeting, to learn as much as possible about the customer's business.  I then create a customer-specific presentation that is based upon information I learned about the customer ….").

[33] *See* Plfs.' Ex. 21 (Long) (stating he was required to memorize a script during initial training but not stating he actually used this script in sales meetings); Plfs.' Ex. 22 (Gillaspy) (describing only purported sales practices in New Mexico, not New Jersey, during a brief five-month period in 2007); Plfs.' Ex. 23 (Simmons) (stating only that she had to learn a "script-like presentation" for purposes of telephonic sales to customers in Michigan and Ohio, not New Jersey).

[34] *See* Bogan Decl. ¶ 106 (citing Gamper Decl. ¶¶ 3-4 (stating he "never used" a script in "actual sales presentations":  "Each presentation I participated in was different, because each customer would provide me with different information."); Johnson Decl. ¶¶ 3-4 (" … I made hundreds of sales presentations.  In these presentations, I never used the script that I learned during my sales

US2008 2338549.12

YellowPages.com personnel have confirmed that, although they may have learned a script during initial sales training, they did not use it in actual sales presentations.[35]  Thus, the overwhelming evidence shows that the question of whether a YellowPages.com sales representative used the script would be a class member-by-class member inquiry.

### F.   Plaintiffs Cannot Show that YellowPages.com's Contracting Process with Respect to its Terms and Conditions Applies to the Class as a Whole

Plaintiffs assert that YellowPages.com, uniformly and without exception, withholds the Terms and Conditions until after a customer agrees to purchase a product.  Motion, at 10-11. The highly-individualized experiences of the class representatives refute this contention.

Mr. Gidro, an attorney, "had the hard copy of the Terms and Conditions attached to the original contract in his possession for at least two days before he signed the revised contract."[36] *Kowalski*, 2010 WL 3323749, at *5.  Ms. Winick acquiesced to the Terms and Conditions by performance:  "[s]he never rejected those Terms and Conditions, and her assent to the contract [was] confirmed by her payments to Defendant for services rendered."  *Id.*  Mr. Kowalski, on the other hand "rejected the Terms and Conditions shortly after receiving them."[37]  *Id.*

---

training.")).

[35] *See, e.g.,* McCaulley Decl. ¶¶ 3-4 ("In my role as a telephone sales representative, I never used a scripted sales presentation.  …  In my experience, no two customers are alike and each sales call must be tailored to the individual needs of the customer to determine the products and services that can best meet those needs. … While a District Sales Manager, I managed between 11 and 12 telephone sales representatives.  I did not see or hear any of these representatives utilize a scripted sales presentation when talking with customers.").  Numerous similar and detailed declarations are quoted in and attached to the Bogan Declaration.  *See* Bogan Decl. ¶¶ 103 (citing Padelford Decl. ¶ 3; Spray Decl. ¶ 4; Quirk Decl. ¶¶ 3-4; McCue Decl. ¶¶ 4-5; Eastburn Decl. ¶¶ 6-7; Kenyon Decl. ¶ 3; Boudreau Decl. ¶ 3; Juhasz Decl. ¶¶ 3-4; Green Decl. ¶¶ 4-7; Howard Decl. ¶ 3).

[36] At the hearing on the motion to transfer, Plaintiffs' counsel said Mr. Gidro's experience was "***aberrant*** … not your run-of-the-mill situation."  *See* 7/27/10 Tr., at 43-45 (emphasis added).

[37] There is no evidence that any other member of the putative class did what Mr. Kowalski did, which was to call YellowPages.com to reject the Terms and Conditions after he received them.

- 19 -

Other evidence illustrates wide divergences among the class members relative to the Terms and Conditions.[38]  Although Plaintiffs rely on the "e-signature" process (in which a complete copy of a contract that includes the Terms and Conditions is e-mailed as soon as the customer executes an electronic order form), the process was only implemented throughout New Jersey beginning in January 2008 (long after the beginning of the class period on May 1, 2005). McCaulley Decl. ¶ 14.[39]  Furthermore, Plaintiffs' theory about "hidden" Terms and Conditions does not apply to all of the putative class members who elected to renew their advertising long after receiving the "objectionable" Terms and Conditions.[40]

---

[38] Plaintiffs claim YellowPages.com never allows customers to cancel their contracts.  Motion, at 11 (citing Plfs.' Ex. 21).  Plaintiffs' Exhibit 21, the Certification of Robert Long, however, does not support this statement, and YellowPages.com's 30(b)(6) witness on this topic explained that early termination decisions are made on a "case by case" basis.  Deposition Transcript of Jason Boehret ("Boehret Dep."), at 94:17-23; *see also* McCaulley Decl. ¶ 16 ("I handle each customer complaint on an individualized basis.  In my experience, each customer complaint is different and must be dealt with accordingly.  AT&T does not have a policy that all complaining customers will not be allowed to cancel their advertising."); Eastburn Decl. ¶ 4 ("Because AT&T values its relationships with its customers, and in an effort to maintain brand loyalty, I would typically permit these customers to terminate their contract early.  In my opinion, there is greater harm in forcing a customer to abide by the terms of their contract against their wishes than in permitting them to terminate early and possibly earn their business back in the future.").

[39] *See also* Quinlan Tr. at 72:17-73:13 (identifying Ms. McCaulley as the person most knowledgeable about the deployment of the "e-signature" process).

[40] In any event, as noted in the District of New Jersey's transfer order, the process of providing terms and conditions after a sale has long been endorsed by courts as an efficient fixture of modern commercial transactions.  *See Kowalski*, 2010 WL 3323749, at *4 ("Courts also have recognized transactions where consumers made purchases prior to getting the detailed terms of the contract, noting that an insurance buyer pays the premium prior to getting the policy; a traveler pays for airplane or cruise tickets before receiving and being bound by the terms of the ticket; and a purchaser is bound by the terms located inside a product packaging which are accessible after the sale has been consummated.").  Other decisions have rejected CFA claims predicated on providing terms and conditions after the initial sale.  *See, e.g., In re Samsung Elecs. Am., Inc. Blu-Ray Class Action Litig.*, No. 08-0663, 2008 WL 5451024, at *3-*4 (D.N.J. Dec. 31, 2008) (rejecting CFA claim predicated on providing terms and conditions in product packaging).

US2008 2338549.12

## III.   ARGUMENT AND CITATIONS OF AUTHORITY

The Second Circuit has rejected earlier decisions holding that only "some showing" need be made that Rule 23's requirements are satisfied.  *See In re Initial Public Offerings Sec. Litig.* ("*IPO*"), 471 F.3d 24, 39-42 (2d Cir. 2006).  Now, "a district judge may not certify a class without making a ruling that each Rule 23 requirement is met." *Id.* at 27.  "[S]uch determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *Id.* at 41.  A district court must conduct a "rigorous analysis" to determine whether each of these requirements are satisfied.  *Lewis Tree Service, Inc. v. Lucent Technologies, Inc.*, 211 F.R.D. 228, 231 (S.D.N.Y. 2002) (quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)).

### A.   None of the Named Plaintiffs Are Appropriate Class Representatives

Each of the three named Plaintiffs are improper class representatives:  (1) Mr. Kowalski did not pay for his advertising and thus cannot demonstrate "standing" or "ascertainable loss" as required for his CFA claim; (2) Ms. Winick expressly disavowed any damages claim against YellowPages.com, and the Motion fails to satisfy the requirements for declaratory or injunctive relief under Rule 26(b)(2); and (3) Mr. Gidro discovered the factual bases for his current allegations but continued to pay anyway, giving rise to a unique defense of voluntary payment.

### 1.   Because Mr. Kowalski Did Not Pay for His Advertising, He Lacks Standing and Has Not Suffered "Ascertainable Loss" Under the CFA

Standing is a "'threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Carfagno ex rel. Centerline Holding Co. v. Schnitzer*, 591 F. Supp. 2d 630, 633 (S.D.N.Y. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "Thus, the

- 21 -

adjudication of standing must be made prior to determining whether the requirements of class certification have been satisfied." *Id.* (citation omitted).[41]

In a class action, "at least one named plaintiff must have standing to pursue each claim alleged." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 169 (S.D.N.Y. 2009). "The class action allegation adds nothing to the standing inquiry since the named plaintiffs 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Doe v. Blum*, 729 F.2d 186 n.4 (2d Cir. 1984) (quoting *Warth*, 422 U.S. at 502). "A putative class representative lacks standing to bring a claim if it did not suffer the injury that gives rise to that claim." *Abu Dhabi*, 651 F. Supp. 2d at 169.[42]

With respect to claims under the New Jersey Consumer Fraud Act (the "CFA"), injury means "ascertainable loss." *See Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 238, 872 A.2d 783, 786 (2005). An ascertainable loss must be capable of calculation, quantifiable, and real. *Id.* at 248, 872 A.2d at 793. In other words, to have standing to pursue a CFA claim, "a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an ***actual loss***." *Id.* at 248, 872 A.2d at 792 (emphasis added).

In *Thiedemann*, summary judgment was granted to the defendant and class certification reversed based on the absence of ascertainable loss, where "[n]one of the plaintiffs [ ] spent a

---

[41] *See also Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) ("[T]he standing question is antecedent to the class certification issue to the extent that a court can only certify a class for claims over which it has power.") (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

[42] *See also Central States Southeast and Southwest Areas Health and Welfare Funds v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005) (denying certification where named plaintiffs had not been directly injured by practice); *Aimis Art Corp. v. Northern Trust Secs., Inc.*, 641 F. Supp. 2d 314, 321 (S.D.N.Y. 2009) (dismissing putative class action where named plaintiff "has not suffered damages . . because it already rescinded its purchase").

US2008 2338549.12

single penny in relation to the fuel system problems they experienced …".  *Id.* at 243, 872 A.2d at 789.  In *Hoffman v. AsSeenOnTV.com*, 404 N.J. Super. 415, 427, 962 A.2d 532, 539 (2009), summary judgment likewise was granted where the defendant cancelled the plaintiff's order and the plaintiff never was charged as a result of the transaction.

In this case, Mr. Kowalski did not pay anything to YellowPages.com.  In the absence of actual loss, he cannot show that he "personally ha[s] been injured" by the conduct he seeks to challenge on behalf of the putative class.[43]  He thus cannot show that he suffered "ascertainable loss" as required to have standing under his CFA claim.[44]  Accordingly, he lacks standing, individually and on behalf of the putative class.[45]

### 2.   Ms. Winick Has Disavowed Any Damages Claim Against YellowPages.com

For similar reasons, Ms. Winick cannot serve as a representative of the putative class.  During her deposition, Ms. Winick unambiguously disavowed any claim for damages against YellowPages.com.  Winick Dep. at 65:1-3 (responding "No" when asked if she was "seeking

---

[43] *Central States*, 433 F.3d at 199; *Doe v. Blum*, 729 F.2d at 186 n.4.

[44] *See Thiedemann*, 183 A.2d at 243, 872 A.2d at 789; *Hoffman*, 404 N.J. Super. at 427, 962 A.2d 539.  Based on the recording of Mr. Kowalski's telephonic sale, which indisputably confirmed that he agreed to purchase certain products and services, YellowPages.com asserted a breach of contract counterclaim against Mr. Kowalski.  YellowPages.com has not pursued this counterclaim in the litigation, however, and hereby expressly abandons it.

[45] Although Plaintiffs briefly reference their separate "Breach of Contract" claim in their Motion, they make no effort to identify any specific contractual provision allegedly breached or to prove the elements of breach on behalf of the named Plaintiffs or the putative class.  In the absence of such proof, certification is improper on the breach claim.  *See, e.g.*, *Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, 151 (S.D.N.Y. 2007) (holding breach claimant "must identify what provisions of the contract were breached as a result of the acts at issue."); *Delaney v. American Express Co.*, No. 06-5134 (JAP), 2007 WL 1420766, at *4 (D.N.J. May 11, 2007) (granting motion to dismiss putative class action due to failure to plead actionable breach claim).  In any event, even if the breach claim has not been abandoned, each of the reasons rendering class certification improper on the CFA claim applies equally to the breach claim.

US2008 2338549.12

damages in this case").  Rather, Ms. Winick seeks to prevent YellowPages.com from "do[ing] this to other people."  *Id.* at 65:7-11.

Although the Amended Complaint requested certification of claims for declaratory or injunctive relief under Rule 23(b)(2), Plaintiffs appear to have abandoned them, devoting only a single sentence to Rule 23(b)(2) in their Motion.  *See* Motion, at 14 (quoting the language of Rule 23(b)(2), without analysis or explanation).  In contrast, Plaintiffs devote seven pages of their Motion to their class damages claims under Rule 23(b)(3).  *Id.* at 19-25.  This emphasis on monetary relief precludes certification of a declaratory or injunctive relief class.

It is well-settled that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages."[46]  Accordingly, "[w]hen a request for monetary relief is coupled with a request for declaratory or injunctive relief, the court must determine whether the requested monetary relief predominates over the equitable relief."[47]  "Among the factors relevant to determining whether the monetary relief predominates over equitable relief is whether 'even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought.'"[48]

Here, the "predominate" relief requested is money damages under Rule 23(b)(3).  Furthermore, Plaintiffs themselves undercut any possible argument that "reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought," because their Motion asserts that "due to the small individual amounts at issue, any notion that such claims could be litigated individually would be wholly unrealistic."  Motion, at 23.  This admission undermines

---

[46] *Parker v. Time Warner Entm't Co.*, 331 F.3d 13, 18-19 (2d Cir. 2003) (citing Fed. R. Civ. P. 23(b)(2) advisory committee note (1966)).

[47] *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 189 (S.D.N.Y. 2010).

[48] *Id.* (quoting *Parker*, 331 F.3d at 20).

US2008 2338549.12

any claim "that a reasonable plaintiff in their position would seek to maintain the lawsuit even if monetary damages are unavailable . . . as they explicitly argue too little is at stake in a single claim to justify an individual lawsuit seeking declaratory relief."[49]

Ms. Winick has disavowed any damages claim and appears to seek only declaratory or injunctive relief.  The class she seeks to represent, however, predominantly seeks money damages.  Accordingly, Ms. Winick is not a member or representative of the class.[50]

### 3. Mr. Gidro Knew of His Complaints When He Made His Payments and Thus is Subject to the Unique Defense of Voluntary Payment

Certification is inappropriate where a "class representative is subject to unique defenses which threaten to become the focus of the litigation."[51]  "[W]hether the issue is framed in terms of the typicality of the representative's claims … or the adequacy of its representation, …there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."[52]

An important and unique defense to Mr. Gidro's allegations is voluntary payment, which "bars recovery of payments voluntarily made with full knowledge of the facts."[53]  Where a named plaintiff is subject to a unique defense, certification is regularly denied.[54]

---

[49] *Calabrese v. CSC Holdings, Inc.*, No. 02-CV-5171 (DLI)(JO), 2009 WL 425879, at *23 (E.D.N.Y. Feb. 19, 2009) (internal quotations omitted).

[50] *See, e.g., General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (representative "must be part of the class and possess the same interest and suffer the same injury as the class").

[51] *Gary Plastic Pkg. Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) (finding atypical proposed representative who was a sophisticated broker and who continued to buy stock after information about defendant's financial difficulties had become publicly known).

[52] *Id.*

[53] *See, e.g., Newman v. RCN Telecom Servs., Inc.*, 238 F.R.D. 57, 78 (S.D.N.Y. 2006).

[54] *See, e.g., Gary Plastic*, 903 F.2d at 179-80 (affirming denial of certification where named plaintiff had continued to buy securities despite knowledge of the alleged fraud); *Spagnola v.*

US2008 2338549.12

The *Spagnola* court explained that when certain class members are subject to the defense of voluntary payment, "the Court or the jury will be tasked with the determination, for each individual class member, whether they knew or should have known of the circumstances … but continued to pay, or whether such payment was the result of a mistake of fact or law relating to their obligation to pay."  264 F.R.D. at 99.  Such determinations, the Court concluded, had the potential "to become the focus of the litigation."  *Id.* at 99 n.25.  Accordingly, where the voluntary payment defense is implicated, class certification is inappropriate.  *Id.* at 99.

Mr. Gidro's testimony confirms that, even after he concluded that YellowPages.com had acted to defraud him, he nevertheless continued to make his monthly payments.  Mr. Gidro's conduct, therefore, gives rise to the voluntary payment defense.[55]  Accordingly, whether viewed in terms of typicality, adequacy, or commonality, Mr. Gidro cannot represent the class.

### 4.    Two of The Named Plaintiffs Face a Unique "Breach of Forum Selection Clause" Counterclaim

Two of the named Plaintiffs (Mr. Gidro and Ms. Winick) are defendants to "breach of forum selection clause" counterclaims arising out of their filing this action in New Jersey, in violation of the New York forum selection clause.[56]  The forum selection clause already has been

---

*Chubb Corp.*, 264 F.R.D. 76, 99 & n.25 (S.D.N.Y. 2010) (denying certification where defense of voluntary payment created individual issues); *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 308 (S.D.N.Y. 2004) (denying certification where plaintiff's "continued use of his credit card after learning of the conversion fees" created individualized defense).

[55] To the extent other New Jersey advertisers potentially would be subject to the voluntary payment defense, the jury would be required to determine "for each individual class member, whether they knew or should have known of the circumstances …"  *Id.* at 99. *See also Camafel Building Inspections, Inc. v. BellSouth Advertising & Publishing Corp.*, Civ. A. No. 1:06-CV-1501-JEC, 2008 WL 649778, at *11 (N.D. Ga. Mar. 7, 2008) (denying certification in light of the "highly individualized voluntary payment issue"), *aff'd*, 298 Fed. Appx. 822 (11th Cir. 2008).

[56] Numerous decisions have recognized the viability of a claim for the attorneys' fees spent litigating in the wrong forum and for suing to have the forum selection clause enforced.  *See, e.g.*, *Indosuez Intern. Finance, B.V. v. Nat'l Reserve Bank*, 304 A.D.2d 429, 431, 758 N.Y.S.2d

US2008 2338549.12

found valid and enforceable as to Mr. Gidro and Ms. Winick.[57]  This counterclaim exposes them to a damages claim for the attorneys' fees and litigation expenses incurred by YellowPages.com in litigating this action in the wrong forum and moving to enforce the clause.  This counterclaim is unique to Mr. Gidro and Ms. Winick because this case is now in the contractually-designated forum, and if this Court were to certify a class, the absent class members could not be held liable for Mr. Gidro's and Ms. Winick's prior choice to prosecute this action in the wrong forum.

Given their financial exposure on this counterclaim, there is a possibility that Mr. Gidro and Ms. Winick will be adversely influenced by this risk of personal liability, creating "a danger that absent class members will suffer" if certification is granted.[58]

Accordingly, YellowPages.com's breach of forum selection clause counterclaim against Mr. Gidro and Ms. Winick renders them inappropriate as class representatives.

### B.  Plaintiffs' Class Does Not Even Satisfy the Commonality Requirement

"While the commonality requirement of Rule 23(a)(2) is usually a minimal burden for a party to shoulder, a class should not be certified when there are no truly common questions of fact or law presented by the plaintiff's claims."  *Lewis Tree*, 211 F.R.D. at 231 (citation omitted). Plaintiffs in this case have not even met the "minimal" burden of showing commonality.

---

308, 311 (1st Dep't 2003) (affirming award of damages on claim for breach of forum selection clause, and further stating that "an award of such damages does not contravene the American rule that deems attorneys' fees a mere incident of litigation") (citing, *inter alia*, *Allendale Mut. Ins. Co. v. Excess Ins. Co., Ltd.*, 992 F. Supp. 278, 286 (S.D.N.Y. 1998)).

[57] *See Kowalski*, 2010 WL 3323749, *adopted* 2010 WL 3810156.  Although YellowPages.com initially asserted its breach of forum selection clause counterclaim against all three named Plaintiffs, in light of the New Jersey district court's failure to rule that the forum selection clause should be enforced specifically against Mr. Kowalski, YellowPages.com hereby abandons any breach of forum selection clause counterclaim against Mr. Kowalski.

[58] *See, e.g.*, *Gary Plastic*, 903 F.2d at 180; *Mann v. TD Bank, N.A.*, No. 09-1062 (RBK/AMD), 2010 WL 4226526, at *14 (D.N.J. Oct. 20, 2010) ("The core concern is that the class representatives' interests sufficiently align with the interests of the class as a whole.") (citing *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 599 (3d Cir. 2009)).

US2008 2338549.12

In *Lewis Tree*, the plaintiff argued that commonality was satisfied "because a common course of conduct was present in the defendants' transactions with all of the class members." *Id.* As with Plaintiffs here, however, the *Lewis Tree* plaintiff "merely construed the factual basis of each class member's claim in the most general fashion." *Id.* The Court stated:

> Lewis Tree has failed to present evidence that a common factual nexus exists among the purported class. Consumers purchased one of sixty or more different products, each of which had multiple versions and applications. . . . Moreover, the factual circumstances of each of the sales was different. Lewis has failed to offer any evidence that the thousands of sales over a decade were made under similar factual circumstances.

*Id.* at 232.

Here, not even the three representatives' claims share commonality, much less the entire class. The named Plaintiffs did not purchase the same products from YellowPages.com, and none of them purchased many of the advertising products encompassed by Plaintiffs' broad class definition.[59] Thus, while Plaintiffs purport to represent class members who purchased these other products (such as the "Click to Call" product, *see* Am. Compl. ¶¶ 6, 27), they are not in a position to speak to any claim relative to the sale or performance of products they did not buy. Nor can they speak for the class members who renewed their advertising year after year.

Thus, while Plaintiffs list ten questions "common to each of the class members," they ignore that the ***answers*** to these questions are individualized, turning on the advertiser's business; the oral representations made to each class member; the understanding and sophistication of the advertiser hearing the alleged misrepresentation;[60] the particular advertising products purchased;

---

[59] Plaintiffs' class encompasses "all persons or entities in the State of New Jersey that allegedly contracted with Defendant for advertising services … after May 1, 2005." Am. Compl ¶ 1.

[60] This is particularly so with respect to Plaintiffs' "overstated conversion statistics" claim, which involves an allegedly misleading ***question*** rather than a purported misrepresentation of material fact. Even assuming a misleading "how many out of 10" question was asked to members of the class (of which Plaintiffs have no evidence), a sophisticated advertiser would answer "none" or

US2008 2338549.12

and the advertiser's actual experience with the product or group of products purchased.  For example, the question of whether YellowPages.com can "perform the technical functions as represented and whether the functions performed are in accordance with industry standards" demands an examination of advertiser-specific data.  Because such questions cannot be resolved on a class-wide basis, Plaintiffs cannot show commonality.[61]

### C.   Plaintiffs Cannot Demonstrate that Common Issues Predominate Over Individual Issues

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  "It is a more demanding criterion than the commonality inquiry under Rule 23(a)."  *Id*.  "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."  *Id*.

Plaintiffs say that common questions predominate, because the "mechanism of the fraud is the use of a scripted sales presentation made to each and every class member."  Motion, at 22.  As shown above, however, overwhelming evidence establishes that YellowPages.com's sales

---

"more like 1 out of 100."  Where the alleged "fraud" hinges on individualized responses to an allegedly misleading question, certification is improper.  *See, e.g., IPO*, 471 F.3d at 42-45 (reversing certification in light of individual issues of reliance and lack of knowledge).

[61] *See Lewis Tree*, 211 F.R.D. at 232 (finding no commonality where "sales were made over a ten year period by different employees of the defendants and its suppliers, and each sales negotiation would have involved different representations. The subjective understandings of the representations would also have varied from consumer to consumer. The plaintiffs have simply not presented sufficient factual circumstances to suggest there was a common tactic, means or intention to conceal [the alleged] defects that was carried out in a uniform matter and that had a similar impact upon class members …."); *see also Morgan v. Markerdowne Corp.*, 201 F.R.D. 341, 348-50 (D.N.J. 2001) (similarly refusing to find commonality in putative CFA class action).

US2008 2338549.12

representatives did **not** make uniform, scripted sales presentations to each class member.  In fact, they did not even make scripted sales presentations to each named Plaintiff.  Instead, the representations varied considerably, based on, among other things, the product being offered and the particular needs of the individual business.  The cases cited in the Motion confirm that, in these circumstances, class certification is improper.

In *Moore*, for instance, the plaintiffs presented substantial evidence that the defendant had developed a "centralized sales scheme" based on uniform marketing materials and sales scripts.  306 F.3d at 1255.  According to the Second Circuit, however, "this evidence [did] not answer the relevant question – whether members of the class received materially uniform misrepresentations."  *Id.*  In other words, the predominance inquiry asks not whether sales agents were trained in a uniform way, but whether the **actual representations** made to the individual class members were uniform.  *See id.*

In *Moore*, "PaineWebber's brokers did not adopt a materially uniform approach in their individual sales presentations."  *Id.* at 1256.  Among other things, there were "material variations in the sales pitches used by [PaineWebber's] brokers."  *Id.*  The court explained:

> Where there are material variations in the nature of the misrepresentations made to each member of the proposed class, [] class certification is improper because plaintiffs will need to submit proof of the statements made to each plaintiff, the nature of the varying material misrepresentations, and the reliance of each plaintiff upon those misrepresentations in order to sustain their claims.

*Id.* at 1253.  Accordingly, notwithstanding the defendant's uniform approach to sales training, the Second Circuit affirmed the district court's denial of class certification.  *Id.*

Similarly, in *McCracken v. Best Buy Stores, L.P.*, 248 F.R.D. 162 (S.D.N.Y. 2008), class certification was denied where there were variations in the alleged oral representations made to the putative class.  *Id.* at 168-169.  Plaintiffs submitted evidence that the defendant provided its sales clerks centrally-prepared training materials, which, among other things, instructed the sales

- 30 -

clerks to ask certain questions and recommended language to use when making a sale.  *Id.* at

165.  Yet, as here, the training materials also urged the sales clerks "to develop and personalize

their own natural and comfortable inquiries and responses to the customers." [62]  *Id.* at 168.  In

light of this focus on customization, the court explained that "[t]here [was] nothing in the record

to suggest that a [sales clerk] in Los Angeles, California would make the same pitch given by a

sales clerk in Jacksonville, Florida, and the facts of this case demonstrate otherwise."  *Id.*

Specifically, the customer complaints demonstrated that "material differences existed in the oral

presentations [the customers] encountered and that individual inquiry is required."  *Id.* at 169.

    *Moore* and *McCracken* are but two examples of the many cases denying certification due

to material variations in sales presentations. [63]  The remaining cases cited by Plaintiffs are not to

the contrary, as they involved allegedly identical representations presented to all class members

---

[62] For example, the training materials on which Plaintiffs rely instructed the sales representatives to customize their sales presentations to meet the needs of each potential customer.  *See e.g.*, Ex. 4, Initial Sales Training (excerpted as Plaintiffs' Exhibits 11 and 24), at 36 (explaining that YellowPages.com sales representatives must understand "a customer's current situation and the direction they wish their business to go"), at 168 (outlining the "steps of the sale"), and at 193-198 (conducting an exercise whereby the trainee takes a particular scenario and "create[s] a logical recommendation of [YellowPages.com] products based on the information given").

[63] *See, e.g.*, *Lewis Tree*, 211 F.R.D. at 235 (cited in Motion, at 20) (denying certification where there were variations between the sales materials provided to and the products ultimately purchased by the putative class members); *In re LifeUSA Holding Inc.*, 242 F.3d 136, 146 (3d Cir. 2001) (selling agents did not employ marketing material uniformly, and sales presentations were individually tailored to each customer's financial objectives); *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 191 (3d Cir. 2001) (individual representations "were oral and varied"); *Demmick v. Cellco P'ship*, No. 06-2163 (JLL), 2010 WL 3636216, at *17 (D.N.J. Sept. 8, 2010) (denying certification of a CFA claim "where some of the plaintiffs made their decisions based on oral representations that may have varied" and stating "it is hard to imagine that any causal connection for this claim could be established absent resort to individualized evidence"); *Morgan*, 201 F.R.D. at 48-50 (refusing to certify common law fraud and CFA claims predicated on alleged oral misrepresentations).  *See generally* Advisory Committee Notes to 1966 Amendments to Fed. R. Civ. P. 23(b)(3) ("although having some common core, a fraud case may be unsuitable for treatment as a class action if there was material variation in the representations made or in the kids or degrees of reliance by the persons to whom they were addressed").

US2008 2338549.12

in a uniform way.[64]  In this case, the undisputed evidence shows the alleged oral representations

made by YellowPages.com sales representatives either were not made to every member of the

putative class or varied materially in nature.[65]  Accordingly, class certification should be denied.

---

[64] In *Prudential*, for instance, the district court certified a **settlement** class because "the oral component of the fraudulent sales presentations did not vary appreciably among class members." *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 514 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998).  Indeed, Prudential required its agents to use the uniform sales materials it furnished, and the "Prudential agents uniformly misled class members with ***virtually identical*** oral misrepresentations."  *Id.* at 514-15 (emphasis added).

The remaining five decisions cited by Plaintiffs likewise are inapposite.  Three of the five cases involve securities fraud claims, which are "especially amenable to class certification" due to the fact that the alleged misrepresentations in such cases are often made in written valuations provided to each class member.  *Katz v. Image Innovations Holdings, Inc.*, No. 06 Civ. 3707 (JGK), 2010 WL 2926196, at *3 (S.D.N.Y. July 22, 2010); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D 76 (S.D.N.Y. 2007); *In re Blech Sec. Litig.*, 187 F.R.D. 97 (S.D.N.Y. 1999).  The fourth case, like *Prudential*, involved a **settlement** class action; the court's decision makes no reference to the alleged misrepresentations at issue, but specifically notes that the court was certifying the settlement at least in part because the putative class would have had difficulty establishing liability at trial.  *Ersler v. Toshiba Am., Inc.*, No. CV-07-2304 (SMG), 2009 WL 454354 (E.D.N.Y. Feb. 24, 2009).  Finally, in the fifth case, the allegedly fraudulent representations were made in television advertisements, print media, and the defendant's website, such that the representations easily were ascertainable and did not vary from class member to class member.  *Lee v. Carter-Reed, LLC*, 4 A.3d 561 (N.J. 2010).

[65] Even assuming Plaintiffs had adduced proof that an alleged misrepresentation had been made to a class member, that advertiser still would be required to show "ascertainable loss" "as a result of" (*i.e.*, proximately caused by), the alleged misrepresentation.  *See, e.g., International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 389, 929 A.2d 1076, 1086 (2007) (emphasizing CFA requirement of "a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss"); *McNair v. Synapse Group, Inc.*, Civ. A. No. 06-5072 (JLL), 2009 WL 1873582, at *9-*12 (D.N.J. June 29, 2009) (denying certification due to class members' individual reactions to alleged misrepresentations); *Parker v. Howmedica Osteonics Corp.*, Civ. A. No. 07-02400 (JLL), 2008 WL 141628, *3 (D.N.J. Jan. 14, 2008) ("[A] plaintiff must demonstrate that the loss suffered is attributable to defendant's unlawful conduct – in essence, was suffered 'as a result of' defendant's violation of the statute – to establish the necessary nexus between the alleged loss sustain[ed] and a defendant's offending behavior.").  This "causation" analysis would be individualized and would require an advertiser-specific inquiry into the "ascertainable loss" suffered.  *See, e.g., Pelman v. McDonald's Corp.*, No. 02 Civ. 07821 (DCP), 2010 WL 4261390, at *7-*9 (S.D.N.Y. Oct. 27, 2010) (denying class certification due to individualized causation issues); *Weiner v. Snapple Beverage Corp.*, No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *5-*6 (S.D.N.Y. Aug. 5, 2010) (denying certification where, as here, "the issue of damages is bound up with the issue of injury").

US2008 2338549.12

**D.      The Class Action Device is Not Superior to Individual Adjudication**

Among the factors relevant to determining whether a class action is the superior method

of adjudication are "whether the class members have an interest in individually controlling the

prosecution of separate actions; "the extent of litigation already commenced by class members";

and "difficulties likely to be encountered in the management of a class action." *Spagnola*, 264

F.R.D. at 99 (citing Fed. R. Civ. P. 23(b)(3)).  These factors weigh against certification here.

**1.      Prior Individual Actions Confirm That Members of the Putative Class
Have an Interest in Controlling Their Own Litigation**

Plaintiffs claim that they are "not aware of any individual actions that have been filed by

a consumer who purchased YellowPages.com listing and/or guaranteed clicks product."  Motion,

at 22.  But YellowPages.com identified no less than five lawsuits brought by individual

businesses against YellowPages.com in New Jersey.[66]  These cases demonstrate that there is

sufficient interest amongst members of the putative class to litigate their claims individually.

Plaintiffs assert that the "small individual amounts at issue" render individual litigation

"wholly unrealistic."  Motion, at 22-23.  But, given that the CFA awards treble damages and

attorneys' fees to successful plaintiffs, the named Plaintiffs' claims range in value from $3,636 to

$16,812, *plus* reasonable attorneys' fees.[67]  Thus, these are not "negative value" suits by helpless

---

[66] *See* Bogan Decl. ¶¶ 113-114 (citing *Albert's Transp. v. YellowPages.com*, DC-013400-09 (N.J.
Super. Ct. Law. Div.) (demanding $4,216 in actual damages); *B-Dry Systems of South Jersey &
Philadelphia, Inc. v. YellowPages.com, LLC*, No. BUR-C-065-08 (N.J. Super. Ct. Ch. Div.)
(noting yearly advertising costs of $20,580); *Douglas v. YellowPages.com*, ATL-L-0158-06 (N.J.
Super. Ct. Law. Div.) (seeking $7 million in damages); *Monmouth Shadowbrook, Inc., et al. v.
YellowPages.com, LLC, et al.*, No. DC-16100-09 (N.J. Super. Ct. Law Div.) (noting yearly
advertising costs of $11,124); and *U 1/2 2 Inc. v. YellowPages.com LLC*, No. SC 2237-08
(demanding repayment of approximately $2,850)).

[67] If she had not abandoned her damages claim, Ms. Winick would be seeking to treble the
$1,212 she agreed to pay, or $3,636; assuming he had paid, Mr. Kowalski would be seeking
treble the $4,296 he agreed to pay, or $12,888; and Mr. Gidro is seeking to treble his total
advertising payments of $5,604, or $16,812.

US2008 2338549.12

consumers, but significant monetary claims that can be and are prosecuted by the business entities that advertise with YellowPages.com.[68]

### 2.   The Class Action Waiver in the Terms and Conditions Should Be Enforced

In light of size of Plaintiffs' individual claims and the substantial remedies available to them under the CFA (including fee shifting), the class action waiver in the "Terms and Conditions" should be enforced.  Paragraph 22 of the Terms and Conditions – the same paragraph containing the forum selection clause that already was enforced by the District of New Jersey (*see Kowalski*, 2010 WL 3323749, at *3-*6) – provides, "Any claim against us arising from this Agreement shall be adjudicated on an individual basis, and shall not be consolidated in any proceeding with any claim or controversy by any other party."  *See* Am. Compl., Ex. B ¶ 22. Although class action waivers will not be enforced where the effect is to preclude vindication of "small sum" claims that only are valuable if aggregated, such waivers will be enforced where, as here, individual claims are sufficiently large to warrant individual adjudication.[69]

---

[68] *Compare Kowalski*, 2010 WL 3323749, at *5 (noting that the named Plaintiffs "are not 'powerless' laypeople who were forced into signing the contract" but "small business owners who sought and signed up for Defendant's services") *with Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotation marks and citation omitted).

[69] *See, e.g.*, *Delta Funding Corp. v. Harris*, 189 N.J. 28, 46-47, 912 A.2d 104, 115 (2006) (class action waiver enforced in light of significant damages claims and generous remedies available under CFA); *Vilches v. Travelers Cos., Inc.*, No. 10-2888, 2011 WL 453304, at *5 (3d Cir. Feb. 9, 2011) (explaining class action waivers will be enforced except with "a consumer contract with predictably small damages"); *Davis v. Dell, Inc.*, Civ. No. 07-630 (RBK), 2008 WL 3843837 (D.N.J. Aug. 15, 2008) (finding claims of $1,000 to $3,000 sufficiently large to incentivize individual claims and enforcing class action waiver); *Jones v. The Chubb Institute*, No. 06-4937 (KSH), 2007 WL 2892683, at *4 (D.N.J. Sept. 28, 2007) (finding that claim of $6,551.26 ($19,653.78 trebled), plus attorneys' fees, could attract competent counsel to vindicate his claims, and thus enforcing class arbitration waiver); *see also Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 186-88 (E.D. Pa. 2010) (enforcing class action waiver where individual claim was worth $468 ($1,404 trebled) and attorneys' fees were available) (Pennsylvania law).

US2008 2338549.12

### 3.    Manageability Concerns Justify Denying Certification

"[M]anagement of a class action in which there are so many individualized questions of proof is a strong reason to prefer individualized litigation." *Calabrese*, 2009 WL 425879, at *27. "By its nature, such an action would have virtually no advantage over separate trials, and would needlessly incur significant disadvantages arising from the litigation of so many separate questions of fact at once." *Id.*; *see also Spagnola*, 264 F.R.D. at 99.

Plaintiffs' contention that a class action would be easily manageable is based on the false premise that a "scripted pitch" containing three uniform misstatements was made to all members of the putative class. *See* Motion, at 24. There was and is no such thing as a "uniform scripted pitch," however, because the representations varied from class member to class member. Indeed, Plaintiffs' argument completely ignores the element of causation, an essential element of a CFA claim. *See supra* n.65. In light of these individual issues, combined with the fact that Plaintiffs have presented no trial plan detailing how this case could be managed, this factor also weighs in favor of denying class certification.[70]

---

[70] "An increasing number of courts require a party requesting class certification to present a 'trial plan' that describes the issues likely to be presented at trial and tests whether they are susceptible to class-wide proof." Advisory Committee Notes to 2003 Amendments to Rule 23(c)(1). Trial plans often reveal the practical impossibility of class-wide trials where, as here, the putative class relies on generalized allegations of a common course of misconduct. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ. 9882 (DLC), 2005 WL 2278076, *3 (S.D.N.Y. Sept. 20, 2005) (denying class certification and noting flaws in request for certification were "underscored" by plaintiffs' proposed trial plan); *Benner v. Becton Dickinson & Co.*, 214 F.R.D. 157, 174 (S.D.N.Y. 2003) ("Plaintiffs' proposed trial plan highlights the management nightmare this Court would face if the putative classes were certified.").

In response to YellowPages.com's interrogatories, Plaintiffs claimed they would "devise – and currently are in the process of devising – such a plan and, upon conclusion of class discovery, will share the plan should the Court so request." Plfs.' Responses to Def.'s Interrog. No. 8. Plaintiffs, however, have not submitted a trial plan.

US2008 2338549.12

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied.

DATED:  March 14, 2011                    Respectfully submitted,

                                          KILPATRICK TOWNSEND & STOCKTON LLP

                                          JAMES F. BOGAN III (admitted *pro hac vice*)
                                          C. ALLEN GARRETT JR. (admitted *pro hac vice*)
                                          RONALD L. RAIDER (admitted *pro hac vice*)
                                          JOHN R. GIBSON (admitted *pro hac vice*)
                                          DANIEL G. SCHULOF (admitted *pro hac vice*)
                                          1100 Peachtree Street, Suite 2800
                                          Atlanta, Georgia 30309-4528
                                          Telephone:  (404) 815-6500
                                          Facsimile:  (404) 815-6555

                                          IAN M. GOLDRICH (NY State Bar No. 501475)
                                          31 West 52nd Street, 14th Floor
                                          New York, New York 10019
                                          Telephone:  (212) 775-8700
                                          Facsimile:  (212) 775-8800

US2008 2338549.12

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2011, pursuant to the Hon. Paul G. Gardephe's

"bundling rule," the foregoing was served by overnight mail, to counsel of record, as addressed

below.  On April 14, 2011, Judge Gardephe "So Ordered" Defendant's request to file certain

documents and exhibits under seal.  Accordingly, I further certify that on April 19, 2011, true

and correct copies of those documents, or relevant excerpted portions of those documents, which

the parties agreed should only be filed Under Seal, were filed by hand with the Clerk's Office at

the U.S. District Court, and redacted versions were filed with the U.S. District Court's CM/ECF

System, and that pursuant thereto, copies of these pleadings, as redacted, have been served upon

counsel of record by electronic and/or regular mail, as addressed as follows:

| | |
|---|---|
| Paul I. Perkins<br>**LYNCH LAW FIRM, P.C.**<br>45 Eisenhower Drive<br>Paramus, NJ 07652<br>Telephone: 201-543-0300<br>Facsimile:  201-455-6359<br>paulperkins@lynchlawyers.com | Peter S. Pearlman<br>**COHN LIFLAND PEARLMAN**<br>**HERRMANN & KNOPF LLP**<br>Park 80 Plaza West – One<br>Saddle Brook, NJ 07663<br>Telephone: 201-845-9600<br>Facsimile:  201-845-9423<br>psp@njlawfirm.com |
| Peter George Safirstein<br>**MILBERG LLP (NYC)**<br>One Pennsylvania Plaza<br>New York, NY 10119<br>Telephone: (212)-271-8205<br>Fax: (212)-868-1229<br>psafirstein@milberg.com | Christopher Polaszek<br>**MILBERG LLP**<br>Corporate Center One<br>2202 N. Westshore Blvd., Suite 200<br>Tampa, FL  33607<br>Telephone: 813-639-4248<br>Facsimile:  561-892-8164<br>cpolaszek@milberg.com |

| | |
|---|---|
| Ronald W. Riggs IV<br>**MILBERG LLP (NYC)**<br>One Pennsylvania Plaza<br>New York, NY 10119<br>Telephone: (212)-946-9496<br>Fax: (212)-273-4311<br>rriggs@milberg.com | Frank J. Janecek, Jr.<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway, Suite 1900<br>San Diego, CA  92101<br>Telephone: 619-231-1058<br>Facsimile:  619-231-7423<br>frankj@rgrdlaw.com |
| Christopher Collins<br>**ROBBINS GELLER RUDMAN & DOWD LLP**<br>655 West Broadway, Suite 1900<br>San Diego, CA  92101<br>Telephone: 619-231-1058<br>Facsimile:  619-231-7423<br>chrisc@rgrdlaw.com | Jason J. Thompson<br>**SOMMERS SCHWARTZ**<br>2000 Town Center, Suite 900<br>Southfield, Michigan  48075<br>Telephone: 248-746-4096<br>Facsimile:  248-541-3133<br>jthompson@sommerspc.com |
| Jesse Young<br>**SOMMERS SCHWARTZ**<br>2000 Town Center, Suite 900<br>Southfield, Michigan  48075<br>Telephone: 248-746-4096<br>Facsimile:  248-541-3133<br>jyoung@sommerspc.com | |

This 19th day of April, 2011.


    /s/ James F. Bogan, III

James F. Bogan, III
*Counsel for Defendant YellowPages.com, LLC*

US2008 2525568.1