UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AL KOWALSKI d/b/a KOWALSKI
PLUMBING, MICHELLE WINICK d/b/a
MICHELLE WINICK DESIGN and
MICHAEL GIDRO, individually and on
behalf of all others similarly situated,

               Plaintiffs,

- against -

YELLOWPAGES.COM, LLC,

               Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3 31 12

**MEMORANDUM
OPINION & ORDER**

10 Civ. 7318 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

          In this action, Plaintiffs Al Kowalski, Michelle Winick, and Michael Gidro seek

damages and equitable relief on behalf of themselves and a putative class against Defendant

YellowPages.com, LLC, for violations of the New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-

1, et seq., ("NJCFA") and for breach of contract. Plaintiffs, owners of New Jersey businesses,

allege that they were induced to enter into contracts with YellowPages.com for online

advertising services on the basis of fraudulent misrepresentations and omissions concerning (1)

the nature and quality of Defendant's services; and (2) the terms and conditions of the service

agreement. (See First Amended Complaint ("FAC") at ¶¶ 126-129)

          Plaintiffs now move under Fed. R. Civ. P. 23 for certification of a class consisting

of "[a]ll persons or entities in the State of New Jersey that allegedly contracted with

YellowPages.com for advertising services from and after May 1, 2005." (Notice of Motion, Dkt.

No. 93)

Defendant opposes class certification, arguing, <u>inter</u> <u>alia</u>, that the named plaintiffs are not representative of the putative class, and that Plaintiffs have failed to show systematic dissemination of the alleged misrepresentations and omissions.

Also pending before the Court are two motions to strike.  Plaintiffs have moved to strike an expert report, expert testimony, and an expert disclosure notice that Defendant submitted in support of its opposition to Plaintiffs' class certification motion.  (Dkt. No. 106)  Defendant has moved to strike certain declarations and exhibits presented for the first time in connection with Plaintiffs' reply brief in support of their class certification motion.  (Dkt. No. 111).

For the reasons stated below, Plaintiffs' motion to strike will be granted in part and denied in part, Defendant's motion to strike will be denied, and Plaintiffs' motion for class certification will be denied.

## <u>BACKGROUND</u>

The three named plaintiffs operate small businesses in New Jersey.  Plaintiff Kowalski has a plumbing business – Kowalski Plumbing – in Rochelle Park, New Jersey; Plaintiff Winick operates Michelle Winick Design in Little Falls, New Jersey; and Plaintiff Gidro has a law practice in Teaneck, New Jersey.  (<u>See</u> FAC at 1)  The FAC alleges that, since 2005, Plaintiffs and putative class members have purchased certain online advertising services from Defendant YellowPages.com on the basis of fraudulent misrepresentations and omissions.

The FAC describes Defendant's business as follows:

Defendant is in the business of soliciting advertising from individual and business consumers and displaying that advertising on the internet for the general public to search and providing services to customers, including the Class Members[,] by driving internet traffic to their Yellowpages.com ad and/or website.  Among other things, Yellowpages.com follows the same format as the Yellow Pages telephone directories that are distributed throughout the United States, except that the advertising appears on the

internet.  Yellowpages.com can be searched by a member of the general public on a nationwide or geographic specific basis.

(FAC, ¶ 3)

The services at issue here are an online search engine product and a number of programs allegedly designed to increase traffic to the advertiser's website or calls to the advertiser's business.  The FAC alleges:

Defendant's Salespeople offer two types of services:

i.  Defendant represents that it provides the number one online yellow pages search engine and thus, any Class Member who purchases a listing within the Yellowpages.com site automatically receives a high amount of exposure.  Moreover, the Salespeople represent that Yellowpages.com has developed "partnerships" with major online search engines like Google.com, Yahoo.com, MSN.com, and others and, as a result, Class Members will be featured prominently in the results of searches run on those search engines.  Defendant's Salespeople represent further that because of the "partnerships," it is cheaper to advertise with Yellowpages.com than directly with those major search engines.

ii.  Yellowpages.com also features several types of advertising products in which the Class Members can also enroll, including, but not limited to:

a.  The YPClicks! Program or Yellowpages.com Guaranteed Clicks Program.  This is a program wherein Class Members are guaranteed to receive a certain number of Clicks on their Yellowpages.com ad or website during a specific period of time.  For example, a Class Member might sign up for 1200 Clicks over the period of a year.

b.  The Click to Call Program.  This is a program wherein the Class Member is charged a fee only when someone calls . . . a special phone number listed on the Class Member's ad.  Like the YPClicks! Program, the Class Member is guaranteed a certain number of calls within a specific time period.

c.  The Purchase of a Tile Position.  This program assures the Class Member his or her ad will be featured in a box advertisement (a "Tile") at the top of [a] list of results displayed when a member of the public searches the

Yellowpages.com site only for goods and services in the Class Members' designated geographic area.

(Id. ¶ 6) (footnote omitted).[1]

Defendant solicits customers by telephone and by in-person sales calls on businesses and residences ("premise sales").  (FAC, ¶ 4)

## I.    SALES TRAINING

The central theme of the FAC and Plaintiffs' class certification motion is that Defendant uniformly trains its sales representatives to sell its products using a "scripted sales pitch" rife with fraudulent misrepresentations and omissions.[2]  (FAC, ¶¶ 5, 8, 18-25, 29-63; Pltf. Class Cert. Br. at 2-3, 7)

Defendant's salespeople begin their employment with an intensive two to three week training program.  (Janecek Decl., ¶ 14)  Instructors use a PowerPoint presentation referred to as the "sales training deck."  (Janecek Decl., ¶ 20; Bogan Decl., Ex. 13 (Quinlan Dep.) at 284-85)  Although the presentation is periodically updated, the "sales pitch" portion of the decks has remained unchanged since 2006.  (Bogan Decl., Ex. 13 (Quinlan Dep.) at 29)

During training, salespeople are instructed that every sales pitch must contain certain "core concepts," and new hires are required to memorize a sales script.  (Janecek Decl.,

---

[1]  The FAC defines a "click" as follows:  "A 'Click' is when a member of the general public, searching the internet, Clicks on a link or logo that takes that person to a specific site on the internet.  In this case, the logo or link takes the person to the Class Member's Yellowpages.com ad or website."  (FAC, ¶ 6(ii)(a) n. 1)

[2]  Plaintiffs have supported their allegations concerning Defendant's sales training and sales practices with declarations from a number of former YellowPages.com sales representatives.  These former salespeople were trained in Philadelphia and Troy, Michigan, and sold advertising in New York, Michigan, New Mexico, Ohio, Pennsylvania, and Richmond, Virginia.  (Janecek Decl., Exs. 21-23; Pearlman Decl., Exs. 64-66)  Although Plaintiffs seek certification of a class consisting of "[a]ll persons or entities in the State of New Jersey that allegedly contracted with YellowPages.com for advertising services from and after May 1, 2005" (Notice of Motion, Dkt. No. 93), none of the declarations offered by Plaintiffs discuss sales practices in New Jersey.

¶¶ 14, 16, Ex. 19)  Those who do not memorize the sales script at the beginning of training are

fired. (Janecek Decl., ¶ 15; Bogan Decl., Ex. 13 (Quinlan Dep.) at 81-82)

        Plaintiffs have offered three sales scripts that, while not identical, contain five

core steps:  (1) the approach; (2) fact-finding; (3) the needs assessment; (4) the pitch; and (5) the

close.  (Janecek Decl., Exs. 8-10; Bogan Decl., Ex. 13 (Quinlan Dep.) at 108)  The "approach"

initiates the sales pitch, and the "fact-finding" component involves obtaining information from

the customer about his or her business.  (Janecek Decl., ¶¶ 25-26)  During "fact-finding,"

salespeople are trained to ask about the potential advertiser's "conversion" rate – i.e., "[i]f 10

people were to search for a local [service or business] online, and they found your website, how

many would end up doing business with you?" (Id., ¶ 26, Ex. 8)

        The "needs assessment" component of the sales script focuses on how much

business growth a customer could manage, in an effort to determine the appropriate product(s)

for the customer.  (Id., ¶ 27, Exs. 8-9)  During "the pitch," salespeople are to tell advertisers,

inter alia, that YellowPages.com will drive traffic to their business.  (Id., ¶¶ 28-29, Exs. 8-9)  The

script directs the salesperson to tell the customer the number of searches on the

YellowPages.com online directory that were made in the prior month in the relevant geographic

market for the services offered by the customer.  (Id., ¶ 29, Exs. 8-9)  The script then moves on

to a discussion of Defendant's products, including YPClicks! – the "guaranteed clicks" product,

which salespeople are taught to say will result in "local[,] targeted, qualified traffic to your

website" – and the "tile" program.  (Id., ¶¶ 29-30, Exs. 8-9)

        The final step in the sales process – as reflected in the sales script – is the "close,"

which involves obtaining the customer's consent to purchase the product, and obtaining the

customer's signature and credit card information.  (Id., ¶ 31, Exs. 8-9)

Although not reflected in the sales scripts submitted by Plaintiffs, they contend that trainees are taught – when a customer hesitates or refuses to purchase a service, or questions the cost of the service – to perform a scripted "Return on Investment" ("ROI") analysis. (Janecek Decl., ¶ 32)  The ROI analysis purports to reflect the return a customer can expect to receive if he or she advertises on YellowPages.com.  (Id.)  Plaintiffs contend that Defendant's salespeople are instructed to (1) repeat the number of relevant internet searches conducted the prior month; (2) tell the customer that "research indicates that 74% of searches on [YellowPages.com] result in a contact [to a listed merchant]"; and (3) tell the customer that "conservatively" the customer can expect to be contacted by 1% of those individuals.  The ROI is then calculated, based on the customer's estimate of what percentage of inquiries result in a sale and the average dollar amount associated with each sale.  (Id., ¶ 33, Ex. 29)

Plaintiffs also contend that Defendant's salespeople are trained not to provide the "Terms and Conditions for Internet Advertising" ("Terms and Conditions") for YellowPages.com's products until a customer has committed to purchase the product:

> For Premises Sales, salespeople were trained to not provide the "Terms and Conditions" – to which the class members would purportedly be bound – until after the customer signed the "Order Form."  For Telephone Sales, the sales people are trained to tell the customer that Terms and Conditions exist that can be found on line, *only after* the customer has agreed to purchase one or more products and provided their credit card number.

(Id., ¶ 22) (emphasis in original).

Plaintiffs also assert that salespeople are required to attend weekly training sessions throughout their employment to reinforce the lessons learned from the initial training. (Janecek Decl., ¶ 23)

Defendant states that its purpose in having trainees memorize a sales script during training is to test new employees' commitment to the training program and company.  (Bogan

6

Decl. ¶ 100)  As to the ROI analysis issue and the use of the 74% contact figure, Defendant's executives – including its sales director, former director of sales training, and "team leader" for the development of sales aids – deny that this ROI analysis was ever a company-approved sales tool.  (See Bogan Decl., ¶¶ 78, 84, Ex. 13 (Quinlan Dep.) at 14, 185 (sales director and former director of sales training; "I've never seen this document before" in response to being shown Ex. 29 to Janecek Decl.); Ex. 29 (Thornburg Dep.) at 6, 29-32, 114-15, 118, 122-24 (former "team leader" responsible for developing sales aids; stating that ROI calculator sheet containing 74% success figure was "not approved" and "was not allowed to be used"; "we did not roll that out in any sense to a sales channel or introduce it").

Defendant has largely not disputed Plaintiffs' assertions concerning its sales training program, however.  As discussed below, Defendant does vigorously dispute whether there is evidence that the sales practices criticized by Plaintiffs were utilized with respect to the named plaintiffs and other members of the putative class.

## II.   SALES PRACTICES

### A.   Plaintiffs' Contentions

Plaintiffs claim that several elements of the presentation Defendant's sales representatives are trained to deliver – and allegedly repeat in the field – misrepresent the amount of additional business YellowPages.com's products will generate for an advertiser.  In particular, Plaintiffs contend that the "sales pitch" (1) "vastly overstates the conversion rate class members could expect by advertising with Yellowpages.com"[3]; (2) "overstates the class

---

[3]  The term "conversion rate," as used by Plaintiffs, means the percentage of those who see a merchant's ad on YellowPages.com who then make a purchase from that merchant.  (Janecek Decl, Ex. 16 (Kent Rpt.) at 11, 30).

members' expected return on investment"; and (3) "misrepresents that the clicks received will be local, targeted and qualified." (Janecek Decl., ¶ 34)

As to the conversion rate, Plaintiffs assert that, "[i]n asking the question about how many people out of 10 would do business with you, the scripted pitch leads the class members to believe that the conversion rates they can expect are 10%, 20%, 30% or greater." (Id., ¶ 35) Plaintiffs have offered an expert report indicating that "online conversion rates are tiny, more often than not under 1%." (Id.; Ex. 16 (Kent Rpt.) at 11)

With respect to the ROI analysis, Plaintiffs contend that, in allegedly telling customers that 74% of the searches conducted on YellowPages.com result in an individual contacting a listed merchant (Janecek Decl., Ex. 29), Defendant are misrepresenting the results of the study on which that statistic is based. The Morpace Study, which was commissioned by Defendant, concluded that 74% of the people who had found a merchant on YellowPages.com contacted or visited that merchant; that study did not conclude that 74% of the searches conducted on YellowPages.com resulted in an individual contacting a listed merchant.[4] (Pltf. Class Cert. Br. at 7-8; Janecek Decl., Ex. 35 at 000055; Ex. 16 (Kent Rpt.) at 32-33)

With respect to the "quality" of the "clicks" a YellowPages.com ad will produce, Plaintiffs claim that Defendant's description of the clicks as "local" and "targeted" is misleading,

---

[4] The question in the cited study is: "In the past month, have you contacted or visited any of the merchants you found searching each of the following?" The names of several online directories are then provided to the survey respondent, including YellowPages.com. Of those surveyed, 74.2% said that they had contacted a merchant they found on YellowPages.com. Plaintiffs' expert notes, however, that the Morpace Study concluded that people who accessed the YellowPages.com website did so an average of 4.9 times per month. (Janecek Decl., Ex. 16 (Kent Rpt.) at 32; Ex. 35 at Question 328) If one assumes that each visitor to the YellowPages.com website conducted only one search per visit, then only 15% of the searches would have resulted in a merchant contact that month. (Id.) That percentage has an inverse relationship with the number of searches an individual conducts, of course. In other words, the more searches an individual conducts per visit to the YellowPages.com website, the smaller the percentage of searches that result in a merchant contact. (Id.)

because YellowPages.com uses a "Designated Market Area" ("DMA") approach when defining

the relevant market, instead of using a set radius from a customer's business.  (Janecek Decl.,

¶ 42)  Because New Jersey advertisers fall into the "extremely large" New York DMA (Janecek

Decl., ¶ 42, Ex. 34 (McMahon Dep.) at 57-63), they "end up getting a lot of clicks that are highly

unlikely to turn into business."[5]  (Janecek Decl., ¶ 42, Ex. 16 (Kent Rpt.) at 18)  In addition,

Plaintiffs argue that YPClicks! relies mainly on "content clicks," that this kind of click product is

much less likely to convert clicks into sales, and that Defendant does not disclose this fact to

potential customers. (Janecek Decl., ¶ 43, Ex. 16 (Kent Rpt.) at 41-42)

       Plaintiffs contend that YellowPages.com's salespeople do not provide or discuss

the terms and conditions of the service agreement until after a customer has signed an "insertion

order" or recorded their oral consent to a purchase over the telephone.  (Janecek Decl., ¶ 46;

Bogan Decl., Ex. 13 (Quinlan Dep.) at 249-50, 260)  During an in-person sales presentation,

once a customer consents to purchase a product, a salesperson gives the customer a laptop with a

form to electronically sign the "insertion order."[6]  The customer has not typically seen a copy of

the terms and conditions at this point.  The entire contract – including the Terms and Conditions–

is thereafter emailed or mailed to the customer.  (Janecek Decl., ¶ 47)  In the case of telephone

---

[5]  Plaintiffs' expert report explains that "pay-per-click" products offered by companies such as
YellowPages.com and Google use a "geo-targeting" system.  Google recommends targeting local
ads within a 20-mile radius of the advertiser's business.  (Janecek Decl., Ex. 16 (Kent Rpt.) at
18)  Because YellowPages.com uses a DMA approach – rather than a system tied to distance
from an advertiser's address – that results in New Jersey advertisers such as Plaintiffs being
placed in the New York DMA, "which represents about 6.5% of the U.S. population and is
somewhere around 5 times the size of a circle with a 20-mile circumference."  (Id.)

[6]  Defendant notes that the "e-signature" process – in which a complete copy of the contract is
emailed to a customer after the customer executes an electronic order form – was first introduced
in October 2007 in the Philadelphia and New York markets, and not introduced in New Jersey
until January 2008.  (Bogan Decl., ¶ 110)

sales, it is not until the conclusion of the voice script – after the customer has agreed to purchase one or more products – that the customer is told that additional terms and conditions may be found online. (Id., ¶ 48)

Plaintiffs further claim that all of these allegedly misleading misrepresentations and omissions "were uniformly presented to plaintiffs and the class members through a scripted sales pitch." (Id., ¶ 24)  In support of this assertion, Plaintiffs rely on declarations submitted by the former sales representatives referenced above stating that they used Defendant's sales script, or made a "script-like presentation when pitching products to potential customers."  (Id., Ex. 22 (Gillaspy Decl.) at ¶ 7; Ex. 23 (Simmons Decl.) at ¶ 5; Pearlman Decl., Ex. 65 (Saunders Decl.) at ¶ 7; Ex. 66 (Rossmiller Decl.) at 8)

**B.      Defendant's Contentions**

Defendant has offered declarations from fifteen current and former salespeople and sales managers – including from the employees who sold products to Plaintiffs Gidro and Winick – who say that while trainees must learn a script during training, employees do not use a script in the field when selling Defendant's products.[7]  (See Bogan Decl., ¶ 103, Ex. 24

---

[7]  Defendant's declarations are from:  (1) Jason Boudreau, general sales manager for Northern New Jersey (Bogan Decl., Ex. 14); (2) Cheryl D'Elia, who sold products to Plaintiff Gidro in New Jersey (Id. Ex. 15); (3) Craig De Vito, who sold products to Plaintiff Winick in New Jersey (Id. Ex. 16); (4) Patrick Eastburn, who is a former sales director and who now serves as general manager of sales (Id. Ex. 17); (5) Gabriel Gamper, a sales representative who was trained in Philadelphia and sold Defendant's products in Phoenix, Arizona (Id. Ex. 18); (6) Joseph Green, an employee since 2005, who is currently a district sales manager in Las Vegas (Id. Ex. 19); (7) Jarret Howard, a sales representative in Minneapolis since 2008 (Id. Ex. 20); (8) Michael Johnson, a former district sales manager in New York (Id. Ex. 21); (9) Delem Juhusz, a general sales manager in Philadelphia (Id. Ex. 22); (10) David Kenyon, director of local sales in Minneapolis (Id. Ex. 23); (11) Cindy McCaulley, a former telephone sales representative and district sales manager and now senior manager of sales operations (Id. Ex. 24); (12) Robert McCue, a "continuation sales trainer" for the northeast region since 2010 (Id. Ex. 25); (13) Vance Padelford, a general sales manager in Salt Lake City (Id. Ex. 26); (14) Robert Quirk, the

(McCaulley Decl.) at ¶¶ 3-4 ("In my role as a telephone sales representative, I never used a scripted sales presentation."); Ex. 26 (Padelford Decl.) at ¶ 3 ("During my initial sales training, I was required to memorize a 'script.'  Since that initial sales training, however, I have never heard any of the media consultants that I oversee use a 'script' during meetings with potential customers."))

Defendant has also offered testimony from its sales director that there is not a "script out there that people should be using."  (Bogan Decl., Ex. 13 (Quinlan Dep.) at 88)  Moreover, no "script" was ever posted on the Company's internal database for sales representatives.  (Id. at 135)  Finally, Defendant has offered evidence that no scripted presentation has been "utilized in the initial sales training since the summer of 2009."  (Bogan Decl., ¶ 95, Ex. 13 (Quinlan Dep.) at 83, 90)

As to the "conversion rate" issue, Defendant has submitted declarations from a number of employees stating that they do not ask potential customers how many people "out of 10" who clicked on the customer's website would contact the merchant after viewing his or her website.  (See Bogan Decl., ¶ 50, Exs. 14, 20, 25-27)  Jason Boudreau, the general sales manager for Northern New Jersey since 2010, states that "if a customer told me that he or she believed they could get 10 people out of 100 people that clicked on their site to do business with them, I would lower the figure to one out of 100.  This ensured that the customer did not develop overly high expectations."  (Id., Ex. 14 (Boudreau Decl.) at ¶ 5)  Robert McCue, a "continuation sales trainer" since 2010 for a region that includes New Jersey, said that he "would typically ask the customer:  'If 100 people visited your website, how many people would you expect to contact you?'  Most customers would respond that they did not know, so I would normally use the figure

director of sales for the Mountain West region (Id. Ex. 27); and (15) Maureen Spray, general sales manager of the Phoenix region.  (Id. Ex. 28)

of 1% as a baseline."  (Id., Ex. 25 (McCue Decl.) at ¶ 7)  Defendant also contends that Plaintiffs have conceded that the conversion rate issue pertains only to the YPClicks! product.  (Bogan Decl., ¶ 29 (citing Ex. 30 (Kent Dep.) at 50-51; Ex. 48 (MacPherson Rpt.) at 8)

With respect to the ROI analysis issue and the allegedly misapplied 74% statistic, Defendant contends – as discussed above – that the ROI analysis using the 74% statistic challenged by Plaintiffs was never an approved sales tool.  (See Bogan Decl., ¶¶ 78, 84, Ex. 13 (Quinlan Dep.) at 185; Ex. 29 (Thornburg Dep.) at 114-15, 118, 122-24)  Defendant has also introduced declarations from sales representatives stating that they never used an ROI analysis that included the allegedly misleading 74% statistic.  (Bogan Decl., Ex. 26 (Padelford Decl.) at ¶ 5; Ex. 28 (Spray Decl.) at ¶ 6; Ex. 25 (McCue Decl.) at ¶ 6)

Defendant also asserts that the Morpace Study, from which the 74% statistic is extracted, was not conducted until 2007 and was not finalized until May 2007 – thus limiting the number of customers in the proposed class (defined as "persons or entities in the State of New Jersey that allegedly contracted with YellowPages.com for advertising services from and after May 1, 2005" (Notice of Motion, Dkt. No. 93) who could have possibly been exposed to the alleged misrepresentation.  (Bogan Decl., ¶ 92)

Finally, Defendant asserts that Plaintiffs have conceded that the ROI analysis issue only applies to the online directory.  (Bogan Decl., ¶ 29 (citing Ex. 30 (Kent Dep.) at 63; Ex. 48 (MacPherson Rpt.) at 4)

## III.   THE NAMED PLAINTIFFS

### A.   Al Kowalski

On October 31, 2008, Plaintiff Kowalski had a telephone conversation with a YellowPages.com sales representative in which he agreed to purchase YellowPages.com "tile"

ads, at a cost of $309 per month for one year, and a three-page website developed by YellowPages.com personnel, at a cost of $49 per month for one year, for his plumbing business. (Bogan Decl., ¶ 33, Exs. 5-6)

During the conversation – which was recorded[8] – the salesperson does not give a presentation consistent with the scripts offered by Plaintiffs:  there is no "fact-finding" or "needs assessment," and the salesperson does not discuss conversion rates with Kowalski, does not mention the YPClicks! program, and does not conduct an ROI analysis.  (Bogan Decl., ¶ 35; compare Bogan Decl., Ex. 5 (Kowalski Dep.) at 54-96 with Janecek Decl., Ex. 8-9)  In sum, there is no evidence that the salesperson is using one of the scripts offered by Plaintiff – or any other script – in his conversation with Kowalski.

Kowalski agreed during the call to purchase the products listed above, and he was later sent the Terms and Conditions by fax.  (Bogan Decl., Ex. 6)  A few days later, Kowalski informed Defendant by telephone and fax that he wished to cancel his order.  (Bogan Decl., Ex. 7)  Kowalski never made any payment to YellowPages.com in connection with his order. (Bogan Decl., ¶ 38)  Defendant subsequently initiated collection proceedings against Kowalski to recover $3,708.91.  (Janecek Decl., Ex. 45)

**B.**     **Michelle Winick**

In August 2009, Craig De Vito, a YellowPages.com sales representative, met with Plaintiff Winick, an interior designer, at her studio on at least two occasions.  (Bogan Decl., ¶ 39) At the second meeting, Winick decided to purchase a listing on YellowPages.com, and she signed an electronic order form.  The cost of the product was $101 per month for one year.  (Id.)

---

[8]  The audio recording of the conversation was played during Kowalski's deposition and was transcribed at that time.  (See Bogan Decl., ¶ 33, Exh. 5)

At her deposition, Winick testified that De Vito asked her, if "ten people went to my website, how many of them would you like for them to call you or use your services." (Bogan Decl., Ex. 8 (Winick Dep.) at 100)  She also testified that De Vito conducted an ROI analysis at their meeting.  (Id. at 98)

De Vito claims that he did not use a scripted presentation when speaking with Winick, and that he "never used" and had "never seen" the ROI spreadsheet containing the 74% statistic.  He has also testified that he believes that Winick has confused the YPClicks! product with the product she actually agreed to purchase.  (Bogan Decl., Ex. 16 (De Vito Decl.) at ¶¶ 5, 12, 16)

The parties dispute whether De Vito gave Winick a hard copy of the Terms and Conditions at the time she signed the order form.  Winick testified that at the time she signed the contract, she had not yet seen the Terms and Conditions; the first time she saw the Terms and Conditions was when they were emailed to her after she signed the order form.  (Bogan Decl., Ex. 8 (Winick Dep.) at 47-48)  De Vito claims that Winick had an opportunity to scroll through the Terms and Conditions in the online contract that she signed, and that he gave her a hard copy of the Terms and Conditions at her studio.  (Bogan Decl., Ex. 16 (De Vito Decl.) at ¶ 8)  Winick paid for all YellowPages.com services for which she was billed.  (FAC, ¶ 72)

C.   **Michael Gidro**

In July 2008, Michael Gidro agreed to advertise with YellowPages.com after two meetings with YellowPages.com representative Cheryl D'Elia.  (Bogan Decl., ¶ 43)  Gidro agreed to purchase a priority local listing in Bergen County, New Jersey, at a rate of $328 per month, a 3-page website at a rate of $49 per month, and the 360-click YPClicks! package, at $90 per month.  (Bogan Decl., Ex. 51)

Gidro testified that D'Elia used the terms "local" and "targeted" when discussing the YPClicks! product, and that they discussed an "expected return" of clicks.  (Bogan Decl., Ex. 10 (Gidro Dep.) at 189, 118)  D'Elia maintains that she did not use a script in her meetings with Gidro, and that she has "never used [an ROI] spreadsheet in any sales meeting."  (Bogan Decl., Ex. 15 (D'Elia Decl.) ¶¶ 7, 12)

On September 15, 2008, Gidro signed an "insertion order" on D'Elia's laptop.  (Bogan Decl., Ex. 10 (Gidro Dep.) at 83-84)  D'Elia later emailed a corrected contract to Gidro that included the Terms and Conditions.  (Id. at 88-91; Bogan Decl., ¶ 109)  Gidro returned a signed copy of the corrected contract to YellowPages.com on September 17, 2008.  (Bogan Decl., ¶ 45, Ex. 51)

In the fall of 2008, Gidro began complaining to D'Elia that he was not seeing the results he had anticipated.  (Bogan Decl., Ex. 10 (Gidro Dep.) at 109-10)  Gidro did, however, make every required payment under the contract.  (Id. at 135)

## IV.   PROCEDURAL HISTORY

Plaintiffs initially filed this action in New Jersey state court on April 7, 2009, with Mr. Kowalski seeking to serve as the representative of a nationwide class.  (See Dkt. No. 1)  On May 18, 2009, YellowPages.com removed the action to the District of New Jersey.  (Dkt. No. 1)  On November 6, 2009, an Amended Complaint was filed naming Winick and Gidro as additional class representatives, and narrowing the class to New Jersey advertisers.[9]  (Dkt. No. 16)  On February 16, 2010, YellowPages.com moved to transfer this action from the District of New

---

[9]  In January 2010, Plaintiffs' counsel re-filed a nationwide class action against YellowPages.com in the Southern District of California styled Herman v. YellowPages.com, LLC.  The Herman case was consolidated with another nationwide class action filed in California, Prime Equity Holdings, Inc. v. YellowPages.com, LLC and AT&T Inc.  Herman and Prime Equity have since been transferred to this Court.  (11-cv-2197, Dkt. No. 66; 11-cv-2196, Dkt. No. 18)

Jersey to this Court, based on a New York forum selection clause in the Terms and Conditions. (Dkt. No. 23; <u>see</u> FAC, Ex. B)  Defendant's transfer motion was granted on September 22, 2010. (Dkt. No. 64)

Class certification discovery was conducted both before and after the transfer of this action to this Court.

## DISCUSSION

### I.   PLAINTIFFS' MOTION TO STRIKE

#### A.   Lee Disclosure

Plaintiffs move to strike Defendants' Rule 26(a)(2)(C) Disclosure for Jacob Lee (the "Lee Disclosure"), which Defendants submitted as Exhibit 32 in opposition to the class certification motion.  Plaintiffs argue that the Lee Disclosure is "nothing more than a statement by counsel as to what counsel proposes Mr. Lee will testify to," and that it should not be considered in connection with Plaintiffs' class certification motion.  (Pltf. Mot. to Strike at 1)

Defendant uses the Lee Disclosure to rebut certain assertions made by Plaintiffs' expert Peter Kent concerning the efficacy of Defendant's geo-targeting and whether Defendant's service appropriately targets local users.  Citing the Lee Disclosure, Defendant argues that "any determination as to the efficacy of a particular combination of geo-targeting and keyword choice would require an account-by-account review."  (Def. Class Cert. Br. at 13 (citing Bogan Decl. ¶ 63 (citing Lee Disclosure ¶ 10))).

"The purpose of Rule 26 disclosures is to alert the opposing party that the witness may be called to support the party's claims and further, that the opposing party may need to take discovery from that named witness."  <u>Media Alliance, Inc. v. Mirch</u>, No. 09–CV–0659 (MAD), 2012 WL 162375, at *3 (N.D.N.Y. Jan. 19, 2012)  As Rule 26(a)(2)(C) disclosures are not

themselves evidence, the Lee Disclosure will be disregarded.  The disclosure is – as Plaintiffs

point out – no more than a statement by defense counsel as to what Lee's testimony is expected

to be.

        Plaintiffs' motion to strike the Lee Disclosure will be granted.

       **B.**      **Kenneth Wise Report**

        Plaintiffs also move to strike the testimony and expert report of Dr. Kenneth Wise

(Bogan Decl., Exs. 52-53; <u>see</u> Pltf. Mot. to Strike at 8), arguing that because Defendant does not

rely on this evidence in its opposition to the class certification motion, it is irrelevant and should

be struck.  (Pltf. Mot. to Strike at 8).  Because this Court has not relied in any fashion on Dr.

Wise's testimony or expert report in connection with resolving the class certification motion,

Plaintiff's motion to strike his testimony and report will be denied as moot.

**II.**      **DEFENDANT'S MOTION TO STRIKE**

        YellowPages.com moves to strike alleged new evidence and arguments presented

in connection with Plaintiffs' class certification reply brief, or, in the alternative, requests leave

to file a sur-reply.  With their reply, Plaintiffs submitted (1) declarations from three of

Defendant's former employees (Pearlman Decl., Exs. 64-66), and (2) what appear to be three

additional YellowPages.com sales aids.  (<u>Id</u>., Exs. 56, 57, 59)  Plaintiffs argue that they

submitted the new declarations and exhibits to rebut the declarations of ten previously

undisclosed YellowPages.com representatives that were submitted by Defendant in opposition to

Plaintiffs' class certification motion.  (Pltf. Opp. to Def. Mot. to Strike at 1-2)

        "Arguments made for the first time in a reply brief need not be considered by a

court," of course.  <u>Playboy Enterprises, Inc. v. Dumas</u>, 960 F.Supp. 710, 720 n. 7 (S.D.N.Y.

1997).  Moreover, "'[w]here new evidence is presented in a party's reply brief or affidavit in

further support of its [] motion, the district court should permit the nonmoving party to respond to the new matters prior to the disposition of the motion.'" Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 945 F.Supp. 693, 708 (S.D.N.Y.1996) (quoting Litton Indus. v. Lehman Bros. Kuhn Loeb Inc., 767 F.Supp. 1220, 1235 (S.D.N.Y.1991), rev'd on other grounds, 967 F.2d 742 (2d Cir.1992)).  "'However, this broad language is tempered by the principle that 'reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party.'"  Id.  "Further, the argument favoring a surreply submission is less compelling where the reply brief, in responding to the opposition brief, 'does not spring upon [the opposing party] new reasons for [granting the motion].'"  Id.

　　　　The new declarations from the former YellowPages.com employees do not "spring upon" Defendant new arguments in favor of granting class certification.  Instead, they contain essentially the same assertions found in declarations from other former employees that Plaintiffs submitted with their original moving papers.  The variations are not significant.  For example, while Noel Saunders asserts in his declaration that he and other employees kept the sales script after sales training (Pearlman Decl., Ex. 65 (Saunders Decl.) at ¶ 7), Plaintiffs have already introduced evidence that "[a]ll salespeople used the script provided by YellowPages.com in the field when pitching products to potential customers."  (Janecek Decl., Ex. 22 (Gillaspy Decl.) at ¶ 7).  Similarly, while Jim Rossmiller states that he used an ROI analysis for both YPClicks! and the online directory product (Pearlman Decl., Ex. 66 (Rossmiller Decl.) at ¶ 15), the Gillaspy Declaration submitted in connection with Plaintiffs' moving papers asserts that "[e]very sales presentation given by a YellowPages.com sales representative was to utilize[] a return on investment ('ROI') analysis."  (Janecek Decl., Ex. 22 (Gillaspy Decl.) at ¶ 10).  Finally, while Rossmiller and Saunders assert that YellowPages.com salespeople told customers

that 74% of the searches on YellowPages.com produced a contact with a listed merchant (Pearlman Decl., Ex. 65 (Saunders Decl.) at ¶ 9; Ex. 66 (Rossmiller Decl.) at ¶ 14), the Gillaspy Declaration asserts that "[i]n conducting the ROI with customers, YellowPages.com premises sales[people] used the statistic from the Morpace study which indicated that 74% of searches made on the YellowPages.com entire distribution network resulted in a contact to a merchant." (Janecek Decl., Ex. 22 (Gillaspy Decl.) at ¶ 13).  In short, the new declarations do not contain materially different information from what Plaintiffs submitted with their moving papers. Defendant's motion to strike the new declarations will be denied.

As to Plaintiffs' Exhibits 56, 57, and 59, Defendant acknowledges that it produced these documents during discovery; therefore they were not "sprung upon" the Defendant for the first time in the reply brief.  (Def. Mot. to Strike Br. at 2)  The Court has not relied on these exhibits in resolving the class certification motion, however, because Plaintiffs have not demonstrated that these documents were used in sales training or in the field.  (See Pearlman Decl., ¶ 11)  Accordingly, YellowPages.com's motion to strike Plaintiffs Exhibits 56, 57 and 59 will be denied as moot.

### III.   CLASS CERTIFICATION[10]

#### A.   Applicable Law

##### 1.   Rule 23(a) and (b)

"[Federal Rule of Civil Procedure] 23(a) sets forth the requirements for class certification and requires a potential class representative to show:  (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).  "If those criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 222 (2d Cir. 2008), partially abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008).  Here, Plaintiffs argue that their proposed class can be maintained under Rule 23(b)(3).[11]

---

[10]  The Terms and Conditions contain a "class action waiver" clause providing that "[a]ny claim against [YellowPages.com] arising from this Agreement shall be adjudicated on an individual basis, and shall not be consolidated in any proceeding with any claim or controversy by any other party."  (FAC, Ex. B)  The parties dispute whether this waiver is enforceable.  Plaintiffs cite case law (see Pltf. Class Cert. Reply Br. 20) indicating that New Jersey courts refuse to enforce class action waivers "'when the waiver is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages.'" Homa v. Amer. Ex. Co., 558 F.3d 225, 230 (3d Cir. 2009) (quoting Muhammad v. County Bank of Rehoboth Beach, De., 912 A.2d 88, 99 (N.J. 2006) (emphasis in original)).  Defendant cites case law indicating that the individual claims here are large enough to warrant individual adjudication, and much larger than the $600 at stake in Muhammad.  (Def. Class Cert. Br. at 34 n.69).  Because this Court finds that the proposed class does not meet the requirements for certification under Rule 23, it does not reach the question of whether the class action waiver provision is enforceable.

[11]  The FAC "seeks certification under Fed. R. Civ. P. 23(b)(2) for injunctive and equitable relief and [under Rule 23](b)(3) for damages."  (FAC, ¶ 115)  While Plaintiffs assert in their moving papers that "both Rule 23(b)(2) and (3) are satisfied" (Pltf. Class Cert. Br. at 14), they did not

"In order to qualify for class certification under Fed. R. Civ. P. 23(b)(3), plaintiffs in the proposed class must first demonstrate that they satisfy the four requirements of Fed. R. Civ. P. 23(a). . . . If these criteria are met, the court must decide whether questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and whether a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002) (internal quotation marks omitted).  The Rule 23(b)(3) "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997).

"[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met."  In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006).  "[S]uch determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement."  Id.  "A motion for class certification should not, however, become a mini-trial on the merits."  Katz v. Image Innovations Holdings, Inc., No. 06 CIV. 3707 (JGK), 2010 WL 2926196, at *2 (S.D.N.Y. July 22, 2010) (citing Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974)).

"The dispositive question is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  Lewis Tree Service, Inc. v. Lucent Technologies, 211 F.R.D. 228, 231 (S.D.N.Y. 2002) (citing Eisen,

---

brief the issues under Rule 23(b)(2).  Defendant argues that, in not briefing the equitable relief class certification issue, Plaintiffs abandoned this claim.  (Def. Class Cert. Br. at 24)

Because certification under Rule 23(b)(2) is appropriate only where "the moving party has carried its burden on the Rule 23(a) requirements," Edwards v. Publishers Circulation Fulfillment, Inc., 268 F.R.D. 181, 189 (S.D.N.Y. 2010), and this Court concludes that Plaintiffs have not met their burden under Rule 23(a), it is not necessary for this Court to resolve whether Plaintiffs abandoned their Rule 23(b)(2) argument by failing to brief it in their moving papers.

417 U.S. at 178 (citing Miller v. Mackey Int'l, 452 F.2d 424, 427 (5th Cir. 1971)).  "The Rule 23 requirements must be established by at least a preponderance of the evidence."  Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010) (citation omitted).  "A party seeking class certification must affirmatively demonstrate his compliance with the Rule. . . ."  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).

### 2.    New Jersey Consumer Fraud Act

Plaintiffs seek damages and equitable relief for violation of the NJCFA.  "The NJCFA provides protection to consumers from 'fraudulent practices in the marketplace.'"  Smith v. Trusted Universal Standards in Elec. Transactions, Inc., No. 09-4567 (RBK/KMW), 2011 U.S. Dist. LEXIS 26757, at * 39 (D.N.J. Mar. 15, 2011) (quoting Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 440 (N.J. 2004)).  "Under the NJCFA, '[a] consumer who proves (1) an unlawful practice, (2) an "ascertainable loss," and (3) "a causal relationship between the unlawful conduct and the ascertainable loss," is entitled to legal and/or equitable relief, treble damages, and reasonable attorneys' fees.'"  Id. (quoting Lee v. Carter-Reed Co., LLC, 4 A.3d 561, 576 (N.J. 2010)).  "The NJCFA defines an unlawful practice as 'any unconscionable commercial practice, deception, fraud, false pretense, false promise, [or] misrepresentation . . . in connection with the sale or advertisement of any merchandise. . . .'"  Id. at *40 (quoting N.J. Stat. Ann. 56:8-2).  Ascertainable loss is one that is "quantifiable or measurable."  Id. at *41.

Claims under the NJCFA do not require proof of reliance.  See Lee, 4 A.3d at 580.  "[I]t is the 'capacity to mislead' which is at the heart of the definition of an 'unlawful practice.'"  Miller v. Am. Family Publishers, 663 A.2d 643, 647 (N.J. Super.Ch. 1995) (citations omitted).  "A practice can be unlawful 'even if no person was in fact misled or deceived thereby.'"  Id. (citations omitted); see also Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J.

1994) ("A practice can be unlawful even if no person was in fact misled or deceived thereby.");

Barry v. Arrow Pontiac, Inc., 494 A.2d 804, 810 (N.J. 1985) (the question is "whether the ad

itself is misleading to the average consumer, not whether it can later be explained to the more

knowledgeable, inquisitive consumer").  Moreover, "[b]ecause it is 'remedial legislation,' the

[NJ]CFA is 'construe[d] liberally to accomplish its broad purpose of safeguarding the public.'"

Lee, 4 A.3d at 577 (quoting Furst, 860 A.2d at 441).

### B.   Discussion

In their motion for class certification, Plaintiffs contend that all named Plaintiffs

and putative class members "purchased listings on YellowPages.com after being informed that

the listing was supposed to substantially increase web-traffic," and that "[m]any of the class

members also purchased Defendant's guaranteed clicks product."  (Pltf. Class Cert. Br. at 1)

They argue that Defendant's products produced far fewer clicks than had been represented, and

that the clicks that the products did produce were not "local" or "targeted."  Plaintiffs describe

Defendant's alleged fraudulent conduct as follows:

> Plaintiffs charge that two discrete frauds were perpetrated in the sale of Defendant's
> products.  The first is in inducing the business relationship itself through fraudulent
> misrepresentations and omissions as to the nature and quality of the services Defendant
> was supposed to provide.  See generally FAC, ¶¶ 12-50.  The second is in
> misrepresenting – indeed secreting – material terms of the agreement itself.  See
> generally FAC, ¶¶ 51-63.

(Id.)

Plaintiffs contend that "[c]lass treatment is appropriate because plaintiffs and their

class members were each subjected to the same uniform sales pitch, delivered by highly trained

salespeople, using a memorized script. . . . Similarly, the salespeople were trained not to provide

or show the terms and conditions until after a signature was obtained."  (Id. at 2)

In opposing Plaintiffs' class certification motion, Defendant argues that each named representative "faces unique challenges to their standing, adequacy, and typicality."  (Def. Class Cert. Br. at 1)  Defendant also contends that the evidence shows that "sales representatives engaged in highly-individualized sales presentations, in which the alleged misrepresentations were not made; did not influence the advertiser's purchasing decision; and had no bearing on the efficacy of the advertising created for each customer."  (Id.)

The Court considers below the Rule 23(a) requirements.

### 1.   Numerosity

The numerosity requirement of Rule 23(a)(1) is satisfied here, given that YellowPages.com's database shows that the Company received approximately 11,700 orders for internet advertising products from New Jersey-based individuals and entities between May 1, 2005 and January 2010.  (Janecek Decl., ¶ 3, Ex. 1 (Boehret Dep.) at 74-83)  See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir.1995) ("[N]umerosity is presumed at a level of 40 members.").

### 2.   Commonality

To satisfy the commonality requirement of Rule 23(a)(2), there must be "a showing that common issues of fact or law exist and that they affect all class members."  Leone v. Ashwood Fin., Inc., 257 F.R.D. 343, 351 (E.D.N.Y. 2009) (citing Vengurlekar v. Silverline Tech., Ltd., 220 F.R.D. 222, 227 (S.D.N.Y. 2003)).

"The commonality standard does 'not mandate that the claims of the lead plaintiff be identical to those of all other plaintiffs.'"  Charron v. Pinnacle Group N.Y., LLC, 269 F.R.D. 221, 230 (S.D.N.Y. 2010) (quoting Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 176 (S.D.N.Y.2008)).  However, it "'require[s] that plaintiffs identify some unifying thread among

the members' claims that warrant[s] class treatment.'"  <u>Damassia v. Duane Reade, Inc.</u>, 250

F.R.D. 152, 156 (S.D.N.Y.2008) (quoting <u>Bolanos v. Norwegian Cruise Lines Ltd.</u>, 212 F.R.D.

144, 153 (S.D.N.Y.2002)).  "The commonality requirement may be satisfied where plaintiffs'

various alleged injuries 'derive from a unitary course of conduct by a single system.'"  <u>Charron</u>,

269 F.R.D. at 221 (citing <u>Marisol A. v. Giuliani</u>, 126 F.3d 372, 376-7 (2d Cir.1997).  "Where

plaintiffs allege that class members have been injured by similar material misrepresentations and

omissions, the commonality requirement is satisfied."  <u>In re Alstom SA Sec. Litig.</u>, 253 F.R.D.

266, 273 (S.D.N.Y. 2008).

      Plaintiffs argue that there are many common questions of fact and law that apply

to each member of the putative class.[12]  The Supreme Court has recently instructed lower courts,

however, that "[w]hat matters to class certification . . . is not the raising of common questions . . .

but, rather the capacity of a classwide proceeding to generate common answers apt to drive the

---

[12]  According to Plaintiffs, the common questions include:

- Does Defendant use a uniform scripted presentation to sell its products?
- Does the scripted sales pitch contain material misrepresentations or omissions?
- Do the written sales materials contain material misrepresentations or omissions?
- Does use of the New York Designated Market Area ("DMA") provide "local, targeted and qualified" clicks?
- Does the uniform presentation used by Defendant have the capacity to mislead?
- Is there a valid contract between Defendant and the Class Members where the Terms and Conditions are not provided to the Class Members until after they purportedly have given their assent to the Order?
- Do defendants perform the technical functions as represented and whether the functions performed are in accordance with industry standards?
- Does Defendant's conduct constitute a breach of that contract?
- Does Defendant's conduct violate the NJCFA?
- What are the proper remedies for Defendant's improper conduct?

(Pltf. Class Cert. Br. at 15-16)

resolution of the litigation." <u>Dukes</u>, 131 S.Ct. at 2551; <u>see also</u> <u>Public Employees' Retirement</u>

<u>System of Mississippi v. Goldman Sachs Group, Inc.</u>, No. 09 CV 1110(HB), 2012 WL 336146

(S.D.N.Y. Feb. 3, 2012).

      Here, as discussed below, the answers to the common questions posed by

Plaintiffs will vary widely, because they turn on the oral representations made to each putative

class member, the particular products purchased, the nature of the advertiser's business, and the

advertiser's experience with the product or group of products purchased.[13]  Moreover, Plaintiffs'

commonality arguments are significantly undermined by their failure to offer any evidence that

scripted presentations – the alleged "unifying thread" here – were in fact made to the New Jersey

customers who make up the putative class.

      "In <u>Dukes</u>, the Supreme Court reversed the certification of a class of current and

former female employees of Wal–Mart . . . on the ground that the class proponents had failed to

establish the requirement of commonality." <u>Oakley v. Verizon Communications Inc.</u>, No. 09

Civ. 9175(CM), 2012 WL 335657, at * 13 (S.D.N.Y., Feb. 1, 2012)  In doing so, the Supreme

Court made clear that the commonality requirement is not satisfied merely by assertions that

numerous victims suffered from a violation of the same law committed by employees of the

same company:

      Title VII, for example, can be violated in many ways – by intentional
      discrimination, or by hiring and promotion criteria that result in disparate impact,

---

[13] Defendant incorrectly argues that "the understanding and sophistication of the advertiser hearing the alleged misrepresentation" matters as well under the NJCFA.  (Def. Class Cert. Br. at 28 n. 60)  "[I]t is the 'capacity to mislead' which is at the heart of the definition of an 'unlawful practice'" under the NJCFA, however.  <u>Miller v. Am. Family Publishers</u>, 663 A.2d 643, 647 (N.J. Super. Ch. 1995) (citations omitted).  "A practice can be unlawful 'even if no person was in fact misled or deceived thereby.'"  <u>Id.</u> (citations omitted); <u>Barry v. Arrow Pontiac, Inc.</u>, 494 A.2d 804, 810 (N.J. 1985) (The question is "whether the ad itself is misleading to the average consumer, not whether it can later be explained to the more knowledgeable, inquisitive consumer.").

> and by the use of these practices on the part of many different superiors in a single company.  Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once.

Dukes, 131 S.Ct. at 2551.  See also Oakley, 2012 WL 335657, at * 14 ("That many different Verizon employees were denied FMLA leave, for a variety of reasons under a variety of policies in a variety of locations, does not to make the questions in each class member's case common to the others. . . . In other words, the possibility that the same law was violated in a variety of ways does not lead to the 'common answers' that make class litigation a productive endeavor.")

Here, the possibility that the NJCFA was "violated in a variety of ways does not lead to common answers."  See Oakley, 2012 WL 335657, at *14.  Plaintiffs have not offered sufficient evidence that the sales presentations Defendant's salespeople made to New Jersey customers contained common misrepresentations and omissions.  While it is true that YellowPages.com trains its employees, and until 2009, required that they memorize a sales script during initial training, there is no evidence that a standardized script was used by Defendant's salespeople in New Jersey.  Indeed, all the evidence is to the contrary.

Plaintiffs have not offered testimony from any former or current YellowPages.com employee who sold internet advertising in New Jersey during the relevant time period to corroborate their claim that salespeople in New Jersey used a scripted presentation.  Defendants, in contrast, have offered (1) a tape of the sales presentation to Kowalski (Bogan Decl., Ex. 5 (Kowalski Dep.) at 54-96) – which does not follow the scripts offered by Plaintiffs (Janecek Decl., Ex. 8-9), and (2) declarations from salespeople who sold YellowPages.com products to the two other named plaintiffs, in which they deny that they made a scripted presentation.  (Bogan Decl., Exs. 15-16)  Defendant has also offered a declaration

from the general sales manager responsible for northern New Jersey – Jason Boudreau –

asserting that he has never made a scripted presentation and that none of his salespeople utilize a

script.  Mr. Boudreau explains that

> [s]elling YellowPages.com products and services cannot be done through the use of a
> script.  The products are too varied and the customers we are selling to are too different.
> Each customer demands and expects an individualized meeting that addresses their
> particular needs and concerns.

(Bogan Decl., Ex. 14)

  The taped presentation to Plaintiff Kowalski, and the declarations from the New

Jersey sales representatives, corroborate Boudreau's assertions.  Defendant's arguments on this

point are further supported by declarations from other salespeople and managers confirming that

Defendants' employees did not use scripts in the field, did not make scripted presentations, and

tailored their sales presentations to each individual customer.  (Bogan Decl., Exs. 17-28)  The

declarations from the salespeople and managers corroborate the director of training's testimony

that there is not a "script out there that people should be using," and that "no two sales pitches . .

. really look the same."  (Bogan Decl., Ex. 13 (Quinlan Dep.) at 88-89)

  Assuming <u>arguendo</u> that all YellowPages.com salespeople were trained to

structure the steps of their sales pitch similarly, this does not demonstrate that members of the

putative New Jersey class were subjected to the same alleged fraudulent misrepresentations or

omissions that caused an "ascertainable loss" under the NJCFA.[14]  <u>See</u> <u>McCracken v. Best Buy</u>

---

[14]  In <u>Moore v. PaineWebber, Inc</u>., 306 F.3d at 1255, the Second Circuit noted that in fraud cases
"each plaintiff must prove that he or she personally received a material misrepresentation. . . .
[and] the [predominance] inquiry should remain focused on whether material variations in the
misrepresentations existed."  The Court also stated that

> [t]he absence of uniform written sales scripts and training informs the
> determination whether material variations existed; it does not mandate a particular
> result.  Thus, the fact that sales agents submitted affidavits that they did not

Stores, 248 F.R.D. 162, 168 ("[C]laims that are based on oral communications are generally not amenable to class treatment because individual issues tend to predominate where liability depends on the specific representations made to each plaintiff.")  The experience of each of the named Plaintiffs proves as much.

Lewis Tree Service, Inc. v. Lucent Technologies, 211 F.R.D. 228, is instructive here.  In Lewis Tree, the court denied a motion to certify a nationwide class of individuals who acquired products that allegedly contained defects related to the processing of the date and time on and after January 1, 2010.  The court denied the motion in part because the plaintiffs did not "present[] sufficient factual circumstances to suggest there was a common tactic, means or intention to conceal Y2K defects that was carried out in a uniform manner and that had a similar impact upon class members so as to satisfy the commonality requirement."  Lewis Tree Service, Inc., 211 F.R.D. at 232.

While Plaintiffs have provided some evidence that salespeople were trained in a uniform manner, it is not clear that sales people who sold YellowPages.com products in New Jersey from 2005 to the present were trained to use a script and to use misleading conversion rates and ROI statistics.  In sum, Plaintiffs have not shown by a preponderance of the evidence – as to the putative New Jersey class – that each sales pitch reflected a "common tactic, means, or intention" to defraud customers.

---

participate in training programs or follow scripts, even if uncontroverted, is insufficient to demonstrate by itself that the misrepresentations themselves were not materially uniform.

Id.  While there is evidence here that salespeople underwent centralized training and had access to centralized sales materials, Plaintiffs have not shown that members of the proposed New Jersey class received materially uniform misrepresentations.  The experiences of the named plaintiffs alone show that the alleged misrepresentations, if any, have not been materially uniform.

This Court recognizes, however, that "for the purposes of Rule 23(a)(2) even a single common question will do." Dukes, 131 S.Ct. at 2556 (internal quotations omitted).  The two proposed common questions that are most promising for Plaintiffs – that is, the two common questions that are most likely to lead to a common answer are:  (1) whether or not there is "a valid contract between Defendant and the Class Members where the Terms and Conditions are not provided to the Class Members until after they purportedly have given their assent to the Order?"; and (2) whether Defendant's products "perform the technical functions as represented and whether the functions performed are in accordance with industry standards."  (Pltf. Class Cert. Br. at 15)  Each of these questions will be addressed in turn.

Plaintiffs have offered declarations from former YellowPages.com salespeople who assert that they were "never told to . . . acknowledge the presence of the Terms and Conditions prior to a potential customer signing a contract with YellowPages.com."  (Janecek Decl., Ex. 21-23)  Plaintiffs have also submitted evidence that salespeople were trained to provide customers with a copy of the Terms and Conditions after a customer had signed either electronically or in hard copy at a premises sale, or provided their oral assent on the telephone. (Bogan Decl., Ex. 13 (Quinlan Dep.) at 249-50, 260)  While the Court credits the evidence that Defendant's salespeople were not trained to discuss all of the Terms and Conditions before a signature or oral assent had been obtained, this evidence does not lead to a finding of commonality, because of the varied nature of the individual sales experience, as demonstrated by the named plaintiffs' experiences.

Plaintiff Gidro, for example, had a hard copy of the Terms and Conditions in his possession when he signed the contract governing the services he purchased.  (Bogan Decl., ¶ 109)  De Vito, the sales representative for Plaintiff Winick, states that he gave Winick a hard

copy of the Terms and Conditions and that he made the Terms and Conditions available to her, on his laptop, before she gave her electronic signature.  (Bogan Decl., Ex. 16 (De Vito Decl.) at ¶¶ 7-8)  There is likewise evidence that some of Defendant's salespeople routinely reviewed the Terms and Conditions with their customers before seeking a signature.  (See Bogan Decl., Ex. 22 (Juhasz Decl.) at ¶ 7)  The evidence offered by Plaintiffs and Defendant may reflect regional differences, but given that Plaintiffs have not offered evidence of the sales practices in New Jersey, this Court cannot make a finding that there was a standard practice in New Jersey of withholding the Terms and Conditions from customers.

Moreover, it appears that the "answer" to Plaintiff's question concerning the Terms and Conditions may vary depending on when the customer was solicited.  To the extent that Plaintiffs rely on the "e-signature" process – in which a complete copy of the contract is emailed to a customer after the customer executes an electronic order form – this technology was not implemented in New Jersey until 2008 and would therefore not apply to a large portion of the putative class.  (Bogan Decl., ¶ 110, Ex. 24 (McCaulley Decl.) at ¶ 14)  The class proposed by Plaintiffs would also include customers who had renewed their contracts with Defendant, and would therefore already be in possession of the Terms and Conditions.  Finally, given that Plaintiffs have not demonstrated that a scripted presentation was made to New Jersey customers, it is reasonable to assume that what sales representatives said about the Terms and Conditions varied widely, reflecting customers' questions and the proclivities of each sales person.  (See Bogan Decl., Ex. 22 (Juhasz Decl.) at ¶ 7)  In sum, the question of whether or not there is a valid contract between YellowPages.com and potential class members – because of a failure to provide the Terms and Conditions before obtaining contractual assent – is likely to lead to multiple answers.

As for the question of whether Defendant's products "perform the technical functions as represented and whether the functions performed are in accordance with industry standards," this question will also likely lead to multiple answers.  As an initial matter, members of the proposed class purchased different products that utilize different technology.  The evidence also demonstrates that sales representatives customized their presentations to reflect the customer's business and needs.  (Bogan Decl., Ex. 14)  Accordingly, it seems likely that any discussion of technical functions and capabilities would have been tailored to the customer's business, needs, and goals.  The answer to the question of whether Defendant's products functioned as represented will turn on the oral representations that were made, and will likely vary depending on the size and nature of the business.  Accepting Plaintiffs' contention that Defendant's listing product performed poorly for small businesses offering a common service, larger businesses offering a specialized service – and interested in reaching a potential market as large as the New York's DMA – may believe that Defendant's products performed as represented and in accordance with industry standards.

For all of these reasons, this Court finds that Plaintiffs "have not established the existence of any common questions," Dukes, 131 S.Ct. at 2556-57, and are unable to meet the commonality requirement of Rule 23(a).

### 3.    Typicality

Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  "A plaintiff's claims are typical of the class claims where the plaintiff's and the class members' injuries derive from a unitary course of conduct by a single system."  MacNamara v. City of New York, 275 F.R.D. 125, 138 (S.D.N.Y. 2011) (internal quotations omitted).  "The commonality and typicality requirements often 'tend

to merge into one another, so that similar considerations animate [the] analysis' of both."  Brown

v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (quoting Marisol A., 126 F.3d at 376).

        Defendant argues that the Rule 23(a) typicality requirement is not met here,

because the three named plaintiffs are improper class representatives.  See Gary Plastic Pkg.

Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)

("[W]hether the issue is framed in terms of the typicality of the representative's claims . . . or the

adequacy of its representation, . . . there is a danger that absent class members will suffer if their

representative is preoccupied with defenses unique to it.")  Defendant asserts that (1) Kowalski

did not pay for his advertising products, and therefore cannot establish standing under the

NJCFA because he did not suffer an "ascertainable loss"; (2) Winick disavowed any claim for

compensatory damages during her deposition; and (3) although Gidro paid for his advertising,

his claims are subject to a unique voluntary payment defense.

        "While the 'mere existence of individualized factual questions' as to the claims of

the class representatives will not bar class certification, the Court may deny certification where

the class representatives are subject to unique defenses which threaten to become the focus of the

litigation."  In re Avon Sec. Litig., No. 91 Civ. 2297 (LMM), 1998 U.S.Dist. LEXIS 18642, at

*18 (S.D.N.Y. Nov. 30, 1998) (citations omitted). "However, this rule is not 'rigidly applied in

this Circuit'; rather, 'a representative may satisfy the typicality requirement even though that

party may later be barred from recovery by a defense particular to him that would not impact

other class members."  Id. (citing Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 201

(S.D.N.Y. 1992); see also In re Frontier Insur. Group Securities Litig., 172 F.R.D. 31, 41

(E.D.N.Y. 1997); Langner v. Brown, No. 95 Civ. 1981 (LBS), 1996 WL 709757, at *3

(S.D.N.Y. Dec. 10, 1996); Shakhnes ex rel. Shakhnes v. Eggleston, 740 F.Supp.2d 602, 625

(S.D.N.Y. 2010) ("The typicality criterion does not require that the factual predicate of each claim be identical to that of all class members. . . ." (citations omitted))  "[T]he typicality requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  Duling v. Gristede's Operating Corp., 267 F.R.D. 86, 96 (S.D.N.Y. 2010) (citations omitted).

Given this Circuit's practice of finding typicality even where a named plaintiff may later be barred from recovery, Defendant's arguments are not persuasive here.  However, as discussed above, Plaintiffs have not established that the "same unlawful conduct was directed at or affected both the named plaintiff[s] and the class sought to be represented."  Robidoux, 987 F.2d at 936-37.  Assuming arguendo that Plaintiffs have established that some putative class members may have heard misrepresentations or omissions that violated the NJCFA, there are far too many variations in the fact patterns of individual YellowPages.com customers to meet the typicality standard.

There are multiple products at issue here, with multiple alleged misrepresentations relating to particular products at different times.  The central allegation in the FAC and the class certification motion – that Defendant's salespeople used a common script rife with the same misrepresentations and omissions – is refuted by the experience of the named plaintiffs.  Plaintiffs have not met their burden of demonstrating typicality.[15]

---

[15]  In Dukes, the Supreme Court noted that the commonality and typicality requirements "'tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.'"  Dukes, 131 S.Ct. at 2551 n. 5 (quoting General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 157-58, n. 13 (1982)).  Because Plaintiffs have failed to meet the commonality and typicality requirements, "it is unnecessary to resolve whether [they] have satisfied the . . . adequate-representation requirements of Rule 23(a)."  Id.

### 4.      <u>**Predominance**</u>

As noted above, Plaintiffs must also meet the requirements of Rule 23(b)(3) to prevail on their class certification motion.  Rule 23(b)(3) requires that this Court find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance requirement is "more demanding than the commonality requirement," <u>McCracken</u>, 248 F.R.D. at 167, and it requires plaintiffs to "'establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof.'"  <u>MacNamara v</u>, 275 F.R.D. at 139 (quoting <u>Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.</u>, 502 F.3d 91, 107-08 (2d Cir. 2007)).  Because this Court finds that the proposed class cannot meet the commonality requirement, <u>a fortiori</u> the proposed class fails the predominance test.

*      *      *      *

"A district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met."  <u>In re Initial Pub. Offering Sec. Litig.</u>, 471 F.2d 24, 41 (2d Cir. 2006).  Here Plaintiffs have not met their burden.  Accordingly, their motion for class certification will be denied.

35

## CONCLUSION

For the reasons stated above, Plaintiffs' motion to strike (Dkt. No. 106) is granted

in part and denied in part; Defendant's motion to strike (Dkt. No. 111) is DENIED; and

Plaintiffs' motion for class certification (Dkt. No. 93) is DENIED.  The Clerk of the Court is

directed to terminate the motions (Dkt. Nos. 93, 106, 111).

Dated: New York, New York
　　　　March 31, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge